IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DELANO HALE, | ) | CASE NO. 1:18-cv-504 |
| | ) | |
| | ) | |
| Petitioner, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| WARDEN TIM SHOOP, | ) | AND ORDER |
| | ) | |
| | ) | |
| Respondent. | ) | |

## INTRODUCTION

Petitioner Delano Hale ("Hale" or "petitioner") was convicted and sentenced to death in the Cuyahoga County Common Pleas Court for the aggravated murder of Douglas Green. Hale filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentences. (Doc. No. 13.[1]) He later amended his twenty-sixth ground for relief. (Doc. No. 24-1.) Respondent Warden Timothy Shoop ("Shoop" or "respondent") filed a return of writ to the petition and amended claim. (Doc. Nos. 17, 28.) Hale filed a traverse (Doc. No. 31), and respondent filed a sur-reply. (Doc. No. 33.) For the reasons stated below, Hale's petition (including the amended twenty-sixth ground for relief) is DENIED.

## FACTUAL HISTORY

The Ohio Supreme Court set forth the following facts underlying Hale's convictions:

> {¶ 1} On June 21, 2004, defendant-appellant Delano Hale Jr. killed Douglas Green by firing four bullets into his head. He then stole Green's Visa card and SUV. Hale was convicted of aggravated murder with an aggravated-robbery specification and was sentenced to death.

---

[1] For ease of reference and the convenience of the reader, record citations will be made to document number rather than document title.

{¶ 2} In 2003, Hale was released from prison after serving 12 years of a sentence for aggravated robbery and carrying a concealed weapon. At first, he lived with his father, but left in February 2004. That same month, he obtained a telemarketing job with a base pay of $7.64 per hour. On March 9, 2004, Hale told his sister Lashayla that he had a gun.

{¶ 3} By June 2004, Hale was in financial difficulty. His bank account had a negative balance during all of June 2004. On June 8, he moved into Room 260 of the Lake Erie Lodge, a motel in Euclid. He initially rented the room for a week. He renewed his stay for another week on June 15, renewed for a single night on June 22, and checked out on June 23.

{¶ 4} On June 23, 2004, an employee of the lodge found a human corpse wrapped in plastic garbage bags in Room 231, a vacant room being used for storage. He notified the management, who summoned the police. The body was identified as that of Douglas Green, a local voice teacher, professional singer, and music producer.

{¶ 5} An autopsy disclosed that Green had been shot four times in the right side of the head. Two shots went into Green's right ear, one entered his skull directly behind the ear, and one entered about two and one-half inches behind the ear. Three of the four shots entered Green's brain. Any one of these three wounds would have immediately stopped any voluntary movement on Green's part. Three of the wounds were contact wounds, meaning that the shots were fired from no more than an inch away. Gunshot residue was found on Green's right hand, but not his left, an indication that Green's right hand was in close proximity to the gun when it was fired.

{¶ 6} Green's bank statement shows that at 12:07 p.m. on June 22, 2004, a person using Green's Visa card made a $55.15 purchase at a Giant Eagle store in Willoughby Hills. Giant Eagle records show that the purchaser bought garbage bags, cleaning supplies, beer, and cigarettes in that transaction. Green did not smoke or drink beer. The purchaser also used a Giant Eagle discount card registered to Hale's sister and deceased mother.

{¶ 7} Hale's friend James Hull saw Hale driving a Explorer SUV on two occasions after Green's murder, including on June 23, 2004, when Hull helped Hale move out of the lodge. Hull later identified photographs of Green's SUV as the one Hale had been driving.

{¶ 8} On June 28, 2004, at 2:30 p.m., Detective Sergeant Robert Pestak of the Euclid police found Hale inside Green's Ford Explorer SUV, parked near Hale's workplace in Cleveland. Pestak, supported by Cleveland police units, arrested Hale.

{¶ 9} When told that he was being arrested for Green's murder, Hale said, "I didn't kill anybody." Sergeant Pestak administered *Miranda* warnings to Hale. While being led to a cruiser, Hale again said, "I didn't kill anybody."

{¶ 10} Hale was taken to the Euclid police station and placed in a cell. After approximately five hours, Hale was removed from the cell and brought to the detective bureau. There, Detective Sergeant James Baird completed a personal-information form on Hale and presented it to Hale for his signature. Hale signed the form using his left hand, but Baird noted that Hale had difficulty writing with that hand.

{¶ 11} Baird then administered *Miranda* warnings to Hale. Hale signed a *Miranda* waiver form, and this time, Hale used his right hand. Baird proceeded to interrogate Hale. During the interrogation, Baird told Hale that Green "was possibly bisexual" and that "if this was a case of self-defense, then that would be understandable if he felt that Mr. Green had attacked him."

{¶ 12} Hale wrote out and signed a four-page statement. In his statement, Hale claimed that he had met Green in May 2004 when Green, identifying himself as a record producer, asked Hale whether he had considered singing professionally and gave Hale his cell-phone number. According to Hale, he later called Green, and Green agreed to go to Hale's motel room to hear him sing.

{¶ 13} According to Hale, they had arranged to meet at the Underground Railroad, a bar near the lodge. Hale claimed that he and Green had met at the Underground Railroad on Monday, June 21, 2004. (However, according to the owner of the Underground Railroad, that establishment was closed on Mondays.) They then went to Hale's room. According to Hale, Green had a small gun in his shoulder bag and displayed it to Hale as they entered the room.

{¶ 14} Hale claimed that he sang for Green, then went to the bathroom. Hale claimed that when he returned, he found Green lying on the bed, nude. Hale told Green to leave. According to Hale, Green grabbed Hale's wrists and "laid his head on [Hale's] crotch" while making "slurping" noises.

{¶ 15} Hale claimed that he then freed his *right* hand, reached into Green's bag, pulled out the gun, held it to Green's head, and cocked it. According to Hale, Green said, "It isn't loaded, so why don't you give me some of that dick."

{¶ 16} Hale fired. Green "reeled back," but still gripped Hale's left wrist, according to Hale. Hale cocked the gun and fired again. He then backed away from Green, took some bullets from Green's bag, and reloaded. According to Hale, Green then tried to stand up. Hale fired "once or twice" more.

{¶ 17} According to Hale, he considered calling an ambulance or the police, but decided not to after he "thought about * * * [his] record" and "the life [he] was attempting to build." Instead, he disposed of the gun and Green's belongings. Then he went out to buy cleaning supplies to clean up Green's blood, using Green's credit card because Hale's "funds were low." The next day, he wrapped Green's body in garbage bags, also purchased with Green's credit card, and dragged the body to a storage room.

*State v. Hale*, 892 N.E.2d 864, 877–879 (Ohio 2008).

These factual findings "shall be presumed to be correct," and Hale has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360–361 (6th Cir. 1998).

## PROCEDURAL BACKGROUND

### A.    State-Court Proceedings

#### 1.    Trial

A Cuyahoga County, Ohio, Grand Jury indicted Hale on July 28, 2004, for the aggravated murder of Douglas Green. (Doc. 7-1 at 33-39.[2]) Hale was charged with two counts of aggravated murder, one under Ohio Rev. Code § 2903.01(A) (purposely causing death with prior calculation and design) and the other under Ohio Rev. Code § 2903.01(B) (causing death while committing, or attempting to commit or fleeing immediately after committing or attempting to commit aggravated robbery). (*Id*. at 34-35.) Each aggravated-murder count carried a capital specification for felony murder, alleging murder during an aggravated robbery, as well as firearm, prior-conviction, and repeat-violent-offender specifications. (*Id*.) Hale also was charged with aggravated

---

[2] All references to document page numbers are to the page numbers assigned by the Court's electronic filing system for each document, and not to page numbers assigned by the document's author or the "PageID" numbers.

robbery, tampering with evidence, escape, and having a weapon while under disability. (*Id*. at 36–39.)[3] Hale entered pleas of not guilty to all charges. (*Id*. at 40.)

Hale's trial began on May 9, 2005. (*See* Doc. No. 8-1 (Trial Tr.) at 226.) He was represented by G. Kenneth Mullin and David Magee of the Cuyahoga County Public Defender's Office and Jillian Davis. (*See, e.g.,* Doc. No. 7-1 at 150.)

The jury convicted Hale on all charges and specifications on June 7, 2005. (Doc. No. 7-2 at 182.) On July 5, 2005, Hale entered a plea of guilty to the escape charge and stipulated to the prior conviction underlying the charge of carrying a weapon while under disability. (Doc. No. 8-5 (Trial Tr.) at 787–89.)

The penalty phase of the trial began on June 13, 2005, and three days later, the jury recommended that Hale be sentenced to death. (Doc. No. 7-2 at 213.) On July 18, 2005, the trial court accepted the jury's recommendation and imposed a death sentence on the merged counts of aggravated murder. (*Id*. at 267.) The court also imposed consecutive prison sentences of ten years for the aggravated-robbery charge, with an additional three years for the attached firearms specification, and eight years for the escape charge; and prison sentences of five years each for the tampering-with-evidence and weapons-while-under-disability charges, which were to run concurrently with the murder charges. (*Id*.)

## 2.    Direct Appeal

Hale filed a timely appeal of his convictions and sentences directly to the Ohio Supreme Court. (Doc. No. 7-3 at 5–7.) He was represented by Kelly Culshaw, Ruth Tkacz, and Kimberly

---

[3] The escape count was severed for trial. (Doc. No. 7-2 at 11.)

Rigby of the Ohio Public Defender's Office. (*See id.*) In his merit brief, Hale presented twenty-two propositions of law, stated as follows:

1.  A defendant's right under the Due Process Clause of the Fourteenth Amendment and the Confrontation Clause of the Sixth Amendment are violated when a trial court prohibits defense counsel from reviewing witness statements pursuant to Ohio Criminal Rule 16(B)(1)(g). U.S. CONST. amends. VI[,] XIV.

2.  Hale was sentenced to more than minimum, concurrent sentences by the trial court, despite the fact that the State proves the statutory criteria for increasing the sentence to a jury beyond a reasonable doubt, depriving Hale of his rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the Constitution.

3.  The trial court erred in failing to suppress Hale's statements in violation of his rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, as well as Article 1, §§ 10 and 16 of the Ohio Constitution.

4.  The accused has a right of presence at all critical stages of the trial under the Confrontation Clause and the Due Process Clause. The right of presence is personal to the accused and may only be waived by the accused. U.S. CONST. amends. VI, XIV.

5.  When a trial court *sua sponte* death qualifies a capital jury, but fails to *sua sponte* life qualify that same jury, the defendant is denied his fundamental right to a fair trial in violation of the Equal Protection Clause and the prosecution inures a benefit unfairly denied the defendant in violation of the Due Process Clause. U.S. CONST. amend. XIV.

6.  Ohio's death penalty scheme results in an arbitrary application of punishment in violation of the Eighth Amendment. Furthermore, jurors who consider non-statutory aggravating circumstances at the penalty phase violate the capital defendant's rights to due process and a fair and reliable sentencing hearing. U.S. CONST. amends. VI, VIII, XIV; Ohio CONST. art. I, §16.

7.  When the trial court fails to remove two jurors and denies a challenge for cause for a third juror who are biased in favor of the death penalty, the capital defendant is deprived of his rights as guaranteed by U.S. CONST. amends. V, VIII, and XIV; Ohio CONST. art. I, §§ 9 and 16.

8.    A trial court violates a capital defendant's constitutional rights to a fair trial and due process when it allows the State to violate the rules of discovery, allows misleading, prejudicial evidence and testimony to be introduced during the trial, arbitrarily limits evidence in the defense's case-in-chief, and makes arbitrary evidentiary rulings. U.S. CONST. amends. VI, XIV.

9.    The admission of shocking and graphic photographs into evidence at both phases violated Hale's right to due process when the probative value of the photographs was outweighed by the danger of prejudice, and the photographs were cumulative.

10.    The trial court erred when it allowed unqualified expert witness testimony under Ohio Rule of Evidence 702 and the Fourteenth Amendment to the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution.

11.    When the trial court precludes a capital defendant from presenting relevant mitigation evidence, a capital defendant's rights to a fair sentencing proceeding and individualized sentencing [are violated]. U.S. CONST. amends. VIII, XIV; Ohio CONST. art. I, §§ 9, 16.

12.    The admission of prejudicial and irrelevant evidence during the sentencing phase of Hale's capital trial denied Hale his rights to due process and a reliable determination of his sentence as guaranteed by U.S. CONST. amends. V, VI, VIII, and XIV; Ohio CONST. art. I, §§ 10, 16.

13.    The capital defendant's right against cruel and unusual punishment and his right to due process are violated when the legal issue of relevance is left to the jury regarding sentencing considerations and, the sentencing proceeding creates an unacceptable risk of arbitrary, non-statutory aggravators in the weighing process. U.S. CONST. amends. VIII, XIV. Those same rights are violated when the trial court instructs the jury not to consider relevant mitigating evidence.

14.    Sentencing before a court biased in favor of the death penalty deprived Hale of his due process rights. U.S. CONST. amend. XIV; Ohio CONST. art. I, § 16.

15.    It is constitutional error for the trial court to consider victim impact evidence in capital sentencing in the form of opinions by the victim's family members about the defendant's character and the offense. U.S. CONST. amends. VIII[,] XIV.

16.    When a trial court weighs mitigation evidence separately, relies on an improper expert opinion, diminishes relevant mitigation, and fails to specify

why the aggravating factors outweigh the mitigating circumstances, the capital defendant is deprived of the right to individualized sentencing and of his liberty interest in the statutory sentencing scheme in violation of rights as guaranteed by U.S. CONST. amends. V, VII, XIV; Ohio CONST. art. I, §§ 9[,] 16.

17.    Imposition of costs on an indigent defendant violates the spirit of the Eighth Amendment. U.S. CONST. amends. VIII, XIV; Ohio CONST. art. 1, §§ 10[,] 16.

18.    Delano Hale's sentence of death is inappropriate. His childhood, the circumstances of the offense, which includes inducement, provocation, and duress, remorse, the love and support of his family, and the ability to successfully adjust to a prison sentence, all favor a life sentence. Moreover, Hale's death sentence is not proportionate when compared to other similar offenses.

19.    A capital defendant is denied substantive and procedural due process rights to a fair trial and a reliable sentence when the prosecutor commits acts of misconduct during the capital trial. U.S. CONST. amends. VI, VIII, XIV; Ohio CONST. art. 1, §§ 9, 16.

20.    Hale's right to effective assistance of counsel was violated when counsel's performance was deficient and [Hale] was thereby prejudiced. U.S. CONST. amends. VI, XIV; Ohio CONST. art. I, § 10.

21.    The cumulative effect of trial error renders a capital defendant's trial unfair and his sentence arbitrary and unreliable. U.S. CONST. amends. VI, XIV; Ohio CONST. art. I, §§ 5, 16.

22.    Ohio's death penalty law is unconstitutional. Ohio Rev. Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 do not meet the prescribed constitutional requirements and are unconstitutional on their face as applied to Delano Hale. U.S. CONST. amends. V, VI, VIII, and XIV; Ohio CONST. art. I, §§ 2, 9, 10[,] 16. Further, Ohio's death penalty statute violates the United States' obligations under international law.

(Doc. No. 7-3 at 137–40 (capitalization altered).)

The State filed a responsive brief. (*Id.* at 476–553.)

On April 17, 2008, Hale filed a motion to remand his case to the trial court for resentencing pursuant to a new Ohio Supreme Court case, *State v. Foster*, 845 N.E.2d 470 (Ohio 2006). (Doc.

8

*Id*. at 54–89.) The State filed a reply brief in which it "agree[d] that Hale [would] have to be re-sentenced on counts 3–6[,]" the non-capital offenses. (*Id*. at 92.)

On July 15, 2008, the Ohio Supreme Court affirmed Hale's convictions and sentences and denied his motion to remand for sentencing. *Hale*, 892 N.E.2d 864 (Ohio 2008). Hale moved for reconsideration of the judgment, (Doc. No. 7-3 at 669–97), which the court denied (*id*. at 3).

Hale filed a timely petition for writ of certiorari with the United States Supreme Court. (*Id*. at 717.) The Court declined jurisdiction over the appeal on April 6, 2009. (*Id*. at 718.)

Meanwhile, on September 16, 2008, Hale requested appointment of counsel to file an application for reopening his direct appeal pursuant to Ohio Supreme Court Practice Rule XI, § 6. (*Id*. at 3, 707–13.) That rule permits defendants to request to reopen the direct appeal from a judgment to present claims of ineffective assistance of appellate counsel within ninety days from issuance of the court's direct-appeal mandate, or later for "good cause." *See* Ohio S. Ct. Prac. R. 11.06(A) (the current version of Ohio S. Ct. Prac. R. XI, § 6); *see also State v. Murnahan,* 584 N.E.2d 1204 (Ohio 1992). The court granted the motion and appointed Attorney Dennis Sipe. (Doc. No. 7-3 at 3.) On October 16, 2008, Sipe filed a notice with the Ohio Supreme Court that he had "reviewed the record as it existed before this Court and determined that there exists no irregularities that would raise a genuine issue as to whether appellant received ineffective assistance of counsel." (*Id*. at 714–15.)

### 3.    Post-Conviction Proceedings

While his direct appeal was pending, Hale, now represented by T. Kenneth Lee and Rachel Troutman of the Ohio Public Defender's Office, filed a timely petition for post-conviction relief with the trial court on March 6, 2007. (Doc. No. 7-4 at 60–282.) He raised nineteen grounds for relief:

9

1.    Hale's death sentence is void or voidable because his trial counsel failed to thoroughly investigate and present mitigating evidence. A prison expert was available to testify on Hale's behalf, but his trial counsel failed to procure such an expert. As a result, Hale was denied his constitutional rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. U.S. CONST. amends. V, VI, VIII, XIV; Ohio CONST. art. I[,] §§ 2, 5, 9, 10, 16, 20.

2.    Hale's convictions and sentences are void or voidable because he was denied the effective assistance of counsel during his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984). As a result, he was prejudiced.

3.    Hale's conviction and sentence are void and/or voidable because he was denied the effective assistance of counsel during his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Hale's trial counsel failed to utilize a crime scene expert to present the defense case at Hale's trial. Counsel's performance "fell below an objective standard of reasonableness." . . .  As a result, he was prejudiced.

4.    Hale's death sentence is void or voidable because the trial court's failure to permit defense counsel to participate in the *in[-]camera* inspection of the witness statements and call to the court's attention any perceived inconsistencies denied Delano Hale his rights to confrontation and due process. This inaction violated Hale's rights guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution.

5.    Hale's death sentence is void or voidable because his trial counsel failed to thoroughly investigate and present mitigating evidence. This inaction violated Hale's rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

6.    Hale's conviction is void or voidable because his trial counsel failed to thoroughly investigate and present evidence in his defense. This inaction violated Hale's rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

7.    The death sentence imposed on Hale is void or voidable because he did not receive the effective assistance of counsel during the penalty phase of his capital trial. Defense counsel's failure to present available, relevant, and compelling mitigation evidence to the sentencer prejudiced Hale.

10

8.   Hale's conviction and sentence are void or voidable because his attorneys failed to present evidence to support their argument that the death penalty is applied in an arbitrary and discriminating manner. Hale was denied his right to effective assistance of counsel, due process, and a fair trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 1, 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.

9.   Hale's conviction is void or voidable because his trial counsel failed to use a prison expert during his trial. A prison expert was necessary to support Hale's defense of self-defense. As a result, Hale was denied his constitutional rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. U.S. CONST. amends. V, VI, VIII, XIV; Ohio CONST. art. I[,] §§ 2, 5, 9, 10, 16, 20.

10.  Hale's convictions and sentence are void or voidable because his death sentence was disproportionate to similarly situated capital defendants in Cuyahoga County. As a result, Hale's rights were violated as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and [Sections] 1, 2, 5, 9, 10, 16, and 20 of Article I of the Ohio [Constitution].

11.  Hale's convictions and sentence are void or voidable because the death penalty law permits the imposition of capital punishment in an arbitrary, capricious and discriminatory manner due to the uncontrolled discretion afforded elected county prosecutors in determining when to seek the death penalty. The arbitrary, capricious, and discriminatory application of the death penalty law in Cuyahoga County is obvious from the analysis of that County's indictments and case dispositions. As a result, Hale's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments of the United States Constitution and [Sections] 1,2,5,9, 10, and 16 of Article I of the Ohio Constitution are violated.

12.  Hale's convictions and sentence are void or voidable because the statutory proportionality reporting system for death penalty cases is inaccurately and ineffectively processed in Cuyahoga County, Ohio. Consequently[,] Hale's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and [Sections] 1, 2, 5, 9, 10, and 16 of Article I of the Ohio Constitution are violated.

13.  Hale's conviction and sentence are void or voidable because the death penalty as administered by lethal injection in the state of Ohio violates his constitutional rights to protection from cruel and usual punishment and to due process of law. U.S. CONST. amends. VIII, IX, XIV; Sections 1, 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.; *Ohio Adult Parole*

> *Authority v. Woodard*, 523 U.S. 272 (1998) (five justices holding that that
> the Due Process Clause protects the "life" interest at issue in capital cases).
> Recently, the United States Supreme Court enhanced the capital defendant's
> ability to challenge the lethal injection method of execution in the federal
> courts. *Hill v. McDonough*, No. 05-8794, 2006 U.S. LEXIS 4674 (June 12,
> 2006).

14.   Hale's judgment and sentence are void or voidable because Ohio's
      postconviction procedures do not provide an adequate corrective process,
      in violation of the constitution. U.S. CONST. amends. V, VI, VIII, and XIV;
      Ohio CONST. art. I, §§ 1, 2, 5, 9, 10, 16, and 20.

15.   Hale's sentence is void or voidable because he was denied the effective
      assistance of counsel during the mitigation phase of his capital trial. Defense
      counsel failed to move the trial court for appointment of a cultural expert to
      assist defense preparations at the mitigation phase of Hale's trial. Instead,
      defense counsel relied upon the testimony of a psychologist who lacked the
      necessary experience to adequately convey cultural mitigation evidence to
      the sentencer. . . . As a result, counsel's performance "fell below an
      objective standard of reasonableness." *Strickland v. Washington,* 466 U.S.
      668 (1984); *Ake v. Oklahoma*, 470 U.S. 68 (1985).

16.   Hale's convictions and sentence are void or voidable because his trial
      counsel failed to reasonably investigate, prepare, and present mitigating
      evidence regarding that Hale may have suffered from neurological deficits
      due to his extensive history of alcohol abuse and chemical dependence,
      including his accompanying black-outs. . . . Hale's rights were denied under
      the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States
      Constitution and Sections 2, 5, 9, 10, 16 and 20 of Article I of the Ohio
      Constitution.

17.   The death sentence imposed on Hale is void or voidable because he did not
      receive effective assistance of counsel during the penalty phase of his
      capital trial. Defense counsel's failure to present available, relevant, and
      compelling mitigation evidence to the sentencer prejudiced Hale. At Hale's
      capital trial, defense counsel failed to investigate, prepare and present
      mitigating evidence regarding his character, history, and background—
      namely, Hale's history of substance abuse. This evidence would have given
      his sentencer reasons to spare his life.

18.   The death sentence imposed on Hale is void or voidable because he did not
      receive effective assistance of counsel during the penalty phase of his
      capital trial. Defense counsel's failure to present available, relevant, and
      compelling mitigation evidence to the sentencer prejudiced Hale. At Hale's
      capital trial, defense counsel failed to investigate, prepare and present

mitigating evidence regarding his character, history, and background—namely, how the loss of important influences in his life shaped Hale. This evidence would have given his sentencer reasons to spare his life.

19.    Hale's judgment and sentence are void or voidable because, assuming *arguendo* that none of the grounds for relief in his post-conviction petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions presented in the petition's foregoing paragraphs have been prejudicial and have denied Hale his rights secured by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

(Doc. No. 7-4 at 70, 73, 75, 78, 81, 84, 86, 89, 91, 93, 96, 99, 102, 105, 108, 111, 114, 117, 120 (supporting arguments, legal citations, and  citations to the trial record omitted).) Hale submitted thirty-five exhibits in support of his petition. (*Id.* at 123–282; Doc. No. 7-5 at 1–232.)

After requesting and receiving a sixty-day extension of time, the State filed its opposition to Hale's petition nearly four and one-half years later, on July 7, 2011. (Doc. No. 7-5 at 240–42, 245-73.)[4] Hale moved to strike the State's untimely response. (*Id.* at 276–78.) On July 25, 2011, the trial court denied Hale's motion to strike but granted him sixty days to reply to the State's response (*id.* at 279), which Hale did on September 23, 2011 (*id.* at 280–90). The trial court denied the petition on September 24, 2015, another four years later. (*Id.* at 292–306.)

Hale, now represented by Jessica Carrico and Isa Mauch of the Ohio Public Defender's Office, filed a timely notice of appeal with Ohio's Eighth District Court of Appeals. (*Id.* at 308–09.) In his appellate brief, he presented the following assignments of error, stated as:

1.    The trial court erred by applying the doctrine of res judicata to bar Hale's first through twelfth and fifteenth through nineteenth grounds for relief.

---

[4] The State also filed a motion for a thirty-day extension of time, which apparently was never ruled upon. (*See* Doc. No. 7-5 at 243-44.)

13

2.     The trial court erred in dismissing Hale's post-conviction petition when he presented sufficient operative facts to merit relief or, at a minimum, an evidentiary hearing.

3.     The trial court erred when it failed to rule on Hale's motion for leave to conduct discovery.

4.     The trial court erred when it failed to rule on Hale's motion for funds to employ experts and to conduct expert testing.

5.     The trial court abused its discretion when it denied Hale relief without affording him the necessary due process to meet his burden.

(Doc. No. 7-6 at 78–79.)

The State filed a responsive brief. (*Id*. at 147–89.) The Ohio appellate court affirmed the trial court's judgment on September 15, 2016. *State v. Hale*, No. 103654, 2016 WL 4978449 (Ohio Ct. App. Sept. 15, 2016). Hale moved for reconsideration, which was denied. (Doc. No. 7-6 at 287.)

Hale filed a timely notice of appeal with the Ohio Supreme Court. (*Id*. at 302–04.) In his memorandum in support of jurisdiction, he presented the following propositions of law, stated as:

1.     When a petitioner presents sufficient operative facts to merit relief or, at a minimum, an evidentiary hearing, in a petition for post-conviction relief, the trial court errs in denying the petition.

2.     The doctrine of res judicata does not bar meritorious post-conviction claims that are supported by sufficient evidence *dehors* the records.

3.     When a death-sentenced defendant files a meritorious post-conviction petition, due process, equal protection, the right to counsel, and the freedom from cruel and unusual punishment require that the defendant receive funding for expert assistance and discovery. U.S. CONST. amend[s]. VI, VIII, XIV.

4.     Denying a petitioner relief without affording him the necessary due process is an abuse of discretion and leaves petitioner without a meaningful forum to present his constitutional challenges within Ohio.

(*Id*. at 308.)

14

The State filed a memorandum in response. (*Id*. at 411–50.) The Ohio Supreme Court denied jurisdiction over the appeal on October 11, 2017. *State v. Hale*, 83 N.E.3d 938 (Table) (Ohio 2017).

Hale file a petition for writ of certiorari with the United States Supreme Court on January 5, 2018. (Doc. No. 7-6 at 452.) The Supreme Court denied certiorari on March 5, 2018. *Hale v. Ohio*, 138 S. Ct. 1269 (Mem.), 200 L. Ed. 2d 425 (2018).

### B.    Federal Habeas Proceedings

Hale filed a notice of intent to initiate this habeas action on March 5, 2018. (Doc. No. 1.) He requested appointment of counsel and permission to proceed *in forma pauperis*. (Doc. Nos. 2, 3.) The Court granted the motions and appointed counsel Jordan Berman and Lisa Lagos of the Federal Public Defender's Office for the Southern District of Ohio.

Hale filed his original petition for a writ of habeas corpus on October 10, 2018. (Doc. No. 13.) Respondent filed a return of writ on February 8, 2019.  (Doc. No. 17.)

Hale filed a motion for leave to amend the twenty-sixth ground for relief of his petition on July 8, 2019. (Doc. No. 24.) Respondent filed a response to the motion on August 22, 2019 (Doc. No. 25), to which Hale replied (Doc. No. 26). This Court granted Hale's motion on December 9, 2019. (Doc. No. 27.) On January 7, 2020, Respondent filed an amended return of writ as to the amended twenty-sixth ground for relief. (Doc. No. 28.)

Hale filed his traverse of March 13, 2020. (Doc. No. 31.) Respondent filed a sur-reply on July 13, 2020. (Doc. No. 33.)

Hale filed a motion for discovery on July 13, 2020. (Doc. No. 34.) Respondent opposed the motion on August 12, 2020. (Doc. No. 35), eliciting a reply from Hale on August 26, 2020 (Doc. No. 6). Hale then filed a motion to expand the record the next day, on August 27, 2020 (Doc.

15

No. 37), which Respondent also opposed, on September 25, 2020 (Doc. No. 38). Hale filed a reply on October 9, 2020. (Doc. No. 39.) The Court will address Hale's motions for discovery and to expand the record in Section XVII of this memorandum of opinion and order.

**PETITIONER'S GROUNDS FOR RELIEF**

Hale asserts twenty-seven grounds for relief in his petition (including the amended twenty-sixth ground for relief), stated as:

1.  The fundamentally flawed process used by Cuyahoga County to select members of petit jury venires, and grand juries, deprived Hale of his rights to an impartial jury, a fair trial, due process, equal protection, and the right to be free of excessive punishment under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.

2.  The trial court violated Hale's Sixth and Eighth Amendment rights to a jury trial because it: 1) sua sponte death qualified the jury, but failed to sua sponte life qualify the jury; 2) encouraged consideration of non-statutory aggravating factors; 3) repeatedly informed jurors of incorrect legal standards; 4) failed to remove a juror who expressed racial bias; 5) failed to remove four jurors and denied a challenge for cause to jurors who were biased in favor of the death penalty; 6) improperly excluded prospective jurors. [5]

3.  Hale's right to effective assistance of counsel was violated when counsel's performance in voir dire was deficient and he was thereby prejudiced. [6]

4.  Hale's rights under the Due Process Clause of the Fourteenth Amendment and the Confrontation Clause of the Sixth Amendment were violated when the trial court prohibited defense counsel from reviewing witness statements.

5.  Hale was deprived of his right of presence at all critical stages of the trial, in violation of the Confrontation Clause and the Due Process Clause under the Sixth and Fourteenth Amendments.

6.  The trial court violated Hale's rights guaranteed by the Fifth and Fourteenth Amendments when it failed to suppress his statements to law enforcement.

---

[5] The identifying title for the second ground for relief is omitted from the petition's table of contents.

[6] The identifying title for the third ground for relief is omitted from the petition's table of contents.

7.     Hale was denied his constitutional right to testify on his own behalf. Any presumed waiver was based on threats, coercion and misrepresentations, and therefore not knowing, intelligent, and voluntary as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

8.     The trial court violated Hale's rights under the Fourteenth Amendment of the United States Constitution when it allowed unqualified expert witness testimony.

9.     The admission of shocking and graphic photographs into evidence at both phases violated Hale's right to due process, a fair trial, and a fair and reliable sentencing determination, when the probative value of the photographs was outweighed by the danger of prejudice, and the photographs were cumulative.

10.     Numerous errors at trial violated Hale's constitutional rights to due process and a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution, including the State's violation of the rules of discovery, the admission of misleading, prejudicial evidence and testimony, the placing of arbitrary limits on the evidence in Hale's case-in-chief, and the trial court's multiple arbitrary and unsupported evidentiary rulings.

11.     Hale's right to effective assistance of counsel was denied by counsel's deficient performance during the trial phase of his capital trial in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

12.     The trial court left the legal issue of relevance of trial phase evidence to the jury during the mitigation phase, in violation of Hale's rights to due process and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments.

13.     The trial court precluded Hale from presenting relevant mitigating evidence, in violation of his rights to a fair sentencing proceeding and individualized sentencing under the Eighth and Fourteenth Amendments.

14.     The trial court allowed prejudicial and irrelevant evidence during the sentencing phase of Hale's capital trial, in violation of his rights to due process and a reliable determination of his sentence under the Fifth, Sixth, Eighth and Fourteenth Amendments.

15.     The trial court's consideration, during sentencing in a capital case, of victim-impact evidence in the form of opinions by the victim's family members about the defendant's character and the offense violates the Eighth and Fourteenth Amendments of the United States Constitution.

16.     The trial court deprived Hale of his right to an individualized sentencing and of his liberty interest, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution by committing numerous errors at the mitigation phase of Hale's trial.

17.     Sentencing before a court biased in favor of the death penalty deprived Hale of his due process rights under the United States Constitution.

18.     Hale's right to effective assistance of counsel was denied by counsel's deficient performance during the sentencing phase of trial in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

19.     Hale was sentenced to more than minimum, concurrent sentences by the trial court, despite the fact that the State failed to prove the statutory criteria for increasing the sentence to a jury beyond a reasonable doubt, depriving Hale of his [rights] as guaranteed by the Fifth, Sixth, [a]nd Fourteenth Amendments to the Constitution.

20.     Imposition of costs on an indigent defendant violates the spirit of the Eighth Amendment. U.S. CONST. amends. VIII and XIV.

21.     Prosecutorial misconduct committed throughout his capital trial denied Hale his substantive and procedural due process rights to a fair trial and reliable sentence in violation[] of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

22.     Hale was denied effective assistance of appellate counsel on his sole appeal of right to the Supreme Court of Ohio in violation of the Fifth, Sixth, Eight[h,] [a]nd Fourteenth Amendments.

23.     The State failed to provide trial counsel with exculpatory evidence in violation of the Fourteenth Amendment.

24.     Cumulative error at trial deprived Hale of due process in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

25.     Ohio's death penalty scheme is unconstitutional on its face, and as applied to Hale, under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as violative of the United States' obligations under international law.

26.     Execution by lethal injection as administered by the State of Ohio violates Hale's rights to due process, equal protection, and freedom from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution.

27.     Hale is innocent of the death penalty. But for the constitutional violations
        in this record and the new evidence in this petition, no rational fact finder
        could impose the death penalty.

(*See* Doc. No. 13 at 17-29; Doc. No. 24-1 at 1 (capitalization altered).)

STANDARD OF REVIEW

**A.     AEDPA Review**

Hale's petition for a writ of habeas corpus under 28 U.S.C. § 2254 is governed by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or "Act"). *See Lindh v. Murphy*,

521 U.S. 320, 336, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997) (AEDPA governs federal habeas

petitions filed after Act's effective date). The Act, which amended § 2254, authorizes federal

courts to issue writs of habeas corpus to state prisoners who are "in custody in violation of the

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

At the same time, however, AEDPA was intended "to reduce delays in the execution of

state and federal criminal sentences, particularly in capital cases, and 'to further the principles of

comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206, 123 S. Ct. 1398, 155

L. Ed. 2d 363 (2003) (quoting *M. Williams v. Taylor*, 529 U.S. 420, 436, 120 S. Ct. 1479, 146 L.

Ed. 2d 435 (2000)). The Act "recognizes a foundational principle of our federal system: State

courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19,

134 S. Ct. 10, 187 L. Ed. 2d 348 (2013). It therefore "erects a formidable barrier to federal habeas

relief for prisoners whose claims have been adjudicated in state court." *Id.*

Most significantly, AEDPA forbids a federal court from granting habeas relief with respect

to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court

decision either:

19

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991) (emphasis in original). A state court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning for its decision. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

"[C]learly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). It includes "only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 188 L. Ed. 2d 698 (2014) (internal quotation marks and citations omitted). When identifying what a Supreme Court decision actually holds, courts should not frame the decision "at too high a level of generality." *Woods v. Donald*, 575 U.S. 312, 318, 135 S. Ct. 1372, 191 L. Ed. 2d 464 (2015). Clearly established law under § 2254(d)(1) "squarely addresses" the issue presented or "clearly establishes" a legal rule developed in a

different context applied to the facts of that case. *Wright v. Van Patten*, 552 U.S. 120, 125, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *T. Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam). And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003) (per curiam). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011).

A state-court decision is based on an "unreasonable determination of the facts" under § 2254(d)(2) if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528–29, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18; *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[7] The Supreme Court has cautioned, however, that "'a state-court

---

[7] Section 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be

factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen,* 558 U.S. 290, 301, 130 S. Ct. 841, 175 L. Ed. 2d 738 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Harrington,* 562 U.S. at 102-03 (internal quotation marks omitted). A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. "[E]ven in the context of federal habeas, deference does

_____

presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrelll*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003). Rather, under AEDPA standards, a federal court can disagree with a state court's factual determination and "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Id*. Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits. *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005). They likewise may review *de novo* claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions. *See, e.g., Wiggins,* 539 U.S. at 534 (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong).

### B.   Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28, 102 S. Ct. 1558, 71 L.

Ed. 2d 783 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). It occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to either: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806.

Where a state court declines to address a prisoner's federal claim because the prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732–33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60–61, 130 S. Ct. 612, 175 L. Ed. 2d 417 (2009).[8]

---

[8] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established the now-familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule. It is:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction—that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's

24

A petitioner also may procedurally default a claim by failing to raise the claim in state court and pursue it through the state's "'ordinary appellate review procedures,'" if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161–62, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996) ("Because [the exhaustion requirement] 'refers only to remedies still available at the time of the federal petition,' . . . it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law'") (internal citations omitted). Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law.'" *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

---

procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (internal citations omitted) (citing *Maupin*, 785 F.2d at 138).

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, the federal court again looks to the last state court rendering a reasoned opinion on that claim. *Ylst*, 501 U.S. at 805. If the state court "clearly and expressly states that its judgment rests on a state procedural bar," then the claim is procedurally defaulted.[9] *Harris v. Reed*, 489 U.S. 255, 263, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989). Conversely, if the last state court presented with the claim reaches its merits, then the procedural bar is removed and the federal habeas court may consider the merits of the claim in its review. *Ylst*, 501 U.S. at 801.

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id*. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982)). "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)).

---

[9] Where a later state-court decision rests upon a prohibition against *further* state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ." *Ylst*, 501 U.S. at 804 n.3. In that situation, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Id*. at 805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no bearing upon [a petitioner's] ability to raise the [federal] claim in federal court").

A fundamental miscarriage of justice in capital cases also means actually innocent of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 347, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992). In this sense, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Id.* at 336. This "actual innocence" standard "must focus on the elements that render a defendant eligible for the death penalty." *Hutton v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (citing *Sawyer*, 505 U.S. at 347).

## C.     Cognizability

In conducting habeas review, a federal court is limited to deciding whether a conviction or sentence violated the Constitution, laws, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (citing 28 U.S.C. § 2241). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 63; *see also Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law[.]"); *Engle*, 456 U.S. at 121 n.21 ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005) (citing *Estelle*, 502 U.S. at 67–68). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of

27

our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996) (further citation omitted)). But they must be "so egregious that [they] result in a denial of fundamental fairness[.]" *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Courts, therefore, "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Id.* (some internal quotation marks omitted) (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993) (further citation omitted)).

**DISCUSSION**

## I.     First Ground for Relief: *Jury Selection*

For his first ground for relief, Hale claims that the trial court's jury-selection procedures violated his Sixth Amendment right to a jury from a fair cross-section of his community and his Fourteenth Amendment rights to due process and equal protection because persons convicted of felonies were excluded from the jury pool. (Doc. No. 13 at 70–82.) Respondent argues that this claim is both procedurally defaulted and lacks merit. (Doc. No. 17 at 41–43.)

### A.     Procedural Posture

Respondent contends that this claim is procedurally defaulted because Hale never raised it in state courts and is no longer able to do so. (*Id.* at 41–42.) Indeed, Hale cannot now raise his fair-cross-section claim in state court due to Ohio's filing deadlines, post-conviction procedures, and *res judicata* rules. *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."); *State v. Perry*, 226 N.E.2d 104, 108–09 (Ohio 1967) (Ohio's *res judicata* rule precludes a defendant from raising for the first time in post-conviction proceedings a claim that was fully litigated or could have been fully litigated at trial or

28

on direct appeal.); Ohio R. Crim. P. 33(B) (defendant may be entitled to new trial after deadline for filing motion for new trial if he was "unavoidably prevented" from filing motion or there is "newly discovered evidence"); Ohio Rev. Code § 2953.23(A)(1) (second, successive, or untimely post-conviction petition permitted if petitioner shows: (1) that he was "unavoidably prevented from discovery of the facts" of the claim, or the claim is based on a new federal or state right the Supreme Court has recognized that applies retroactively; and (2) but for constitutional error at trial, no reasonable factfinder would have found petitioner guilty of offense or eligible for death sentence). And with no state-court remedies still available to him, Hale has defaulted this claim. *See Gray*, 518 U.S. at 161–62 (1996) ("Because the [exhaustion requirement] refers only to remedies still available at the time of the federal petition, . . . it is satisfied if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law") (internal quotation marks and citations omitted); *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("[I]f an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review.") (citations omitted).

Hale counters, however, that he can establish cause and prejudice to excuse the default. He first asserts that he could not present this claim to state courts because the facts underlying the claim were "reasonably unknown" to him until his federal habeas counsel discovered them in 2018. (Doc. No. 31 at 61–62.) As Hale notes, a habeas petitioner shows "cause" where he demonstrates that he failed to raise a constitutional issue because it was "reasonably unknown to him" at the time. *Fautenberry v. Mitchell*, 515 F.3d 614, 629 (6th Cir. 2008) (citing *Amadeo v. Zant*, 486 U.S. 214, 222, 108 S. Ct. 1771, 100 L. Ed. 2d 249 (1988)). And, more specifically, the Sixth Circuit has found that petitioners established cause where the factual basis for their fair-cross-section claim, a computer glitch, "was not reasonably available to counsel, and petitioners could not have

29

known that minorities were underrepresented in the *jury pool* by looking at the *venire panel*." *Ambrose v. Booker*, 684 F.3d 638, 645 (6th Cir. 2012) (emphasis in original). The court explained that to "suggest that an effective defense attorney must investigate the jury assembly process in every case conditioned upon his client's loss of the right is unnecessary and wasteful." *Id.* at 646 (internal quotation marks omitted) (citation omitted). Alternatively, Hale asserts that his trial and post-conviction counsel were at fault for failing to raise the claim. (Doc. No. 31 at 63–66.) "Attorney error that constitutes ineffective assistance of counsel is cause." *Coleman*, 501 U.S. at 753–54.

This Court need not reach this issue, however, as this claim is easily resolved on its merits. *See* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits); *Lambrix v. Singletary*, 520 U.S. 518, 525, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner").

## B.    Merits Analysis

Hale alleges that, according to the transcript of a hearing conducted in 2011 before Judge Richard Ambrose, the same judge who presided over his trial six years earlier, Cuyahoga County excluded all felons from jury service at that time. (Doc. No. 31 at 43–46.) He asserts, with some support,[10] that this practice existed in 2005 and continues to this day. (*Id.*) Hale contends the

---

[10] To show that felons were excluded from jury venires in Cuyahoga County in his trial in 2005, Hale cites to testimony from the 2011 hearing of a county employee that the jury selection software used in 2011 was designed in 1998, and of Judge Ambrose that the jury-selection procedures in that case were "'no different than any other case'" and "'were used as for the policy for general juries in this jurisdiction.'" (Doc. No. 31 at 45–46 (citing and quoting 2011 hearing transcript (Doc. No. 13-8 at 71–84)).) This transcript (Doc. No. 13-8) is one of several exhibits that Hale attached to his petition in support of this claim. He also submitted: a news article (Doc. No. 13-9); an Ohio Attorney General opinion (Doc. No. 13-10); a document showing the distribution of people with felony convictions (Doc. No. 13-11); Urban Institute reentry data (Doc. No. 13-12); juror questionnaire cover pages with race data (Doc. No. 13-13); excerpt of a transcript from another Ohio case (Doc. No. 13-14); and information from the Jury Commission website (Doc. No. 13-15). Hale has moved to have the record expanded to include these documents, among other exhibits supporting

county's exclusion of felons from jury service is—and presumably was in 2005—contrary to Ohio law, which permits convicted felons to serve on juries once their probation or term of community control sanctions is completed. (*Id*. at 46 (citing Ohio Rev. Code § 2967.16(C)(1) (restoring "rights and privileges forfeited by a conviction")[11]; Ohio Att'y Gen. Op. No. 2006-031 ("RC 2967.16(C)(3) restores the privilege of serving as a juror on a petit jury to a person who was convicted of a felony under the laws of Ohio prior to, or on or after July 1, 1996, and who has completed his probation or period of one or more community control sanctions.")).) Moreover, he argues, felons comprise a "substantial" portion of Cuyahoga's population, and a "disproportionate" number of those individuals are African-American men. (*Id*. at 47–49.) The county's jury-selection practice of excluding felons, Hale concludes, violated his Sixth Amendment right to a jury that represents a fair cross-section of his community and his Fourteenth Amendment rights to due process and equal protection. (*Id*. at 49–61.)

The Sixth Amendment guarantees criminal defendants a jury selected from a fair cross-section of the community. *Duren v. Missouri,* 439 U.S. 357, 99 S. Ct. 357, 58 L. Ed. 2d 579 (1979). The Supreme Court in *Duren* set forth three criteria necessary to establish a *prima facie* violation of the fair-cross-section requirement: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

---

other grounds for relief. (*See* Doc. No. 37.) For reasons fully explained in Section XVII of this opinion, the Court has granted Hale's request to include the exhibits supporting his jury-selection claim (Doc. Nos. 13-8—13-15) and they have been duly considered in its merits review.

[11] This provision also applies to prisoners who have completed their prison term. *See* Ohio Rev. Code § 2967.16(C)(1)(a). Section 2967.16(C) was in effect in 2005; it has been amended twice since then (in 2008 and 2018) to create an exception to those eligible for restoration of privileges but otherwise remains substantially the same. *See* Ohio Rev. Code § 2967.16(C)(1).

(3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* at 364. Even if a defendant has established a *prima facie* fair-cross-section violation, the government may overcome the right to a proper jury by proffering a significant state interest that manifestly and primarily advance "those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." *Id.* at 367–68.

The selection of juries also must comply with the Equal Protection Clause of the Fourteenth Amendment. *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). The Supreme Court has long recognized that racial exclusions and substantial underrepresentation in juries deny defendants equal protection under the law. *Castaneda v. Partida*, 430 U.S. 482, 492–93, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977). Traditionally, to show that an equal protection violation has occurred in this context, the defendant must satisfy the three-part test established in the Supreme Court decision *Castaneda v. Partida*. *Id.* at 494. *United States v. Ovalle,* 136 F.3d 1092, 1104 (6th Cir. 1998) (citing *Castaneda*, 430 U.S. at 494). The defendant must demonstrate: (1) "'the group excluded from the grand jury is one that is a recognizable, distinct class capable of being singled out for different treatment under the laws'"; (2) the selection procedure was "'susceptible to abuse or is not racially neutral'"; and (3) "'the degree of underrepresentation occurring over a significant period of time by comparing the proportion of the excluded group in the total population to the proportion serving as grand jurors.'" *Id.* (quoting *Jefferson v. Morgan,* 962 F.2d 1185, 1188–89 (6th Cir. 1992)). "'Once [a defendant] has established a prima facie case, the burden shifts to the state to rebut the inference of intentional discrimination.'" *Id.* (quoting *Jefferson*, 962 F.2d at 1189).

Hale's jury-selection claim fails, whether asserted under the Sixth or the Fourteenth Amendment. First, to the extent that Hale argues that Cuyahoga County violated Ohio law

(specifically, Ohio Rev. Code § 2967.16(C)(1)) in its jury-selection process by excluding felons, that claim is not cognizable on federal habeas review. *Estelle*, 502 U.S. at 68.

Further, courts have roundly rejected claims such as Hale's that the exclusion from jury service of individuals convicted of, or even charged with, the commission of a felony violates the fair cross-section requirement. *See* James M. Binnall, *Sixteen Million Angry Men: Reviving a Dead Doctrine to Challenge the Constitutionality of Excluding Felons from Jury Service*, 17 Va. J. Soc. Policy and Law 1, 18 (2009) ("establishing felons as a 'distinctive group' for the purpose of supporting a fair cross-section claim has proven impossible for litigants") (citing Brian Kalt, *The Exclusion of Felons From Jury Service*, 53 Am. U. L. Rev. 65, 75 n.34 (2003) (collecting cases)).

Many of these courts have concluded that excluding felons is justified because "groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors . . . are not 'distinctive groups' for fair-cross-section purposes." *Lockhart v. McCree,* 476 U.S. 162, 174, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986). And felons, the courts find, may not "conscientiously and properly carry out [a juror's] sworn duty to apply the law to the facts of the particular case." *Id.* at 184. *See United States v. Barry*, 71 F.3d 1269, 1273–74 (7th Cir. 1995) ("On the whole, [felons'] exclusion, more than their inclusion, would be likely to preserve public confidence in the criminal justice system."); *United States v. Greene*, 995 F.2d 793, 797–98 (8th Cir. 1993) (holding jury service of charged but not convicted felons is "'incompatible with [the] significant [governmental] interest' . . . of having jurors who 'can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case'" and therefore is not a fair-cross-section violation (quoting, respectively, *Duren*, 439 U.S. at 368, and *Lockhart*, 476 U.S. at 184)); *United States v. Foxworth*, 599 F.2d 1, 4 (1st Cir. 1979) (upholding disqualification of persons convicted of or charged with

33

a crime punishable by imprisonment for more than one year whose civil rights have not been restored as "intended to assure the 'probity' of the jury . . . [and] rationally based"); *United States v. Test*, 550 F.2d 577, 594 (10th Cir. 1976) ("The reasons for movants' challenge to this provision are beyond our comprehension."). Hale's fair-cross-section claim, therefore, lacks merit.

Courts have likewise uniformly rejected equal-protection claims based on the exclusion of felons from jury service. *See* James M. Binnall, *Sixteen Million Angry Men: Reviving a Dead Doctrine to Challenge the Constitutionality of Excluding Felons from Jury Service*, 17 Va. J. Soc. Pol'y & L. 1, 19 (2009) ("Most often fatal to Equal Protection claims is the refusal of the Supreme Court to recognize felons as a class worthy of special protections."); *United States v. Arce*, 997 F.2d 1125, 1127 (5th Cir. 1993) (holding that "excluding convicted felons from jury service does not violate the constitutional guarantee of equal protection" because the government "has a legitimate interest in protecting the probity of juries . . . [and] [e]xcluding convicted felons from jury service is rationally related to achieving that purpose"); *Greene*, 995 F.2d at 795–96 ("the exclusion from juror eligibility of persons charged with a felony is rationally related to the legitimate governmental purpose[s] of guaranteeing the probity of jurors . . . [and] of creating a pool of jurors likely to give unbiased consideration to the evidence presented").

Hale attempts to distinguish his claim from these cases on the ground that not only were felons excluded from his jury pool, resulting in a significant racial and sex-based disparity in the jury's composition, but the excluded felons were only from Cuyahoga County, which violated Ohio law. (Doc. No. 31 at 59.) But courts have rejected similar arguments to Hale's, and for reasons that apply equally here. The Eighth Circuit, for example, found no merit in a defendant's argument that the exclusion of charged felons from his jury pool was impermissible because it had a disparate impact on potential jurors who were African-American, which warranted a higher

34

standard of review than whether the exclusion was rationally related to a legitimate governmental purpose. *Greene*, 995 F.2d at 796. The circuit court concluded that because the exclusion of felons was facially race-neutral, the rational-relationship test applied, unless the defendant had some evidence of purposeful intent to discriminate or that the size of the disparity alone was sufficient to allow an inference of intent to discriminate, which he did not. *Id.* And the court further found that the exclusion of felons was "rationally related to the legitimate governmental purpose[s] of guaranteeing the probity of jurors . . . [and] of creating a pool of jurors likely to give unbiased consideration to the evidence presented." *Id.* at 795–96; *see also United States v. Best*, 214 F. Supp. 2d 897, 904–05 (N.D. Ind. 2002) (rejecting argument that African Americans were unconstitutionally unrepresented on venire because convicted felons are generally ineligible for jury service). The Court agrees with the Eighth Circuit's analysis. Even if Hale could establish a *prima facie* case of discriminatory intent, which he has not, it is rebutted by the State's significant interest in the honesty, integrity, and impartiality of jurors. Hale, therefore, has not established an equal-protection violation either.

Accordingly, Hale's first ground for relief is procedurally defaulted and meritless.

## II.    Second Ground for Relief: *Trial-Court Error/Voir Dire*

Hale asserts for his second ground for relief that the trial court violated his constitutional rights in conducting *voir dire*. Specifically, the trial court erred in: (1) death-qualifying the jury while failing to life-qualify the jury; (2) encouraging consideration of non-statutory aggravating factors; (3) misinforming jurors of the law; (4) failing to remove a juror who expressed racial bias; (5) failing to remove four jurors who were biased in favor of the death penalty; and (6) improperly excluding prospective jurors who were not biased against the death penalty. (Doc. No. 13 at 83–

35

108.) Respondent argues this claim is procedurally defaulted and meritless. (Doc. No. 17 at 43–56.)

### A. Procedural Posture

Respondent contends that each of Hale's six sub-claims, as listed above, is procedurally defaulted.

### 1. Sub-claim 1

Respondent characterizes Hale's first sub-claim as comprising two separate assertions of trial-court error in conducting *voir dire*: (1) judicial bias in life- and death-qualifying venirepersons; and (2) unfairly "priming" one of the jurors "to be disposed towards death." (*Id*. at 44–46.) He contends both claims are procedurally defaulted. (*Id*.)

As to the first argument, Respondent notes the Ohio Supreme Court found Hale's claim of judicial bias waived. The state court stated:

> {¶ 76} In his fifth proposition of law, Hale claims that the trial judge conducted voir dire in a one-sided, and therefore unfair, manner. According to Hale, the judge death-qualified each prospective juror without any request by the prosecution, but he did not similarly "life-qualify" each prospective juror—i.e., he did not ask those jurors questions to determine whether they would automatically vote for the death penalty. See generally *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492. Hale alleges that "the trial court failed to ask life-qualifying questions of at least 28 prospective jurors."

> {¶ 77} Crucially, Hale does not contend that the trial judge prevented defense counsel from life-qualifying the jurors. Instead, he argues "that the trial court's conduct of voir dire was biased" because the judge asked death-qualifying questions himself, but left it to defense counsel to ask life-qualifying questions.

> {¶ 78} Hale has failed to preserve his claim that the trial judge was not impartial. Such claims must be raised by filing an affidavit of disqualification with the chief justice of this court. Hale did file such an affidavit in this case, but that affidavit made no allegation concerning the conduct of the trial judge during voir dire. See *In re Disqualification of Ambrose,* 110 Ohio St.3d 1220, 2005-Ohio-7154, 850 N.E.2d 722.

36

*Hale*, 892 N.E.2d at 887.

As Respondent argues, the requirement that litigants file an application of disqualification to assert claims of judicial bias is an adequate and independent state procedural ground, well-established in Ohio. *See* Ohio Rev. Code § 2701.03; *Getsy v. Mitchell*, 495 F.3d 295, 309 (6th Cir. 2007). Furthermore, although the Ohio Supreme Court conducted a plain-error review of the claim after invoking the procedural rule, such analysis "does not constitute a waiver of the state's procedural default rules and resurrect the issue . . . ." *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).[12]

Hale responds that the default should not be enforced because the Ohio Supreme Court misapplied the disqualification-affidavit rule. (Doc. No. 31 at 105.) As he asserts, "an incorrect application of a state [procedural] rule does not constitute reliance on an adequate and independent state ground." *Wogenstahl v. Mitchell*, 668 F.3d 307, 341 (6th Cir. 2012) (evaluating state-court application of *res judicata* doctrine). According to the Ohio Supreme Court, Hale argues, this rule applies only to the "'narrow issue of possible bias or prejudice of a judge,'" and "'is not a vehicle to contest matters of substantive or procedural law . . . .'" (Doc. No. 31 at 105 (quoting *In re Disqualification of Solovan*, 798 N.E.2d 3 (Mem) (Ohio 2003).) And the claim he asserted in state court, Hale maintains, was actually a "failure-to-life-qualify claim," challenging the judge's conduct in empaneling jurors with a bias in favor of the death penalty, not one alleging the judge's

---

[12] A state court's review for plain error is "properly viewed as a court's right to overlook procedural defects to prevent manifest injustice . . . ." *Lundgren*, 440 F.3d at 765; *see also* Ohio R. Crim. P. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *State v. Long*, 372 N.E.2d 804, 808 (Ohio 1978) (Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice where, but for the error, the outcome of the trial clearly would have been otherwise.).

personal bias. The claim, therefore, was outside the scope of the disqualification-affidavit rule, according to Hale, and the Ohio Supreme Court misapplied the rule. (*Id.*)

As the Ohio Supreme Court explained, however, Hale argued before it "'that the trial court's conduct of voir dire was biased' because the judge asked death-qualifying questions himself, but left it to defense counsel to ask life-qualifying questions." *Hale*, 892 N.E.2d at 887. And here, too, Hale squarely attacks the judge's bias. He states in his petition: "Hale is not alleging that the trial court precluded him from questioning jurors. Instead, Hale argues that the trial court's conduct at voir dire was biased." (Doc. No. 13 at 86.) The Ohio Supreme Court, therefore, correctly applied Ohio law in ruling that Hale waived any judicial-bias challenge by failing to raise the issue in an affidavit of disqualification to the state high court, as he did with regard to other issues during the pendency of his trial. *See In re Disqualification of Ambrose*, 850 N.E.2d 722 (Mem.) (Ohio 2005). To the extent that Hale asserts a claim of judicial bias, therefore, that claim is procedurally defaulted.

When the Ohio Supreme Court conducted its plain-error review of this claim, however, the court addressed more than judicial bias. It also considered the claim Hale contends he raised in state court and asserts here: whether the trial court's conduct of *voir dire* violated Hale's constitutional right to a jury free of bias, including bias in favor of the death penalty. *See Hale*, 892 N.E.2d at 887. As Hale argues, this was "a matter[] of substantive . . . law" and therefore not covered by Ohio's disqualification-affidavit rule. *In re Disqualification of Solovan*, 850 N.E.2d at 3–4. Therefore, to the extent Hale raises a claim regarding the trial court's obligation to life-qualify jurors, that claim is not procedurally defaulted.

As to Hale's assertion that the trial judge unfairly "primed" one juror's disposition in favor of the death penalty, Respondent argues that Hale defaulted that claim, too, because he never raised

it in state courts. (Doc. No. 17 at 45.) The Court agrees. That issue arises out of the record of proceedings in the trial court, and therefore could have been raised on direct appeal. Hale failed to do so, however, and, under Ohio law, *res judicata* now prohibits him from raising the issue in any post-conviction proceeding. *See Wong,* 142 F.3d at 322 ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."); *Perry,* 226 N.E.2d 104 (holding that *res judicata* bars a criminal defendant from raising in post-conviction proceedings those claims that could have been raised on direct appeal). With no state-court remedies still available to him, Hale has defaulted this claim. *See Gray,* 518 U.S. at 161–62; *Alley,* 307 F.3d 3at 385.

### 2.    Sub-claims 2, 3, 4 and 6

Respondent argues that sub-claims 2, 3, 4, and 6, as listed above, also are procedurally defaulted. (Doc. No. 17 at 47–48, 49, 50–51, 55.) He asserts that because the claims are record-based and Hale never presented them to state courts on direct appeal, they are now procedurally barred under Ohio's doctrine of *res judicata* and precluded from federal habeas review. (*Id*.)

Hale challenges Respondent's procedural-default defense to these claims only as to sub-claim 2, in which Hale asserts that the trial court "misled" the jurors during *voir dire* about non-statutory aggravating factors. (*See* Doc. No. 31 at 104–05.) He argues that he raised this claim to the Ohio Supreme Court, citing one sentence of his merit brief filed in that court, which stated, "'The judge misled the jurors further when he mentioned 'prior calculation and design' as an example of an aggravating circumstance.'" (*Id*. at 104 (quoting Doc. No. 7-3 at 188).) Hale's habeas claim, however, differs significantly in substance and factual support from his state claim. In state court, Hale included the sentence he cites above in his discussion of a broader claim that also charged Ohio's "deficient death penalty scheme," "juror misconduct," and "vague" and

39

"misleading" jury instructions with failing to "cure the jurors' misperceptions" of what constitutes an aggravating circumstance under Ohio law for purposes of weighing against mitigating factors in determining whether to impose a death sentence. (Doc. No. 7-3 at 188.) The heading for the claim in Hale's merit brief to the Ohio Supreme Court asserted that "Ohio's Death Penalty Scheme Results In An Arbitrary Application Of Punishment In Violation Of The Eighth Amendment [and] Jurors Who Consider Nonstatutory Aggravating Circumstances At The Penalty Phase Violate [a] Defendant's Rights To Due Process . . . ." (*Id*.) And the discussion concludes: "Juror misconduct and a defective capital trial system deprived Hale of due process and a fair and reliable sentencing hearing." (*Id*. at 189.) The Ohio Supreme Court, therefore, reasonably characterized this claim as one of "Juror Misconduct/Misunderstanding," stating, "Hale contends that the jurors did not understand the concept of aggravating circumstances and that they committed 'juror misconduct' by considering nonstatutory aggravating circumstances." *Hale*, 892 N.E.2d at 887.

Here, however, Hale focuses entirely on the judge's conduct, and he challenges not just the judge's statement to the jurors during *voir dire* regarding "prior calculation and design" as an aggravating circumstance, but also the court seating jurors who were "willing to consider nonstatutory aggravating circumstances in the sentencing phase of trial." (Doc. No. 31 at 77–78.)

Hale did not fairly present the fundamental legal basis of this claim to state courts "such that the ultimate question would have been the same despite variations in the legal theory or factual allegations urged in its support." *Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir. 2008) (citing *Picard v. Connor*, 404 U.S. 270, 277–78, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971)). This claim is procedurally defaulted.

Accordingly, sub-claims 2, 3, 4, and 6 are all procedurally defaulted.

### 3. Sub-claim 5

Respondent argues that Hale also defaulted sub-claim 5, which asserts that the trial court erred by failing to remove four jurors who were biased. (Doc. No. 17 at 52–53.) Hale raised juror-bias claims as to two of the jurors, Jurors Nos. 4 and 5, to the Ohio Supreme Court on direct appeal. The court found them waived, ruling:

> {¶ 89} Jurors No. 4 and 5 served on the jury. But Hale waived any objection to their service. First, he declined to challenge either one for cause. Second, he did not exhaust his peremptories, and he thereby "acquiesced in the jury that was finally selected." *State v. Carter* (1970), 21 Ohio St.2d 212, 214, 50 O.O.2d 446, 256 N.E.2d 714; see also *State v. Stallings* (2000), 89 Ohio St.3d 280, 288, 731 N.E.2d 159. Finally, defense counsel expressly stated that they were satisfied with the jury. See *Eaton,* 19 Ohio St.2d at 149, 48 O.O.2d 188, 249 N.E.2d 897.

*Hale*, 892 N.E.2d at 888. Hale did not raise a juror-bias claim regarding the other two jurors, Jurors Nos. 1 and 6, in state court, and as a record-based claim he no longer may do so. Hale does not contest Respondent's assertion that this sub-claim is procedurally defaulted. (*See* Doc. No. 31 at 104–05.)

### 4. Cause and prejudice

Hale argues that he can demonstrate cause to excuse the procedural default of each of these claims in the ineffectiveness of his trial and direct-appeal counsel. (Doc. No. 31 at 105–06.) As will be discussed below, however, Hale's ineffective-assistance claims, asserted in grounds for relief three, eleven, and eighteen, are meritless and/or themselves procedurally defaulted, and they therefore cannot constitute cause for the defaults. *Edwards v. Carpenter*, 529 U.S. 446, 453, 120 S. Ct. 1587, 146 L. Ed. 2d 518 (2000) (holding that claims of ineffective assistance of counsel cannot provide cause for the procedural default of another claim if the ineffective-assistance claim itself is procedurally defaulted).

B.       Merits Analysis

Regardless of whether each sub-claim of Ground 2 has been preserved for federal habeas review, each would be denied as meritless.

1.       Failure to "life qualify" the jury

Hale first contends that the trial court erred when, without being asked, it "death-qualified" each prospective juror by ensuring that they would consider imposing a death sentence but failed to "life-qualify" each of them by ensuring that they would not always impose a death sentence. (Doc. No. 31 at 75–77;101–02.) He alleges that the judge did not ask life-qualifying questions of "at least" twenty-eight prospective jurors, including half of the seated jurors. (*Id*. at 76.)

Hale presented this claim to the Ohio Supreme Court on direct appeal. As noted above, the court first found the claim waived because Hale did not raise these allegations of judicial bias in an application of disqualification with the chief justice of that court as required under Ohio law. It then reviewed the claim for plain error and found none, reasoning:

> {¶ 76} In his fifth proposition of law, Hale claims that the trial judge conducted voir dire in a one-sided, and therefore unfair, manner. According to Hale, the judge death-qualified each prospective juror without any request by the prosecution, but he did not similarly "life-qualify" each prospective juror—i.e., he did not ask those jurors questions to determine whether they would automatically vote for the death penalty. See generally *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492. Hale alleges that "the trial court failed to ask life-qualifying questions of at least 28 prospective jurors."

> {¶ 77} Crucially, Hale does not contend that the trial judge *prevented* defense counsel from life-qualifying the jurors. Instead, he argues "that the trial court's conduct of voir dire was biased" because the judge asked death-qualifying questions himself, but left it to defense counsel to ask life-qualifying questions.

> * * *

> {¶ 79} . . . [T]he claimed error does not reach the level of plain error. In the first place, the record shows that the trial judge asked numerous prospective jurors

whether they could consider mitigating factors or whether they would automatically vote for a death sentence. In many cases, the judge asked *both* questions.

{¶ 80} Second, the trial court had no obligation to personally life-qualify the jurors. *State v. Stojetz* (1999), 84 Ohio St.3d 452, 705 N.E.2d 329, syllabus; *State v. Mundt,* 115 Ohio St .3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 164–167. The fact that the judge did ask death-qualifying questions did not create any such obligation. The fact remains that the trial judge did not prevent defense counsel from asking such questions, and counsel in fact did ask such questions without hindrance. Hale provides no support for his assertions that the trial judge's method of proceeding caused the seating of a "death-prone jury." We overrule Hale's fifth proposition of law.

*Hale*, 892 N.E.2d at 887.

The parties disagree about whether AEDPA applies to the Ohio Supreme Court's plain-error review of this claim, reflecting a prolonged intra-circuit split in the Sixth Circuit on the issue. As Respondent argues, however, the Sixth Circuit resolved the matter in *Stewart v. Trierweiler*, 867 F.3d 633 (6th Cir. 2017). There, the court recognized as controlling precedent its decision in *Fleming v. Metrish*, 556 F.3d 520 (6th Cir. 2009), in which it held that AEDPA applies to a state court's plain-error analysis if it "'conducts any reasoned elaboration of an issue under federal law.'" *Stewart,* 867 F.3d at 638 (quoting *Fleming*, 556 F.3d at 531). The state court here considered federal law in its analysis of this claim, and AEDPA deference therefore applies to its decision.

Hale argues that, if AEDPA governs, the state court's decision unreasonably applied *Morgan v. Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992) under § 2254(d)(1) by concluding that "[t]he fact that the judge did ask death-qualifying questions did not create any such obligation" to life-qualify potential jurors. (Doc. No. 31 at 101.) The Supreme Court clearly established in *Morgan*, Hale asserts, that "[t]he Constitution requires the trial court to seek out and remove" jurors who cannot impose a death sentence and those who will always impose a death sentence. (*Id.* (citing *Morgan*, 504 U.S. at 728–29).) It did not.

43

The Court first held in *Morgan* that a juror "who will automatically vote for the death penalty in every case" is not impartial as required by the Sixth and Fourteenth Amendments, and a capital defendant may challenge for cause any prospective juror who holds such views. *Morgan*, 504 U.S. at 729. It then turned to what procedures in *voir dire* are needed to identify that specific bias. *Id*. at 729–36. The Court held that the "[p]etitioner was entitled, upon his request, to inquiry discerning those jurors who" would always impose a death sentence following conviction. *Id*. at 736. And in that case, it concluded, general questions about "fairness" and ability to "follow the law" that were asked during *voir dire* were inadequate. *Id*. at 735–36. The crux of the matter, according to the Court, was the *defendant's ability* to uncover juror bias through *voir dire*: "We deal here with petitioner's ability to exercise intelligently his complementary challenge for cause against those biased persons on the venire . . . ." *Id*. at 733; *see also id*. at 735–36 ("A defendant on trial for his life must be permitted on *voir dire* to ascertain whether his prospective jurors function under such misconception."). Whether the trial judge conducted the life-qualifying inquiry or defense counsel did so was not at issue. The Court explained, "'[a]s with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate*, through questioning*, that the potential juror lacks impartiality. It is then the trial judge's duty to determine whether the challenge is proper.'" *Id*. at 733 (emphasis in original) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)); *see also Stanford v. Parker,* 266 F.3d 442, 454 (6th Cir. 2001) ("*Morgan* does not mandate that life-qualifying questions be asked of potential jurors in every case. Instead, *Morgan* holds that a defendant has the right to life-qualify his jury upon request.").

And here, as the Ohio Supreme Court noted, the judge queried prospective jurors about their views on the death penalty, including asking life-qualifying questions, as did Hale's counsel

44

"without hindrance." *Hale*, 892 N.E.2d at 887. Venire persons also were asked many questions about their views on the death penalty on the juror questionnaire, including to what extent they agreed or disagreed that the death penalty should "**always** be used as the punishment for every murder"; "**never** be used for the punishment of any murder"; and "**sometimes** be used as the punishment in certain murder cases." (*E.g.*, Doc. No. 13-16 at 10–12 (emphasis in original).)[13] The state court's decision, therefore, was neither contrary to, nor an unreasonable application of, *Morgan* or any other Supreme Court precedent.

The state court also reasonably found no judicial bias. As the court found, and Hale does not contest, the judge questioned potential jurors about their views on the death penalty, including whether they could consider a lesser punishment or whether they would automatically impose death, or both. On its face, this does not demonstrate a "one-sided voir dire" as Hale alleges. (Doc. No. 31 at 101.) Nor does it show the judge had any personal bias favoring the death penalty or the prosecution.

Similarly unfounded is Hale's new claim, never addressed by state courts, that the trial court's *voir dire* questioning "primed at least one juror to be disposed towards death by listing the facts of the case—which the juror had not yet heard—as a hypothetical . . . of a case where a death penalty instruction would be appropriate . . . ." (*Id.* at 76–77 (citing Doc. No. 8-1 (Trial Tr.) at 695).) The judge made the statement at issue in response to the remark of a prospective juror who

---

[13] Hale has moved to have the record expanded to include the juror questionnaires of Juror Nos. 34 (Doc. No. 13-16), 5 (Doc. No. 13-17), 6 (Doc. No. 13-18), and 7 (Doc. No. 13-19), among other exhibits he submitted with his petition in support of other grounds for relief. (*See* Doc. No. 37.) Respondent does not oppose the inclusion of the juror questionnaires as they were part of the state-court record. (Doc. No. 38 at 2.) For that same reason, as explained in Section XVII of this opinion, the Court has granted Hale's request to include the juror questionnaires in the record and has considered them in its merits review of this claim.

was ultimately seated on the jury that he assumed that an "aggravating circumstance" for purposes

of capital sentencing "would mean something like extreme brutality" or "extreme circumstances."

(Doc. No. 8-1 (Trial Tr.) at 693.) The court stated (with the challenged language in bold):

> I'm glad you raised that because that is a good point because the circumstances that you might feel would be appropriate for a death penalty may not be what the law says is appropriate for a death penalty. And that's where we have to go in terms of figuring out whether or not you'd follow the law, or you'd just follow your own conscience and not follow the law.
>
> So what I'm trying to get at is a matter of conscience with you, and again, we're not trying to judge your conscience because it's who you are, and what you believe is who you are. And we're not here to change that, we're just here to find out what it is, because we have to make a determination as to whether or not you could serve as a juror on this case because it is such a serious issue. I am going, and the attorneys obviously want to ask you questions as well.
>
> . . . I just want to ask you on the one issue, because I can give you an example, I'll just pose it as a hypothetical because, again, what facts and the law will be at trial are subject to some modification, we haven't tried the case yet, so we don't know a lot of this stuff, but in a situation such as this, **I could instruct you that if the State has proven that a murder has been committed and that also the murder was committed in the course of, or in furtherance of a robbery, you know, while someone was being robbed, they were murdered, then I would instruct you that is an aggravating circumstance attached to that murder that would require an instruction to you as a juror on the death penalty.**
>
> Now, if you think that – that, well, I wouldn't – **I can't impose a death penalty if it's just a killing that happened during a robbery, it would have to be something worse**, that's what we need to know. That's what we need to find out, because that's telling me that you wouldn't be able to do that, then you wouldn't be able to follow the instructions of law. You would have to – if you're going to go your own way, then we have to make sure that that's known.

(*Id*. at 694–95 (emphasis added).)

The judge's remarks, especially when placed in context, do not demonstrate that he

"primed" a juror toward any particular view regarding the death penalty, as Hale charges. Rather,

the judge was trying to explain that aggravating circumstances are defined by the law through the

use of a simple hypothetical, so that he could discern the juror's ability to follow the law should a

46

capital sentencing phase of the trial take place. The judge did not specify any facts of the case other than that the State alleged the murder took place during a robbery. Moreover, this claim is entirely speculative, as there is nothing in the record to show that this juror was in any way "disposed toward death."

Hale's claims regarding the trial court's questioning of potential jurors regarding the death penalty and judicial bias, therefore, are unfounded.

### 2. Encouragement to consider non-statutory aggravating circumstances

Hale next claims that during jury selection, the trial court "encouraged consideration of," and "erroneously seated jurors willing to consider," non-statutory aggravating circumstances at the penalty phase of trial. (Doc. No. 31 at 77–78; 102–03.) Hale notes that one juror stated during *voir dire*: "But then again it would have to be the circumstances, I would have to decide by what was presented as far as the reason or the cause of death, how it was done, why it was done." (Doc. No. 8-1 (Trial Tr.) at 501.) Another remarked: "I mean I'm assuming that the aggravated circumstances would mean like something like extreme brutality . . . ." (*Id.* at 693.) Because no state court has addressed this claim, AEDPA deference does not apply and this Court reviews it *de novo*. *E.g., Rice*, 660 F.3d at 252 ("It is well settled that we may review *de novo* an exhausted federal claim that was not adjudicated on the merits in state court.").

As the Ohio Supreme Court observed in reviewing a related claim, these jurors' statements regarding aggravating circumstances, "made on voir dire—before the jury had even been selected, much less formally instructed as to the meaning of aggravating circumstances—cannot support an inference that the jurors either misunderstood or disobeyed the instructions they later received in the penalty phase." *Hale*, 892 N.E.2d at 887–88. Hale concedes that the trial court "mentioned the correct standard at other points in the trial" and does not challenge the court's jury instructions on

47

the issue. (Doc. No. 31 at 102.) Moreover, "juries are presumed to follow their instructions . . . ." *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987). There is no reason to believe that the jurors in this case did not follow the judge's instructions on what constitutes an aggravating circumstance under Ohio's capital sentencing laws. This claim is meritless.

### 3.    Misstatements of the law

Hale further contends the trial court misstated the law during *voir dire*. (Doc. No. 31 at 102–03.) He cites two statements the judge made to prospective jurors: (1) "Another example of an aggravating circumstance under the law of the State of Ohio is if someone were to commit an aggravated murder by a prior calculation and design[,]" which Hale argues is incorrect; and (2) "[I]f there were to be a second phase, then it becomes a test of balancing mitigating factors against aggravating circumstances and that's something that you as a member of the jury would have to do[,]" which Hale contends improperly omitted the State's burden of proof beyond a reasonable doubt. (*Id*. at 77–78 (quoting, respectively, Doc. No. 8-1 (Trial Tr.) at 407, 504).) Hale further asserts that the judge improperly instructed counsel for both parties during *voir dire* that the potential jurors should understand "that if they don't agree with the rest of the jury, they do not find mitigating outweighs aggravating, or vice versa, then they have to have a valid reason for their feelings, in other words, to not vote for the death penalty if that was the way the jury was divided." (*Id*. at 77 (quoting Doc. No. 8-2 (Trial Tr.) at 355).) This characterization of the law "inverts" the prosecution's burden of proof, Hale says, and "shackled" the defense. (*Id*.) No state court has addressed this claim, so this Court reviews it *de novo*.

Hale's argument is unavailing. First, the Court does not agree that the trial judge misstated the law to the jurors in the context of *voir dire*, in which the jurors are provided preliminary,

simplified legal standards to assist them in responding to the questions posed to them. The court's definition of an aggravated murder with prior calculation and design comports with Ohio's statute regarding aggravating circumstances. *See* Ohio Rev. Code § 2929.04(A)(7). And omitting a discussion of the standard of proof in explaining Ohio's capital sentencing procedure of weighing aggravating circumstances against mitigating factors is reasonable. *See* Ohio Rev. Code § 2929.03(D).

Moreover, even if these statements regarding the law were incomplete or confusing, as Hale contends, they did not prejudice Hale. The challenged statements to the jurors were cured by the court's later instructions on the law. As noted above, "juries are presumed to follow their instructions . . . ." *Richardson*, 481 U.S. at 211. Further, the record does not show that counsel disagreed with, or felt "shackled" by, the judge's articulation of the law regarding Ohio's capital sentencing scheme; defense counsel did not object or attempt to further discuss the matter and Hale does not cite any instances in which counsel incorrectly stated the standard after the court made the statements at issue. This claim, too, fails.

### 4. Removal of juror who expressed racial bias

Hale next claims that the trial court should have *sua sponte* removed a juror who expressed racial bias. (Doc. No. 31 at 78–79; 106–07.) Hale notes that Juror No. 34, a 50-year-old white male, checked "[a]gree" in his juror questionnaire to the statement that "[s]ome races and/or ethnic groups tend to be more violent than others." (Doc. No. 13-16 at 3, 13.) The juror explained in his own words: "There's simply a lot of violence in the world—parents don't discipline enough or teach values." (*Id*. at 13–14.) He also checked "[n]ot too serious" when asked to indicate how serious of a problem he felt racial discrimination was against African Americans in our society. (*Id*.) Finally, Hale points to the juror's response to a question during *voir dire* about the death

49

penalty. The juror affirmed that he agreed on his juror questionnaire that the death penalty should "sometimes" be used. (Doc. No. 8-2 (Trial Tr.) at 347.) He also agreed that he would "want[] to know the circumstances surrounding that crime[.]" (*Id*.) He elaborated:

> It would always have to depend on, you know, evidently you have to show what was going through his head. I mean, if there is found, you know, that there may be a little imbalance or something, just don't know, you know, what drives somebody to that. If it was just brutal, you know, everything is okay and he is whatever, sure, hang him high, but if it's, you know, you really got to take every instance for itself on its own merit.

(*Id*. at 347–48.) Juror No. 34 was not challenged by either party and was seated on the jury. (*Id*. at 352, 963.)

The Court reviews this claim *de novo* as it was never presented to state court. The Sixth and Fourteenth Amendments "ensure the impartiality of any jury that will undertake capital sentencing." *Morgan,* 504 U.S. at 728. The question of whether a trial court seated a fair and impartial jury is a factual one: Is there "fair support in the record for the state courts' conclusion that the jurors here would be impartial[?]" *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984). Under AEDPA, such factual findings are presumed correct unless the petitioner can prove otherwise by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Indeed, habeas courts have long accorded trial courts "special deference" in empaneling a jury, as a trial judge is in the best position to assess the demeanor and credibility of the jurors. *See, e.g., Patton,* 467 U.S. at 1038; *Darden v. Wainwright*, 477 U.S. 168, 175–78, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986).

Here, the record does not show that Juror No. 34 was racially biased. As Hale points out, the juror agreed to the questionnaire's statement that some races and/or ethnic groups "tend to be more violent than others." (Doc. No. 13-16 at 13.) But his explanation for that belief was that

50

"there's simply a lot of violence in the world," indicating a far more nuanced view of the issue in general and no particular view about African Americans at all. (*Id*. at 13–14.) The juror also stated in the questionnaire that he did not feel uncomfortable around any racial or ethnic group; had never had a negative or frightening experience with a person of another race; and did not feel that people are overly sensitive about racial and ethnic jokes. (*Id*.) As to the juror's remarks about the death penalty during *voir dire* that Hale cites, they had nothing to do with race. And, regardless, they occurred during a discussion of whether he could consider mitigating evidence, such as "family life, social history, [and] circumstances of the crime[,]" which the juror unequivocally said he could. (Doc. No. 8-2 (Trial Tr.) at 346–47.) The statements Hale points to as evidencing bias do not contradict that view. Indeed, a review of Juror No. 34's responses in the questionnaire and to *voir dire* questioning reveals nothing to suggest that he exhibited overt racial bias such that it was clear he could not perform his duties as a juror and the trial court should have *sua sponte* removed him. This claim is unfounded.

### 5.     Removal of jurors biased against Hale and in favor of death penalty

For this sub-claim, Hale asserts that the trial court failed to sufficiently question and *sua sponte* remove for cause four jurors whom he alleges were biased against Hale and in favor of the death penalty: Jurors Nos. 1, 4, 5, and 6. (Doc. No. 13 at 93–102.) As Hale concedes, his trial counsel did not challenge these jurors and they were all empaneled on the jury. (*Id*. at 93.) Hale presented his juror-bias claims regarding Jurors Nos. 4 and 5 to state courts; he did not raise a claim regarding the other two.

As explained above, the trial court has no constitutional duty to conduct a life-qualifying inquiry. *Morgan*, 504 U.S. at 733. To the extent Hale claims that the trial court erred by failing to question these jurors further on their views of the death penalty, therefore, the claim fails.

51

The question here is whether the trial court should have *sua sponte* dismissed the jurors because it was apparent that their views on capital punishment "would 'prevent or substantially impair the performance of [their] duties as . . . juror[s] in accordance with [their] instructions and . . . oath.'" *Witt*, 469 U.S. at 424. As explained above, "a juror who in no case would vote for capital punishment regardless of his or her instructions, is not an impartial juror and must be removed for cause." *Morgan*, 504 U.S. at 728. A state-court determination of juror bias is a factual finding, which is presumed correct. *Witt*, 469 U.S. at 428–29; *see also* 28 U.S.C. § 2254(e)(1). And habeas courts are to accord "special deference" to trial courts in applying these standards, because trial judges are in the best position to assess the demeanor and credibility of the jurors. *See, e.g., Darden*, 477 U.S. at 175–78; *Patton*, 467 U.S. at 1038.

*Jurors Nos. 4 and 5*. After finding that Hale had waived his claims regarding Jurors Nos. 4 and 5, the Ohio Supreme Court, the last state court to review the claims, conducted a plain-error review, stating:

{¶ 84} In his seventh proposition of law, Hale contends that three prospective jurors should have been excused for cause.

* * *

{¶ 90} The trial court did not commit plain error in failing to excuse jurors No. 4 and 5 sua sponte. The record does not show that they were automatic-death-penalty jurors. Juror No. 4 thought he could consider all sentencing options. He agreed that the death penalty is "for a very few select people" and should not be imposed on all murderers without regard to mitigating circumstances.

{¶ 91} Juror No. 5 thought that sex murderers and child murderers should be executed and that in cases such as Charles Manson's, "you really want to see that person hang." Otherwise, she stated, it depended on the individual case. These statements in no way suggest that juror No. 5 would vote automatically for a death sentence in this case.

{¶ 92} Indeed, juror No. 5 appeared uncertain that she could sign a death verdict and was reluctant to answer that question without knowing the circumstances of the

case. She understood that the death penalty "is reserved for only a few." She said that she could consider mitigating factors and would consider all sentencing options. She said, "I may not vote for the death penalty in this instance. I might think something lesser would be appropriate."

{¶ 93} Hale has waived his claims with respect to jurors No. 4 and 5, and the trial court did not commit plain error in allowing them to sit. We therefore overrule Hale's seventh proposition of law.

*Hale*, 892 N.E.2d at 888–89.

Hale argues that the Ohio Supreme Court's decision was based on unreasonable determinations of fact in light of the evidence presented under AEDPA's § 2254(d)(2). (Doc. No. 31 at 103–04.) He challenges the state court's assertion that Juror No. 4 "agreed that the death penalty is 'for a very few select people' and should not be imposed on all murderers without regard to mitigating circumstances." *Hale*, 892 N.E.2d at 888. But the court was correct, as shown in these exchanges:

MR. MULLIN: So what we're talking about here in the death penalty portion of this case is a very, very narrow portion of crimes charged in the State of Ohio. And it's reserved for a very few select people, do you understand that? Would you agree with that?

JUROR NO. 4: I understand. I certainly understand.

MR. MULLIN: Do you agree with it?

JUROR NO. 4: Again, you're asking me to – I don't know the facts of this case, so how – I agree it should be reserved for those that meet those requirements.

(Doc. No. 8-1 (Trial Tr.) at 488.)

MR. MULLIN: Do you think that if somebody did something in a premeditated fashion, for example, and they had things, their background such as mental illness or drug abuse or bad family situation, do you think you would consider that in determining whether or not death is appropriate?

* * *

53

> JUROR NO. 4: It's important stuff. I would like to think, I would – I take this very seriously, just being in that room I would take all information relative to this very seriously but I would tell you that also my opinion is that when I watch – I'll hear lots of stuff, I don't necessarily out of the box consider that stuff, you know, mental illness as an excuse for, if somebody had a tough upbringing, that's a tough situation, but there is a lot of people who have tough upbringing who don't commit violent acts. I would like to – long way of saying I would like to think I would consider all of the relevant facts, I mean, but I don't necessarily think that out of the box those things take away culpability from doing things.

(*Id*. at 490–91.)

Juror No. 4's answers to the questions posed show that, although the juror was careful to acknowledge his views supporting the death penalty, he was willing to keep an open mind and follow the law in deciding whether it was warranted in Hale's case. Hale has not shown by clear and convincing evidence that the juror would automatically impose the death penalty.

As to Juror No. 5, Hale contends the state court unreasonably found that the juror said the death penalty "depended on the individual case" and "appeared uncertain" about whether she could sign a death verdict. (Doc. No. 31 at 103.) He argues that these findings were based only on the juror's one-word responses to questions – "yes" – which differed from the juror's longer replies about her views that the death penalty takes too long to carry out and convicted criminals are released too soon. (*Id*.) But there is no reason that a prospective juror's answer of "yes" to a question during *voir dire* is an insufficient basis from which to discern that person's views. And the juror's criticisms of the death penalty do not necessarily show a bias in favor of it and certainly do not show that the juror would impose it in every case. Hale has not rebutted the presumption that the Ohio Supreme Court's findings regarding Juror No. 5 were correct.

Hale's claims about Jurors Nos. 4 and 5, therefore, are meritless.

*Jurors Nos. 1 and 6.* Even under the more lenient standard of *de novo* review, as no state court has adjudicated these claims, the Court find Hale's claims regarding Jurors Nos. 1 and 6 also

54

lack merit. There is ample evidence in the record demonstrating that these jurors could impartially follow Ohio's capital sentencing laws.

Hale notes that Juror No. 1 stated that she would "probably be against" sentences less than life without parole. (Doc. No. 31 at 81 (quoting Doc. No. 8-1 (Trial Tr.) at 421).) But the juror went on to say that she "would have to hear more about the discussion on the other[]" possible lesser sentences if that issue were presented. (Doc. No. 8-1 (Trial Tr.) at 421.) When asked how she felt about the death penalty, Juror No. 1 replied that she "was very open minded to that. I believe all points should be taken into consideration, it's a very important decision on one's life. And I think after hearing all sides and all views, my decision would be made on that." (*Id*. at 416–17.) The juror also agreed that she would "give full, fair, and meaningful consideration" to the legal requirements for imposition of a death sentence. (*Id*. at 420.)

Hale argues that Juror No. 6's remarks on *voir dire* indicate that "he could and would automatically vote for death for any sane defendant." (Doc. No. 31 at 83.) They do not. The prosecutor questioned the juror about his statement on his questionnaire that he "believe[d] in the death penalty if the person's actions caused another to die and that [at] the time he or she was mentally capable of knowing what he[/]she was doing." (Doc. No. 8-1 (Trial Tr.) at 523.) The juror agreed that there were other possible circumstances aside from competency in which the death penalty would not be appropriate, such as where the defendant acted in self-defense. (*Id*. at 524.) When defense counsel asked the juror about this comment on his questionnaire, he explained that the decision whether to impose a death sentence "[d]epends on the circumstances" and "mental competency is just one of the factors [he] would consider . . . ." (*Id*. at 538.) Most significantly, Juror No. 6 unequivocally affirmed that he was "willing to accept and follow all instructions of law" given by the judge. (*Id*. at 535.)

55

The record does not show that Jurors Nos. 1 and 6 would have automatically voted to impose the death penalty in every case, *Morgan*, 504 U.S. at 729, or otherwise had views regarding capital punishment that "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath[.]'" *Witt*, 469 U.S. at 424. This claim also is meritless.

### 6.     Exclusion of unbiased prospective jurors

Finally, Hale argues that the trial court improperly granted the prosecution's challenges for cause of three jurors whom Hale claims were not biased against the death penalty. (Doc. No. 31 at 92–94.) Hale did not raise this claim in state courts, so this Court reviews it *de novo*.

Hale cites numerous instances in which Jurors Nos. 9, 27, and 41 expressed conflicting views about capital punishment but ultimately agreed that they would follow the court's instructions on the law in applying it. (*See id*. at 83–87.) In reviewing the record, however, and mindful of the "special deference" owed to the trial judge, the Court finds that the jurors' responses in *voir dire* support the trial court's conclusion that their views on the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt*, 469 U.S. at 424. As the Supreme Court stated in *Witt*, a juror's bias need not be proven with "'unmistakable clarity.'" *Id.* It explained:

> [V]eniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id*. at 425–26. This claim, too, fails.

Accordingly, Hale's second ground for relief is procedurally defaulted and/or meritless.

### III.  Fourth, Eighth through Tenth, and Thirteenth through Fifteenth Grounds for Relief: *Trial-Court Error/Evidentiary Rulings*

In the above-listed grounds for relief, Hale claims that the trial court made numerous erroneous evidentiary rulings. Specifically, he alleges in thirteen sub-claims that the trial judge erred by: (1) prohibiting defense counsel from reviewing State witness statements (Ground 4); (2) permitting expert testimony of Curtiss Jones and Detective Michael Grida (Ground 8); (3) admitting into evidence gruesome photographs (Ground 9); (4) improperly ruling on the State's discovery violations (Ground 10); (5) permitting the State to elicit testimony from Robert Stewart (Ground 10); (6) permitting victim-impact testimony in both guilt and sentencing phases of trial (Ground 10); (7) admitting into evidence a publicity photo of the victim (Ground 10); (8) admitting into evidence testimony from the State's blood-spatter expert (Ground 10); (9) restricting testimony of defense witness Johnny Smith (Ground 10); (10) improperly ruling on defense allegations of prosecutorial misconduct (Ground 10); (11) precluding defense from presenting relevant mitigating evidence (Ground 13); (12) admitting prejudicial evidence during sentencing phase of trial (Ground 14); and (13) considering victim-impact evidence at sentencing phase of trial (Ground 15). (Doc. No. 13 at 123–28; 143–70; 226–44.) Respondent maintains that these claims are procedurally defaulted, non-cognizable on habeas corpus, and/or meritless. (Doc. No. 17 at 83–85; 99–117; 120–27.)

#### A.  Procedural Posture

##### 1.  Sub-claims 3, 4, 5, 7, 9, 11, and 13

Respondent acknowledges that Hale raised evidentiary sub-claims 3, 4, 5, 7, 9, 11, and 13, as listed above, on direct appeal to the Ohio Supreme Court, which adjudicated them on their

57

merits, and they are preserved for federal habeas review. (Doc. No. 17 at 104, 108, 109, 112, 113, 120, 125.)

### 2. Sub-claims 1, 2, 8, and 12

Respondent contends that Hale procedurally defaulted sub-claims 1, 2, 8, and 12, as listed above, because he raised them on direct appeal to the Ohio Supreme Court, but the court found them waived because defense counsel did not properly object at trial to the evidentiary rulings at issue. (*Id.* at 83–84; 99; 112–13; 122–24.) Ohio's contemporaneous objection rule requires that a party preserve an error for appeal by calling it to the attention of the trial court at a time when the error could have been avoided or corrected. *State v. Mason*, 694 N.E.2d 932, 950–51 (Ohio 1998); *State v. Glaros*, 166 N.E.2d 379, 380(Ohio 1960), paragraph one of the syllabus. Failure to adhere to the "firmly-established" contemporaneous objection rule is "an independent and adequate state ground" upon which to find federal habeas claims procedurally defaulted. *See, e.g., Keith*, 455 F.3d at 673. And, as noted above, the Ohio Supreme Court's plain-error review does not constitute a waiver of the state's procedural default rules and resurrect the issue. *Id.*

Hale challenges Respondent's charge that sub-claims 1 and 12 are defaulted. As to claim 1, as explained above, Hale raised this claim on direct appeal in the Ohio Supreme Court, which found it waived because Hale did not object to the complained-of evidentiary ruling. *Hale*, 892 N.E.2d at 890. Hale then presented this claim again on post-conviction review in state court, with supporting evidence *dehors* the record. *See State v. Smith*, 477 N.E.2d 1128, 1131 n.1 (Ohio 1985) (an exception to Ohio's *res judicata* doctrine exists where a petitioner presents evidence dehors, or outside, the record to support a claim on post-conviction review). But the last state post-conviction court to review the claim, the court of appeals, found it barred by *res judicata* because it had already been litigated by the Ohio Supreme Court on direct appeal and Hale's extra-record

58

evidence was insufficient to overcome the *res judicata* bar. *Hale*, 2016 WL 4978449, at \*7; *see also State v. Lawson*, 659 N.E.2d 362, 367 (Ohio Ct. App. 1995) (to defeat the *res judicata* bar on post-conviction review, extra-record evidence must be "competent, relevant and material"). Where a later state-court decision rests upon a prohibition against *further* state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ." *Ylst*, 501 U.S. at 804 n.3. In that case, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Id*. at 805. As Respondent correctly asserts, therefore, claim 1 remained procedurally defaulted on the ground invoked by the Ohio Supreme Court on direct review. (Doc. No. 17 at 84.)

Hale counters that the post-conviction appellate court's assertion of *res judicata* was an unreasonable determination of fact under § 2254(d)(2) due to its "improper reliance" on the Ohio Supreme Court's "unreasonable" decision on direct appeal denying the claim on its merits under plain-error review. (Doc. No. 31 at 150–51.) Section 2254(d), however, applies only to claims "adjudicated on the merits in State court proceedings"; it does not apply to a state court's ruling on a procedural issue governed by state law. *See* 28 U.S.C. § 2254(d). Moreover, even if the Ohio Supreme Court's alternative merits decision were unreasonable, that would not resurrect the claim's procedural default for purposes of federal habeas review. *See, e.g., Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) ("The alternative [merits] holding thus does not require us to disregard the state court's finding of procedural bar.") (citing *Harris*, 489 U.S. at 264 n.10). Sub-claim 1, therefore, is procedurally defaulted.

As to sub-claim 12, the Ohio Supreme Court found the claim waived because defense counsel did not state his objections to the testimony at issue with the specificity required under Ohio Evidentiary Rule 103(A)(1). *Hale*, 892 N.E.2d at 894. Hale counters that the nature of the

objections was "apparent from the context" and, therefore, exempt from Rule 103. Moreover, he contends that defense counsel "substantially complied" with the rule by requesting a sidebar soon after stating his initial objections and providing the court with specific grounds for the objections at that time, which, he argues, is sufficient under *Lee v. Kemna*, 534 U.S. 362, 366–67, 122 S. Ct. 877, 151 L. Ed. 2d 820 (2002). (Doc. No. 31 at 342–43 (citing Doc. No. 8-5 (Trial Tr.) at 453–56).)

As Respondent points out, however, Hale's counsel did not assert at trial many of the grounds for the objections that Hale does here. Defense counsel stated to the trial court, for instance, that "relevancy is not my objection." (Doc. No. 8-5 (Trial Tr.) at 454.) Ultimately, habeas courts are bound by state courts' interpretation of state evidentiary rules, *Bradshaw*, 546 U.S. at 76, and Hale has not presented sufficient evidence to support his claim that the Ohio Supreme Court misapplied those rules here. Sub-claim 12 is procedurally defaulted.

Hale further argues that he can establish cause and prejudice to excuse the defaults of claims 1, 2, and 12 based on the ineffective assistance of counsel. (Doc. No. 31 at 149–50, 199–202, 344–45.) As discussed below, however, the Court finds those ineffective-assistance claims themselves are either procedurally defaulted or meritless.

### 3.    Sub-claim 6

Respondent argues that claim 6, as listed above, also is procedurally defaulted because Hale did not fairly present it to state courts. (Doc. No. 17 at 110.) He asserts that Hale did not frame this claim as a federal issue and did not include the same factual allegations in state court. (*Id.*) A "'petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law.'" *Williams*, 460 F.3d at 806 (quoting *Koontz*, 731 F.2d at 368). But Hale was clear in his merit brief to the Ohio Supreme Court that he was asserting a

60

federal constitutional violation. (Doc. No. 7-3 at 202, 205.) And the factual allegation to which Respondent refers does not present a new, unexhausted claim, as "the ultimate question would have been the same despite variations in the . . . factual allegations urged in its support." *Jells*, 538 F.3d at 504 (citing *Picard*, 404 U.S. at 277–78). This claim is not procedurally defaulted.

### 4.      Sub-claim 10

Claim 10, as listed above, asserts the trial court erred by overruling defense objections to prosecutorial misconduct. Respondent argues that this claim is partially procedurally defaulted. (Doc. No. 17 at 117.) But the Court need not decide that issue because, as will be explained below, it finds no merit to the underlying claims of prosecutorial misconduct and therefore no error in the trial court's rulings on the conduct at issue.

### B.      Merits Analysis

Regardless of any procedural default, each of these claims either is not cognizable on habeas review or lacks merit.

As a general rule, to the extent that Hale's claims allege violations of Ohio evidentiary law, they are not cognizable on federal habeas review. *See, e.g., Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) ("alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review"). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw*, 546 U.S. at 76 (citing *Estelle*, 502 U.S. at 67–68). In particular, federal habeas courts presume that state courts correctly interpret state law in their evidentiary rulings. *Small v. Brigano*, 134 F. App'x 931, 936–37 (6th Cir. 2005). Their review of state-court evidentiary rulings, therefore, "is limited to whether [a petitioner] can demonstrate a violation of his federal

constitutional rights." *Haliym v. Mitchell*, 492 F.3d 680, 700 (6th Cir. 2007) (citing *Bell v. Arn*, 536 F.2d 123, 125 (6th Cir. 1976)).

State-court evidentiary rulings may "rise to the level of due process violations [if they] 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Egelhoff*, 518 U.S. at 43). But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh*, 329 F.3d at 512. Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id.* (quoting *Wright*, 999 F.2d at 178) (further citation omitted)).

The Court will address in turn each ground for relief.

### 1.     Inspection of witness statements (Ground Four)

Hale claims in his fourth ground for relief that the trial court violated his Fourteenth Amendment due process rights and Sixth Amendment right to confront witnesses by not allowing him to examine the prior statements of State witnesses as was then required under Ohio law. (Doc. No. 13 at 123–28.) After finding this claim waived because defense counsel did not object to the alleged errors, the Ohio Supreme Court, the last state court to review the merits of this claim,[14] conducted a review for plain error, reasoning:

> {¶ 94} Crim.R. 16(B)(1)(g) provides for the in camera inspection of a witness's
> written or recorded out-of-court statement to determine whether the statement is
> inconsistent with the witness's testimony (in which case it may be used in cross-
> examining the witness). Under the rule, counsel for both parties "must be given the
> opportunity to: (1) inspect the statement personally; and (2) call to the court's
> attention any perceived inconsistencies between the testimony of the witness and
> the prior statement." *State v. Daniels* (1982), 1 Ohio St.3d 69, 1 OBR 109, 437

---

[14] As explained above, Hale later presented this claim on post-conviction review in state court, with supporting evidence *dehors* the record. But the last post-conviction court to review it, the court of appeals, found the claim barred by *res judicata* because it had already been litigated by the Ohio Supreme Court on direct appeal and Hale's evidence did not overcome the *res judicata* bar. And, where a later state-court decision rests upon a prohibition against *further* state review, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Ylst*, 501 U.S. at 805.

N.E.2d 1186, syllabus. In his first proposition of law, Hale contends that his trial counsel were not allowed to participate in the trial court's in camera review of several witnesses' prior statements.

{¶ 95} Hale's strongest claim involves a police report written by Sergeant Baird. At a pretrial suppression hearing, the trial court reviewed Baird's report, but Hale's counsel were not allowed to participate in that review.

{¶ 96} However, the defense failed to preserve this issue. "[O]nce the trial court concluded that there were no inconsistencies between the statements and trial testimony * * *, defense counsel did not ask to review the statements or object to the procedure employed by the court * * *. Defense counsel merely accepted the trial court's decision that there were no inconsistencies * * *." *State v. Cunningham,* 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 48. Thus, Hale "has waived all but plain error in regard to this issue." *Id.*

{¶ 97} There was no plain error here, because Hale "has failed to identify any inconsistencies that would warrant reversal." *Id.* at ¶ 49. The "inconsistencies" mentioned by Hale are actually details of the interrogation to which Baird testified but did not mention in his report. However, "[t]he fact that details may be lacking in a pretrial statement does not mean that inconsistencies exist for purposes of Crim. R. 16(B)(1)(g)." *Id.*

{¶ 98} Hale also claims that his counsel were not allowed to participate in the inspection of statements by James Hull, Hale's sister Lashayla, and Jude Nilsson, a carpenter at the Lake Ohio Lodge in 2004, but these claims are far less substantial. First, the record does not show that defense counsel were prevented from participating in the in camera inspection of statements by these three witnesses, and we decline to speculate on the matter. Thus, with regard to those statements, the factual premise for Hale's claims simply does not exist.

{¶ 99} Second, any issue was waived at trial, for the defense neither objected to the inspection procedure nor asked to review the statements. *Id.* at ¶ 48. And there was no plain error. As to Hull's statements, the claimed "inconsistencies" are again merely details that Hull mentioned in his testimony but that do not appear in his pretrial statements. *Id.* at ¶ 49. As for Lashayla Hale and Jude Nilsson, Hale fails to identify *any* purported inconsistencies between these witnesses' statements and their testimony. Hale's first proposition of law is overruled.

*Hale*, 892 N.E.2d at 889–91.

AEDPA deference may not apply to the state court's plain-error analysis of this claim, as the court did not "conduct[] any reasoned elaboration of [the] issue under federal law." *Stewart,*

867 F.3d at 638 (quotation marks and citation omitted). But even under the more lenient *de novo* standard of review, the claim fails.

To the extent that Hale asserts that the trial court did not comply with Ohio Criminal Procedural Rule 16(B)(1)(g), as discussed above, this claim is not cognizable on federal habeas review. The Sixth Amendment does not provide Hale relief, either. The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend VI. It "guarantees an *opportunity* for effective cross-examination . . . ." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985) (emphasis in original). It does not, however, guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id*. Hale does not allege that the trial court denied defense counsel the opportunity to cross-examine the State's witnesses, including about prior statements they may have made. Indeed, as the state court found, the record does not show that defense counsel even asked to examine the statements at issue. Hale's confrontation rights, therefore, were not violated in this case.

Nor was there any due process violation based on the trial court's handling of the State witnesses' statements, as Hale contends. Hale alleges the trial court failed to permit defense counsel to review three prior inconsistent statements of State witnesses but has not demonstrated that the alleged inconsistencies, to the extent that they even existed, were so material that defense counsel's inability to cross-examine the witnesses about them rendered his trial fundamentally unfair.

First, Hale notes that James Hull, a friend of Hale's, testified that he helped Hale move his belongings out of the Lake Erie Lodge, the site of the murder, on June 23, 2004, two days after the murder occurred; but Hull's statement to police shows that the detective informed Hull that the

64

day he helped Hale move was June 23. (Doc. No. 31 at 143.) Consistent with his statement, however, Hull testified that he did not recall "what day exactly" he first socialized with Hale the week he helped Hale move, but after the prosecutor explained the various dates involved, such as the checkout date from the lodge, he agreed that he helped with the move on June 23. (Doc. No. 8-4 (Trial Tr.) at 317–18 (Hull Test.); Doc. No. 7-10 at 32–33 (Hull Statement).) Defense counsel also cross-examined Hull about his inability to recall the exact dates of the events at issue. (Doc. No. 8-4 (Trial Tr.) at 383, 387–88.) Hull's testimony regarding the date he assisted Hale move, therefore, was not inconsistent with his statement.

Second, Hale notes that Hull testified that after moving Hale's things from the lodge, they purchased beer and cigarettes, went to Hull's sister's house and took her children swimming, and then parted ways; but Hull told the police that after having drinks at a bar called Christine's and helping Hale move, he did not see Hale again. (Doc. No. 31 at 143-44 (citing Doc. No. 8-4 (Trial Tr.) at 371–77; Doc. No. 7-10 at 32–33 (Hull Statement)).) Hale argues that Hull's differing account at trial of the day's activities, which omitted any mention of a stop at the bar Christine's and added details such as a beer-and-cigarettes purchase and a swim with children, "made Hale seem particularly cold and callous." (*Id*. at 144.) The state court reasonably concluded that this inconsistency is not material. Hull mentioned in his statement that, as he testified, he and Hale visited Hale's sister's house the day in question, and after that day he did not see Hale again. (Doc. No. 8-4 (Trial Tr.) at 373 (Hull Test.); Doc. No. 7-10 at 32–33 (Hull Statement).) In addition, Hale does not explain how cross-examining Hull about these inconsistencies would have bolstered his defense, including by making him appear less "cold and callous." Hull simply may have recalled the day more clearly since being interviewed by police and drawing attention to Hale's activities that day through cross-examining Hull could have done Hale more harm than good.

65

Moreover, even if this inconsistency were material, the prosecutor informed defense counsel that Hull's testimony about the events of the day was inconsistent with his statement to police, and defense counsel could have cross-examined Hull or requested to see Hull's statement but did not. Before Hull testified, the prosecution informed the court and defense counsel in a sidebar that there was a "contradiction [in] how [Hull] describe[d] the events surrounding his involvement with Mr. Hale" the week of the murder between his statement and his expected testimony. (Doc. No. 8-4 (Trial Tr.) at 270–71.) He requested that Hull be considered a court's witness so that both parties could cross-examine him, because his testimony might have incriminated him as an accessory to a charge of tampering with evidence, which the judge denied after appointing counsel for Hull. (*See id.* at 269–73.) Then, after Hull testified about his activities with Hale on June 23, prosecutor Thomas asked Hull if he had given a statement to police. (*Id.* at 380.) Hull said he had, and the prosecutor requested an *in camera* meeting with the judge and defense attorney Magee to discuss Hull's statement. (*Id.*) The full record of that discussion states:

> THE COURT: Well, it wasn't covered in the testimony, but to contradict with that.
>
> MR. THOMAS: If you want me to I'll agree to let counsel ask that question.
>
> THE COURT: I'll just note a portion of the statement that seemed to be in question and answer format and there is a long – longer narrative portion that does appear more in the form of a pure statement.
>
> MR. MAGEE: Judge, we would just inquire as to when the statement was recorded.
>
> THE COURT: Appears from the notation on the bottom, May 25, 2005.
>
> MR. MAGEE: Okay.
>
> THE COURT: It doesn't indicate the time of day.
>
> MR. THOMAS: Still proffer for the record.

66

THE COURT: All right. So I don't find anything inconsistent based on what he testified to. Again, it doesn't cover everything that he's testified to.

MR. THOMAS: Well, just so we have a complete record, the point that you're noting is on page 2 at the end of the narrative at the upper half of the page, and I believe what you are referring to is I didn't see him any more after that until I went to the bar, Christine's, and he had killed a guy. Is that what you're focusing on? Does counsel deem that to be a material omission, do you wish to cross-examine?

MR. MAGEE: No.

THE COURT: We'll mark it for proffer.

(Doc. No. 8-4 (Trial Tr.) at 381–82.) The record shows, therefore, that the State informed defense counsel of Hull's prior inconsistent statement about the events of June 23, and counsel neither requested to review the statement nor objected to their inability to see it. Moreover, they had every opportunity to cross-examine Hull about the contradiction at issue.

Third, Hale asserts that the trial court improperly precluded defense counsel from inspecting the report of Detective Baird after Baird testified at a suppression hearing, which would have shown that he did not tell Hale as he testified that Green was bisexual and that if Green had propositioned Hale his actions would have been understandable. (Doc. No. 31 at 144 (citing Doc. No. 8-1 (Trial Tr.) at 351; Doc. No. 7-10 at 5–9 (Baird Rpt.)).) Hale claims that this inconsistency was significant because "it undermined the notion that Hale made up the sexual assault as a result of the information from Baird." (*Id.*) But this argument is speculative. The fact that Baird did not write in his report that he made this statement to Hale during the interrogation does not mean that he did not say it as he testified. Furthermore, defense counsel had the opportunity to cross-examine Baird on any facet of his testimony.

Accordingly, Hale has not shown that the trial court's decision that defense counsel was not entitled to inspect the statements of Hull and Detective Baird for prior inconsistent statements

did not violate Hull's confrontation rights or render Hale's trial so fundamentally unfair as to violate his due process rights.

### 2. Expert testimony of Curtiss Jones and Detective Michael Grida (Ground Eight)

For his eighth ground for relief, Hale claims the trial court erred by permitting Curtiss Jones, the State's crime-scene expert, to testify about blood spatter, and Detective Michael Grida to testify about Hale's bank records, when they were not qualified to render opinions on those matters. (Doc. No. 13 at 143–48.) Hale raised this claim on direct appeal to the Ohio Supreme Court, which reasoned:

{¶ 50} In his tenth proposition of law, and in section (E) of his eighth proposition of law, Hale contends that the trial court erred by allowing prosecution witnesses Curtiss Jones and Michael Grida to give expert testimony.

{¶ 51} Curtiss Jones was the supervisor of the trace-evidence department of the Cuyahoga County coroner's office. He testified regarding blood spatter found in Hale's motel room. Hale argues that Jones had insufficient practical experience to qualify as an expert on blood-spatter evidence.

{¶ 52} Hale did not object at trial to the court's recognizing Jones as an expert. Hence, he has waived this issue unless he can demonstrate plain error.

* * *

{¶ 54} No plain error occurred here. Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her specialized knowledge, skill, experience, training, or education. Neither special education nor certification is necessary to confer expert status on a witness. The witness offered as an expert need not have a complete knowledge of the field in question, as long as the knowledge he or she has will aid the trier of fact. *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128.

{¶ 55} Jones testified that he has a master's degree in forensic science. Additionally, he underwent 48 hours of instruction in the field of blood-spatter analysis, had passed two proficiency tests in that field, and had testified three or four times previously on blood-spatter evidence. Jones testified that he deals with blood-spatter evidence "every day in terms of looking at evidence." Examining items "for the presence of biological fluid such as blood" is "one of the main things"

68

he does, and when he does so, he applies his knowledge of blood-spatter analysis. In light of Jones's training and experience, the trial court did not commit any obvious error in permitting him to testify as an expert on blood spatter. Cf. *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 362, 662 N.E.2d 311. Hence, no plain error exists, and this issue is waived.

{¶ 56} Hale also questions the reliability of blood-spatter analysis in general. However, we have recognized that blood-spatter analysis is a proper subject for expert testimony. *State v. Biros* (1997), 78 Ohio St.3d 426, 452, 678 N.E.2d 891.

{¶ 57} Michael Grida was a Euclid police detective. Using Hale's bank statements and ATM receipts, Grida testified that Hale had carried a negative bank balance in June 2004, the month of the murder. He also reconciled Hale's bank statement with an ATM receipt showing a negative balance of $1,099.84 in Hale's account.

{¶ 58} Hale objected to some of Grida's testimony, but not on the ground that Grida lacked expert qualifications. Hence, this issue is waived absent plain error. No plain error occurred here. Hale's financial situation gave him a motive for robbery, but the aggravated robbery itself was firmly established by other evidence. In his statement to the Euclid police, Hale admitted stealing Green's SUV and credit card. Hale's friend James Hull saw Hale in possession of Green's SUV after the murder, and police found Hale inside Green's SUV when they arrested him. Green's bank records confirmed that Green's Visa card was used on June 22. Giant Eagle records provided additional evidence that Hale had used the Visa card at the Giant Eagle store.

{¶ 59} Hale's tenth proposition of law and section (E) of his eighth proposition of law are overruled.

*Hale*, 892 N.E.2d at 883–84.

As Respondent argues, this claim is not cognizable on federal habeas review. Hale argues that the trial court's admission of Jones' testimony about blood-spatter evidence and Grida's testimony about financial records violated his due process rights. (Doc. No. 31 at 188.) But the only federal law Hale cites is *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Kumho v. Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). (Doc. No. 31 at 188, 190–92.) These cases concern the admissibility of expert testimony based on scientific, technical, and other specialized knowledge under the Federal

69

Rules of Evidence and are not relevant to a state prisoner's conviction. *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998).

Moreover, Hale offers only conclusory assertions that the two witnesses were unqualified to provide the testimony at issue to support his claim that the trial court erred under Ohio law, and no basis at all for a finding that the testimony resulted in a fundamentally unfair trial. *Id.* (denying habeas petitioner's claim based on the admission of expert testimony where, "as a state evidentiary matter, appellant presents no reason for this court to believe Mitchell's testimony was admitted in error nor any reason to believe that this testimony denied appellant a fundamentally fair trial").

This claim, too, is meritless.

### 3.     Gruesome photographs (Ground Nine)

Hale's ninth ground for relief asserts that the trial court erred in admitting "cumulative and gruesome photographs." (Doc. No. 13 at 149–54.) He also presented this claim on direct appeal to the Ohio Supreme Court, which adjudicated the claim's merits, disposing of the claim as follows:

> {¶ 72} In his ninth proposition of law, Hale contends that he was prejudiced by the admission of gruesome and cumulative autopsy and crime-scene photographs. See generally *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267.

> {¶ 73} State's Exhibits 27 and 28, although they are autopsy photographs, are not gruesome. Neither are the photographs of Green's body wrapped in opaque plastic bags, or those showing the bags after their removal from the body. Likewise, the crime-scene photographs are not gruesome, even though a few show small bloodstains on carpets, furniture, or walls. Thus, although some of these photos are cumulative, *Morales* does not apply to them.

> {¶ 74} Six autopsy photos showing Green's head wounds can be characterized as gruesome. However, State's Exhibits 32, 33, and 34 are not repetitious or cumulative. Each one shows something the other does not. Exhibit 33 shows "fouling" around one of the bullet wounds that indicates it was a contact wound. Exhibit 32 does not show fouling, but does depict the probes that the coroner inserted into the bullet holes to show the angles of entry. Exhibit 34 also shows the probes, but from an angle different from that in Exhibit 32.

70

{¶ 75} On the other hand, State's Exhibit 31 appears to show nothing not shown by Exhibit 33, and Exhibit 30 appears to be merely a closer view of Exhibit 29. Nevertheless, we find no prejudice and no reversible error in the admission of two cumulative photographs. Cf. *State v. Jalowiec* (2001), 91 Ohio St. 3d 220, 230, 744 N.E.2d 163 (cumulative effect of several repetitive autopsy photographs was harmless).  We therefore overrule Hale's ninth proposition of law.

*Hale*, 892 N.E.2d at 886–87.

Hale argues that AEDPA does not apply to this claim because the state court failed to address the federal constitutional grounds he raised before it. (Doc. No. 31 at 208.) A state court has adjudicated a claim "on the merits," however, and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. *Harrington*, 562 U.S. at 99.

The Sixth Circuit repeatedly has held that a trial court's admission of gruesome photographs of a murdered victim does not violate the Constitution when there is some legitimate evidentiary purpose for demonstrating the nature of the injuries. *See, e.g., Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) ("The [state] court found, however, that the photographs were properly admitted as they demonstrated that Biros beat Engstrom rather severely and meticulously dissected her body with two different knives."); *Frazier v. Huffman*, 343 F.3d 780, 789 (6th Cir. 2003) ("The Ohio Supreme Court directly addressed this evidentiary issue, concluding that the multiple photographs 'were introduced during the coroner's testimony to illustrate the testimony,' that '[e]ach photograph presents a different perspective of the victim,' and that the photographs 'were used to illustrate' the nature of the encounter that immediately preceded Skiba's death.") (citation omitted); *Cooey v. Coyle*, 289 F.3d 882, 893 (6th Cir. 2002) (noting Ohio Supreme Court ruling that although the photographs were gruesome, they were highly probative) (citation omitted).

71

Similarly, here, the Ohio Supreme Court reasonably concluded that the photographs were probative demonstrative evidence of the manner of Green's death, showing the entrance points of the gunshot wounds he sustained, and were not so gruesome, cumulative, or repetitive that they unduly prejudiced Hale. Indeed, these photographs were far less inflammatory than those challenged in *Biros*, where the Sixth Circuit upheld the admission of photographs depicting a victim's severed head, severed breast, and severed body parts placed near the victim's torso. *Biros*, 422 F.2d at 391.

The trial court's admission of these photographs, therefore, was not so egregious that it deprived Hale of a fundamentally fair trial, nor did the Ohio Supreme Court's decision contravene or unreasonably apply Supreme Court precedent.

### 4.     State's discovery violations (Ground Ten)

In his tenth ground for relief, Hale first claims the trial court erred in refusing to penalize the prosecution by excluding oral statements Hale made to police officers when prosecutors did not disclose the statements to defense counsel prior to trial in the form required under the court's discovery orders. (Doc. No. 13 at 155–58.) Hale raised this claim on direct review to the Ohio Supreme Court, which resolved the claim on its merits, stating:

> {¶ 106} In section (A) of his eighth proposition of law, Hale contends that the trial court should have punished the state's noncompliance with its discovery orders by excluding Hale's oral statements to Sergeants Baird and Pestak.

> {¶ 107} Crim.R. 16(B)(1)(a)(ii) provides: "Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy * * * [w]ritten summaries of any oral statement * * * made by the defendant or co-defendant to * * * any law enforcement officer." This rule requires that the prosecution "reduce the [defendant's] statement to writing, in the form of a summary, to be provided to the defense during discovery." *State v. Bidinost* (1994), 71 Ohio St. 3d 449, 456, 644 N.E.2d 318.

72

{¶ 108} At issue are Hale's statement to Pestak that he "didn't kill anybody" and Hale's statement to Baird that he had discarded the gun, Green's clothing and shoulder bag, and some towels in a dumpster outside the lodge. The state had informed defense counsel of the statements to Baird during a pretrial, but had failed to provide written summaries of either statement, as required by *Bidinost,* within the deadline set by the trial court.

{¶ 109} The trial court initially ordered that Hale's oral statement to Baird be excluded as a discovery sanction. However, the court did not exclude the statement to Pestak. Later, the trial court found that the defense had opened the door to part of Hale's oral statement to Baird—all except the part about the shoulder bag—and allowed Baird to testify to that portion of the statement.

{¶ 110} The prosecutor asked Sergeant Baird about Hale's admission that he had disposed of the gun and Green's clothing and shoulder bag. On objection, the prosecutor withdrew this question. The defense did not ask the trial court to strike the prosecutor's reference to the shoulder bag or to issue a curative instruction.

{¶ 111} The prosecutor then asked, "[W]hat did the defendant tell you he disposed of?" Baird replied, "He told me that he had disposed of the clothing, the gun *and the bag,* along with some towels." (Emphasis added.)

{¶ 112} Defense counsel objected and moved for a mistrial. At sidebar, the prosecutor suggested that Baird had been referring to a *garbage* bag that Hale had placed the gun and clothing in before disposing of them. The trial court determined that its order did not bar references to the garbage bag. Further questioning clarified that the "bag" mentioned by Baird was indeed a garbage bag.

{¶ 113} Crim.R. 16(E)(3) provides: "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."

{¶ 114} We have held that Crim.R. 16(E)(3) vests the trial court "with a certain amount of discretion in determining the sanction to be imposed for a party's nondisclosure of discoverable material. The court is not bound to exclude such material at trial although it may do so at its option." *State v. Parson* (1983), 6 Ohio St.3d 442, 445, 6 OBR 485, 453 N.E.2d 689.

{¶ 115} *Parson* established guidelines for evaluating the trial court's exercise of discretion in this area: "Where, in a criminal trial, the prosecution fails to comply with Crim.R. 16(B)(1)(a)(ii) by informing the accused of an oral statement made by a co-defendant to a law enforcement officer, and the record does not demonstrate

(1) that the prosecution's failure to disclose was a willful violation of Crim.R. 16, (2) that foreknowledge of the statement would have benefited the accused in the preparation of his defense, or (3) that the accused was prejudiced by admission of the statement, the trial court does not abuse its discretion under Crim.R. 16(E)(3) by permitting such evidence to be admitted." *Parson,* 6 Ohio St.3d 442, 6 OBR 485, 453 N.E.2d 689, syllabus.

{¶ 116} None of the three *Parson* factors exists in this case. First, nothing in the record indicates that the state's failure to provide written summaries of Hale's oral statements in question was a *willful* discovery violation. To the contrary, the trial court expressly found that the prosecution had engaged in "no intentional withholding of the information."

{¶ 117} Second, there is no evidence that foreknowledge of the statements at issue would have benefited the defense. In fact, the defense *had* foreknowledge of these statements. As we have noted, the prosecution had orally informed the defense of Hale's statements to Baird before trial. While this conduct did not satisfy the requirement of a written summary, it clearly did provide the defense with foreknowledge of the statement.

{¶ 118} As for Hale's statements to Pestak that he "didn't kill anybody," the defense learned of them no later than May 9, 2005, when Pestak testified about that statement at the suppression hearing. That hearing occurred 22 days before Pestak testified at trial concerning those statements. Thus, "[w]hile the defense was entitled to a written summary of the statement[s], the record does not reflect that a written summary would have benefited appellant in the preparation of his defense." *Bidinost,* 71 Ohio St.3d at 457, 644 N.E.2d 318.

{¶ 119} Third, the record does not show prejudice. The defense was not surprised by these statements, because defense counsel had actual foreknowledge of their content. Nor did the defense request a continuance to prepare to cross-examine Pestak and Baird. Hence, "the trial court may have properly determined that appellant was prepared to proceed despite any claim of unfair 'surprise.'" *Bidinost,* 71 Ohio St.3d at 457, 644 N.E.2d 318. See also *State v. Wiles* (1991), 59 Ohio St. 3d 71, 80, 571 N.E.2d 97, citing *State v. Edwards* (1976), 49 Ohio St. 2d 31, 42–43, 3 O.O.3d 18, 358 N.E.2d 1051.

{¶ 120} Finally, no due process issue exists here. "There is no general constitutional right to discovery in a criminal case * * *." *Weatherford v. Bursey* (1977), 429 U.S. 545, 559, 97 S. Ct. 837, 51 L.Ed.2d 30. See also *Gray v. Netherland* (1996), 518 U.S. 152, 168, 116 S. Ct. 2074, 135 L.Ed.2d 457. In particular, a criminal defendant has no due process right to inspect his own confession. See *Leland v. Oregon* (1952), 343 U.S. 790, 801–802, 72 S. Ct. 1002, 96 L. Ed. 1302; *Cicenia v. La Gay* (1958), 357 U.S. 504, 510–511, 78 S. Ct. 1297, 2 L.Ed.2d 1523, overruled in part on other grounds, *Escobedo v. Illinois* (1964), 378 U.S. 478, 492, 84 S .Ct.

1758, 12 L. Ed. 2d 977, fn. 15. We overrule section (A) of Hale's eighth proposition of law.

*Hale*, 892 N.E.2d at 891–93.

Hale argues that the Ohio Supreme Court's conclusions that the State's discovery violations were not willful and did not prejudice Hale were based on unreasonable determinations of fact in light of the evidence presented. (Doc. No. 31 at 226.) But he points to no evidence to show the prosecution's willfulness or how the defense was prejudiced when the prosecutors informed defense counsel of the statements at issue well before trial. (*See id*. at 212–14.) Hale also has not, and cannot, refute the state court's observation that the Supreme Court has clearly established that criminal defendants have no due process right to discovery or to inspect the defendant's own confession. This claim, too, fails.

### 5.      Testimony from Robert Stewart (Ground Ten)

Hale next contends in his tenth ground for relief that the trial court erred when it admitted the testimony of Robert Stewart, a maintenance worker at the Lake Erie Lodge, about his reaction to finding Green's body. (Doc. No. 13 at 158–59.) He raised this claim on direct appeal to the Ohio Supreme Court, which addressed the claim's merits, concluding:

> {¶ 60} In section (B) of his eighth proposition of law, Hale contends that Robert Stewart gave inflammatory, irrelevant testimony. Stewart, a maintenance worker at the lodge, had seen Green's body in Room 231. The prosecutor asked him how that affected his emotions. Over a defense objection, the trial court permitted Stewart to answer. Stewart testified that seeing the body "shook [him] up pretty good" and that he "didn't work much the rest of the day."

> {¶ 61} Because Stewart's emotional reaction to seeing the victim's body was irrelevant, the trial court erred by overruling Hale's objection. However, Stewart was a minor witness, and his testimony that seeing the body upset him was not inflammatory. The trial court's error was harmless.

*Hale*, 892 N.E.2d at 885.

Hale asserts that the state court's decision was contrary to clearly established federal law. (Doc. No. 31 at 227.) But he fails to cite any on-point Supreme Court precedent. (*See id*. at 226–27.) Further, the state court reasonably concluded that the testimony was of little value and its admission harmless; it certainly did not render Hale's trial fundamentally unfair. This claim is meritless.

### 6.      Victim-impact testimony (Ground Ten)

For his next sub-claim under  Ground Ten, Hale argues that the trial court erred by permitting the State to elicit improper "victim-impact testimony" from two friends of Green, Ricardo Cuffari and Vivian Wilson Jr. (Doc. No. 13 at 159–64.) Hale raised this claim on direct review to the Ohio Supreme Court, which reasoned:

> {¶ 62} In section (C) of his eighth proposition of law, Hale contends that the testimony of Ricardo Cuffari and Vivian Wilson Jr. amounted to improper "victim-impact evidence." In response to Hale's self-defense claim, the state called Cuffari and Wilson, two friends of Green's, to testify that Green had a peaceful character. Hale claims that their testimony went beyond Green's character for peacefulness.

> {¶ 63} First, Hale complains that Cuffari testified about Green's "business practices." Cuffari testified that it was not Green's "normal practice" to "audition" a potential student before agreeing to teach him. This testimony was relevant because it contradicted Hale's account of why Green was in Hale's hotel room.

> {¶ 64} Hale also complains that Cuffari testified about Green's work in the music industry. Cuffari, who owned a recording and voice-coaching studio, testified that he had met Green after hearing him sing professionally; Green later became a coproducer at Cuffari's studio. Their relationship was originally a professional one, but they quickly became friends. This testimony was relevant to establish Cuffari's relationship with Green, and thus his knowledge of Green's character. "[T]o introduce opinion evidence the offering party must qualify the character witness by laying a foundation showing that the witness is sufficiently acquainted with the accused or victim to have formed an opinion about that person's character." 1 Gianelli & Snyder, Evidence (2d Ed.2001) 253, Section 405.4.

> {¶ 65} Finally, Hale argues that Cuffari's testimony that he and Green had prayed together should have been excluded. The prosecutor asked Cuffari, "[L]eading up to the point in time when Doug died, how would you describe the level of friendship

between the two of you?" Cuffari replied: "Doug was probably one of my best friends at that time. * * * We called each other a lot on the phone. If there was problems on his side or my side, I would call for prayers and vice versa. When my mom was passing away he came to the hospital and prayed over my mom. He also sang in her funeral so you could see how direct it was. And he was a very, very close and dear friend."

{¶ 66} Cuffari briefly mentioned prayers as part of his response to the prosecutor's question about the "level of friendship" between Cuffari and Green. In this context, Cuffari was simply elaborating on Green's status as "one of [his] best friends," thus laying a foundation to establish his knowledge of Green's character.

{¶ 67} Hale complains that Vivian Wilson testified that Green did not smoke or drink beer. Wilson's testimony was relevant to the aggravated-robbery charge, because Green's Visa card was used at the Giant Eagle store to buy beer and cigarettes.

{¶ 68} Wilson also testified that the last time he saw Green, Green had greeted him by saying, "[G]ive me some love * * *." On that occasion, Wilson had asked Green to sing "Happy Birthday" for Wilson's son the next day. This testimony illustrated the close relationship between Green and Wilson and was thus relevant to Wilson's knowledge of Green's character. We reject section (C) of Hale's eighth proposition of law.

*Hale*, 892 N.E.2d at 885–86.

Hale argues that the state court's conclusion here—that the testimony at issue was admissible as laying a foundation to establish the witnesses' knowledge of Green's character—was an unreasonable application of the Supreme Court's holding in *Payne v. Tennessee,* 501 U.S. 808, 111 S. Ct. 808, 115 L. Ed. 2d 720 (1991). (Doc. No. 31 at 227.) In *Payne*, the Supreme Court removed any *per se* constitutional bar to a prosecutor's use of evidence and argument relating to the victim and the impact of the victim's death on the victim's family. *Payne,* 501 U.S. at 827. And if such "victim-impact evidence" is introduced, the Court explained, and it "is so unduly prejudicial that it renders the trial fundamentally unfair, the Fourteenth Amendment's Due Process Clause provides a mechanism for relief." *Id.* at 809. Therefore, "excessive or prejudicial references to victim-impact evidence might 'so infect[] the trial with unfairness as to make the resulting

77

conviction a denial of due process.'" *Beuke v. Houk*, 537 F.3d 618, 648 n.9 (6th Cir. 2008) (citations omitted); *see also Byrd v. Collins*, 209 F.3d 486, 532 (6th Cir. 2000) (applying *Payne*'s rationale to victim-impact evidence introduced during the guilt phase of trial).

Hale argues that Cuffari and Wilson's testimony about Green's personal traits—such as his musical talent and business, strong family relationships, abstention from drinking beer and smoking, religious practices, and wife's frail health—was victim-impact evidence that was "highly prejudicial and had no relevance to the charges at issue." (Doc. No. 31 at 227.) Hale also challenges the prosecution's references to this testimony made during closing argument in the guilt phase of trial. (Doc. No. 13 at 163–64.)

To the extent Hale challenges the Ohio Supreme Court's determination that this testimony was relevant, primarily because it laid a foundation to establish Green's character for peacefulness in rebutting Hale's self-defense argument, that is a matter of state evidentiary law to which this Court must defer. *See, e.g., Bradshaw*, 546 U.S. at 76 (2005) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"). And even if the testimony at issue were properly characterized as victim-impact evidence, it was not so extensive or inflammatory as to rise to a due process violation under *Payne*. *See, e.g., Beuke*, 537 F.3d at 648 (finding testimony about a victim's children was not constitutionally improper, as it was "minimal and largely insignificant" at less than one-half page of transcript testimony and "not inflammatory").

The Ohio Supreme Court's decision, therefore, neither contravened nor misapplied *Payne* or other Supreme Court precedent.[15]

### 7.  Photo of the victim (Ground Ten)

Hale next claims in ground ten that the trial court should not have admitted into evidence a photograph of Green because it was irrelevant and misleading victim-impact evidence. (Doc. No. 13 at 164–65.) The Ohio Supreme Court, in rejecting this claim on direct review, stated:

> {¶ 69} In section (D) of his eighth proposition of law, Hale contends that State's Exhibit 151, a photograph of Green, was irrelevant and misleading. The photograph was taken from the cover of a compact disc containing songs by Green. In the photo, Green wears rings on both hands. The state introduced the photo to show that Green owned and wore jewelry, thus suggesting robbery as Hale's motive to kill him.

> {¶ 70} Hale argues that the photo is misleading because it does not specifically show Green's appearance "at the time he met Hale at his motel room." We find this contention specious. Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This test is a broad one, and the photo clearly satisfies it. See 1 McCormick, Evidence (2006) 733–735, Section 185.

> {¶ 71} Moreover, the photo created no danger of unfair prejudice; hence, no cogent argument exists to exclude the photo under Evid.R. 403(A). Hale offers no explanation to support his assertion that the photo "amounted to victim impact" evidence. Cf. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 57 (predeath photo of victim admissible). We reject section (D) of Hale's eighth proposition of law.

*Hale*, 892 N.E.2d at 886.

Hale argues that the Ohio Supreme Court misapplied *Payne* in concluding that this photograph was not victim-impact evidence and was not unfairly prejudicial. (Doc. No. 31 at 228.)

---

[15] Hale also contends the state court's decision was based on an unreasonable determination of fact in light of the evidence presented. (Doc. No. 31 at 227.) But he does not specify any clearly erroneous factual finding of the state court, and that argument also fails.

But, again, the state court's ruling regarding the photo's relevancy under Ohio evidentiary rules binds this Court, and Hale presents no persuasive argument that it was "so unduly prejudicial that it render[ed] the trial fundamentally unfair" under *Payne*. *Payne,* 501 U.S. at 825. He asserts only that the photo "represented [Green] at a different time." (Doc. No. 31 at 228.) This is insufficiently egregious to support a due process violation. This claim is meritless.

### 8.    State's blood-spatter expert (Ground Ten)

For this sub-claim, Hale repeats his assertion of sub-claim 2 that the trial court improperly permitted State witness Curtiss Jones, who supervised the trace-evidence department of the Cuyahoga County coroner's office, to testify about blood-spatter evidence. (Doc. No. 13 at 165–67.) The Court rejects this claim for the same reasons as those provided above.

### 9.    Testimony of defense witness Johnny Smith (Ground Ten)

Hale also claims in his tenth ground for relief that the trial court erred by excluding certain testimony of defense witness Johnny Smith concerning a sexual assault Green allegedly committed in 1998. (Doc. No. 13 at 167–69.) Hale presented this claim on direct appeal to the Ohio Supreme Court, which reviewed the merits, deciding:

{¶ 35} In section (F) of his eighth proposition of law, Hale argues that the trial court erred by partly excluding defense testimony about a sexual assault Green allegedly committed in 1998.

{¶ 36} At trial, the defense claimed that Hale's killing of Green constituted lawful self-defense because Green had attempted to rape Hale. The state responded to this claim by calling witnesses to testify about Green's peaceful character. See Evid.R. 404(A)(2) (victim's peaceful character admissible to rebut evidence that victim was first aggressor). In response, the defense adduced the testimony of Johnny A. Smith that in 1998, Green had performed oral sex on him, forcibly and against his will.

{¶ 37} The state objected to Smith's testimony. Citing *State v. Barnes* (2002), 94 Ohio St.3d 21, 759 N.E.2d 1240, the state argued that the 1998 sexual assault could not be used to prove Hale's claim of self-defense. The defense argued that *Barnes* was inapplicable because the 1998 assault was being introduced only

80

to rebut the state's evidence of Green's peaceful character, not to prove Hale's self-defense claim.

{¶ 38} The trial court agreed with the state that *Barnes* barred evidence about the 1998 sexual assault. Nevertheless, the trial court permitted Smith to testify that the assault had taken place, because Sergeant Baird had already mentioned the 1998 sexual-assault accusation in his testimony about Hale's interrogation. However, the trial court limited Smith's testimony to information the jury had already heard: that Green had sexually assaulted Smith in 1998 . . . and that the assault had involved oral sex.

{¶ 39} On direct examination, the defense asked Smith whether Green had been "restraining" him during the assault. The state's objection to this question was sustained. Hale claims that the jury should have been allowed to hear Smith's answer.

{¶ 40} The parties' arguments address the applicability of our holding in *State v. Barnes*: "A defendant asserting self-defense cannot introduce evidence of specific instances of a victim's conduct to prove that the victim was the initial aggressor." *Barnes,* 94 Ohio St.3d 21, 759 N.E.2d 1240, syllabus (applying Evid.R. 405(B)). As he did at trial, Hale argues that *Barnes* is inapplicable, because Smith's testimony was not offered to prove that Green was the initial aggressor, but rather "to rebut the good character evidence the State had presented."

{¶ 41} In our view, it does not matter whether the proffered testimony was offered to rebut the state's character evidence, as Hale suggests, or to prove that Green was the aggressor, as the state argues. Under Evid.R. 405, the testimony was inadmissible for *either* purpose.

{¶ 42} Evid.R. 405 governs methods of proving character, including the use of specific instances of conduct. Evid.R. 405 authorizes use of specific instances in only two situations: on cross-examination of the other party's character witnesses, Evid.R. 405(A), and in cases where "character or a trait of character of a person is an essential element of a charge, claim, or defense." Evid.R. 405(B).

{¶ 43} Under our holding in *Barnes,* Smith's testimony could not be used in direct support of Hale's self-defense claim, i.e., to prove that Green was the aggressor on June 21, 2004, because Evid.R. 405(B) authorizes specific instances of a person's conduct only when the person's character "is an essential element of a charge, claim, or defense" and the victim's character is not an essential element of a self-defense claim.

{¶ 44} If we accept Hale's claim that he offered Smith's testimony not to prove that Green was the aggressor but merely to rebut the state's evidence of Green's character, then Evid.R. 405(A) would apply, and *Barnes* would be inapplicable.

But Evid.R. 405(A) does not authorize Smith's testimony either. Nothing in Evid.R. 405(A) allows a party to use *extrinsic evidence* of specific instances of a person's conduct to rebut the other party's evidence regarding that person's character. Accord *United States v. Benedetto* (C.A.2, 1978), 571 F.2d 1246, 1249–1251; *United States v. Pantone* (C.A.3, 1979), 609 F.2d 675, 680; *State v. Bourgeois* (Me.1994), 639 A.2d 634, 636–637; *People v. Champion* (1981), 411 Mich. 468, 471, 307 N.W.2d 681; *Spadafina v. State* (Tenn.Crim.App. 2000), 77 S.W.3d 198, 212; *Daggett v. State* (Tex.Crim.App. 2005), 187 S.W.3d 444, 454, fn. 24.

{¶ 45} Hale also argues that, pursuant to Evid.R. 404(B), the proffered testimony was admissible as "other acts" evidence for *non* character purposes. He argues that the testimony would have provided evidence of Green's intent to sexually assault Hale and of Green's modus operandi in committing such assaults. But Hale did not offer Smith's testimony for those purposes at trial. He offered it only on the issue of Green's character. Hence, he waived any argument for admissibility based on Evid.R. 404(B). See *Pantone,* 609 F.2d at 682.

{¶ 46} Finally, Hale claims that the exclusion of Smith's testimony denied him due process. We disagree. Due process requires only "that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta* (1984), 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413. Nevertheless, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois* (1988), 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798.

{¶ 47} In *United States v. Bautista* (C.A.10, 1998), 145 F.3d 1140, the court rejected a due process claim on nearly identical facts. Bautista, charged with murder, claimed to have killed the victim "in the heat of passion upon adequate provocation." The claimed provocation was that the victim had made a homosexual advance at Bautista. The defense proffered the testimony of a witness who claimed that the victim had once made such an advance at him. The trial court excluded this testimony, and the defendant was convicted. *Id*. at 1145, 1151.

{¶ 48} The court of appeals affirmed, noting that "the right to present defense witnesses is not absolute. A defendant must abide [by] the rules of evidence and procedure."

{¶ 49} Like Bautista, Hale was able to present his self-defense claim to the jury by relying on his confession. Indeed, the trial court gave Hale greater leeway than Bautista received. Smith was permitted to testify about the alleged sexual assault by Green, notwithstanding Evid.R. 405. He was prevented only from stating that Green had restrained him. The trial court's (partial) enforcement of Evid.R. 405 did not deny Hale a "meaningful opportunity to present a complete defense," and hence

did not violate Hale's right to due process. *Trombetta*, 467 U.S. at 485, 104 S.Ct. 2528, 81 L.Ed.2d 413. We overrule section (F) of Hale's eighth proposition of law.

*Hale*, 892 N.E.2d at 881–83.

Hale argues that the state court's decision was contrary to, or an unreasonable application of, clearly established Supreme Court precedent and was based on an unreasonable determination of the facts. (Doc. No. 31 at 230.) But, again, he merely restates the arguments he advanced before the state court—namely, that Smith's testimony regarding the specifics of Green's alleged assault was relevant to rebut the State's evidence of Green's character, show Green's intent to assault Hale, and "further corroborate[] Hale's version of events." (*Id*. at 229–30.) Hale does not specify any facts that are clearly erroneous or any clearly established Supreme Court case that the state court misapplied or contravened. The court's interpretation of Ohio evidentiary law is binding on this Court. And, as the Ohio Supreme Court explained, Hale was afforded the due process protections clearly established by the Supreme Court for defendants in their presentation of a defense: "'a meaningful opportunity to present a complete defense'" but not "'an unfettered right to offer testimony that is . . . otherwise inadmissible under standard rules of evidence.'" *Hale*, 892 N.E.2d at 883 (quoting, respectively, *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984), and *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. S. Ct. 646, 98 L. Ed. 2d 798 (1988)). This claim is unfounded.

### 10.    Allegations of prosecutorial misconduct (Ground Ten)

Hale's final claim in his tenth ground alleges that the trial court erred by overruling numerous defense objections to instances of prosecutorial misconduct. (Doc. No. 13 at 169–70.) As will be explained in relation to Hale's twenty-first ground for relief, Hale's underlying claims

of prosecutorial misconduct lack merit. It follows that the trial court did not err in failing to sustain defense counsel's objections to that conduct.

### 11.    Preclusion of mitigating evidence (Ground Thirteen)

For his thirteenth ground for relief, Hale asserts that the trial court improperly excluded relevant mitigating evidence regarding the potential impact of a death sentence on Hale's family. (Doc. No. 13 at 226–31.) Hale raised this claim on direct review to the Ohio Supreme Court, which adjudicated the claim on the merits, deciding:

{¶ 121} In Hale's 11th proposition of law, he contends that the trial court improperly excluded relevant mitigating evidence from the penalty phase.

{¶ 122} Hale's three sisters, Latisha, Lashayla, and Laquatia, testified on his behalf in the penalty phase. During Lashayla's testimony, defense counsel asked: "What would it do to you if your brother was sentenced to death?" The state's objection was sustained.

{¶ 123} Hale claims this ruling was erroneous because the impact of the death penalty on the defendant's family is a relevant mitigating factor. The constitutional right of a capital defendant to present mitigating evidence includes any aspect of his character or record and any of the circumstances of the offense. *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973.

{¶ 124} However, a trial court may exclude proffered mitigation that is not relevant to the defendant's character, his record, or the circumstances of the offense. *Id.* at fn. 12. Several jurisdictions have held that testimony by the defendant's relatives concerning the impact that the defendant's execution will have on them is not relevant to the defendant's character, his record, or the circumstances of his offense and therefore may be excluded. See, e.g., *People v. Vieira* (2005), 35 Cal.4th 264, 295, 106 P.3d 990, 25 Cal.Rptr.3d 337; *People v. Armstrong* (1998), 183 Ill.2d 130, 154–155, 233 Ill.Dec. 252, 700 N.E.2d 960; *Ross v. State* (Miss. 2007), 954 So.2d 968, ¶ 15; *Fuller v. State* (Tex.Crim.App. 1992), 827 S.W.2d 919, 936; *State v. Stenson* (1997), 132 Wash.2d 668, 750–754, 940 P.2d 1239. Contra *State v. Stevens* (1994), 319 Or. 573, 584, 879 P.2d 162 (effect of execution on defendant's family is relevant to his character because it shows his capacity to be of emotional value to others).

{¶ 125} Even were we to conclude that the evidence should have been admitted, we would find in this case that any error was harmless. The trial court's ruling was narrow. Although Lashayla was precluded from testifying as to how Hale's

84

execution would affect her, she was permitted to testify that she loved him. Similarly, Latisha and Laquatia testified that they loved Hale and wanted to maintain a relationship with him. In addition, all three sisters were permitted to expound on Hale's good qualities. Thus, while staying within the bounds of the trial court's ruling, Hale's sisters were fully able to convey that they loved and valued their brother and to present aspects of his character that militated in favor of sparing his life. See *Vieira,* 35 Cal.4th at 295, 106 P.3d 990, 25 Cal.Rptr.3d 337; *State v. Loftin* (1996), 146 N.J. 295, 369, 680 A.2d 677 (any error would have been harmless; defendant presented character evidence that directly focused on his relationship with wife and child). We overrule Hale's 11th proposition of law.

*Hale*, 892 N.E.2d at 893.

Hale asserts that the Ohio Supreme Court's decision was contrary to authority of "numerous federal courts including the U.S. Supreme Court, [that] evidence [of the effect of a death sentence on his family] may have caused the jury to impose a less severe penalty and was therefore relevant to mitigation." (Doc. No. 31 at 330–31.) But the only Supreme Court decision he cites in support of that specific proposition is *Pinholster*, 563 U.S. at 191, which he explains "notes the 'family sympathy' mitigation defense." (Doc. No. 31 at 331.) Clearly established law for purposes of § 2254(d)(1), however, includes "only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White*, 572 U.S. at 419 (internal quotation marks and citations omitted). And must "squarely address[]" or "clearly establishe[]" a legal rule developed in a different context applied to the facts of that case. *Wright*, 552 U.S. at 125. As Hale concedes, the Court in *Pinholster* did not squarely address whether the constitution guarantees defendants the right to present "family sympathy" mitigation defense but merely noted in the context of discussing the constitutional effectiveness of the defense counsel's trial strategy that this particular "defense was known to the defense bar in California at the time and had been used by other attorneys." *Pinholster*, 563 U.S. at 191.

85

The Ohio Supreme Court correctly identified the controlling Supreme Court precedent on this issue: *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). There, the Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604 (emphasis in original). The Court cautioned, however, that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at n.12. The state court's decision that the testimony of Hale's sisters regarding the toll a possible death sentence on their brother would take on them was not relevant to Hale's character, his record, or the circumstances of his offense and was properly excluded, therefore, did not contravene or misapply *Lockett.* The state court also reasonably concluded that even if the evidence should have been admitted, any error would have been harmless, as Hale's sisters' testimony as it was established their love for Hale and positive aspects of his character that weighed against a death sentence.

Hale's thirteenth ground for relief, therefore, is meritless.

### 12. Admission of prejudicial evidence during sentencing phase of trial (Ground Fourteen)

For his fourteenth ground for relief, Hale challenges the trial court's admission of certain evidence in the mitigation phase of trial that he deems prejudicial and irrelevant. (Doc. No. 13 at 232–39.) Hale raised this claim in state court on direct appeal. The Ohio Supreme Court denied it on plain-error review, concluding:

> {¶ 126} In his 12th proposition of law, Hale argues that the trial court allowed inadmissible evidence in the penalty phase.

{¶ 127} Hale's sister Laquatia testified in the penalty phase. During her cross-examination, the state elicited testimony regarding a threat by Hale to kill his father. Laquatia testified that she had heard about the threat, but "wasn't present" when it was made. The defense objected, but did not state any grounds for the objection, and the trial court overruled it.

{¶ 128} Hale now advances three grounds for holding the testimony inadmissible. First, he argues that Laquatia's testimony was inadmissible hearsay. See *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 233, 744 N.E.2d 163 (hearsay rule applies to the penalty phase). Second, Hale argues that the prosecutor was "testifying," although he makes no attempt to explain this assertion. Third, he argues that Laquatia's testimony was inadmissible because it went to the issue of future dangerousness and showed that Hale was a person of bad character.

{¶ 129} However, Hale did not advance any of these grounds at trial. By failing to "stat[e] the specific ground of objection," Hale waived his claims. Evid.R. 103(A)(1). Hence, he can prevail now only if he shows that the admission of Laquatia's testimony was plain error.

{¶ 130} We find that it was not. Hale's sister Latisha testified that she was present at times when Hale argued with his father. On one such occasion, Hale threatened to kill his father, "but then he told him that he kn[e]w that he wouldn't die so he's not going to kill him. If anything he'll torture him." Laquatia's testimony regarding the death threat was thus merely cumulative of Latisha's testimony, whose admissibility Hale does not challenge.

{¶ 131} Hale also claims that the state improperly elicited evidence about Hale's having been paroled. On cross-examination, the prosecutor asked Dr. John Fabian, the defense psychologist, about the length of the sentence from which Hale had been released in 2003. Fabian knew that Hale had served 12 years, but did not know the length of the original sentence. The prosecutor asked: "In fact, doctor, it was an indeterminate sentence of 12 to 25 years, was it not?" Fabian repeated, "I don't know." The prosecutor then asked: "[A]ssuming that that is accurate, * * * would you agree from your knowledge of the prison system that in order to be red lighted after the minimum term of an indeterminate sentence, the parole board reviewed the inmate's performance while in prison [and] was satisfied that parole was justified at that point?" Fabian said: "That seems logical to me." Fabian had not discussed parole on direct examination.

{¶ 132} Again, the defense made nonspecific objections to the prosecutor's questions. Thus, Hale has failed to preserve his claim and must demonstrate that it was plain error to permit Fabian to answer these questions. Raising the issue of parole on cross-examination may have been improper, see *State v. Cassano,* 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 98, but it was not clearly

> outcome-determinative. We therefore find that no plain error occurred. Moreover, our independent review of the death sentence will cure the error, as the possibility of parole will play no part in our analysis. Hale's 12th proposition of law is overruled.

*Hale*, 892 N.E.2d at 893–94.

As the state court, in its plain-error review, analyzed these evidentiary issues only under state law, this Court reviews this claim *de novo*. Hale argues that the challenged testimony regarding Hale's prior death threats and parole was "constitutionally inadmissible." (Doc. No. 31 at 338.)

Hale first asserts that Laquatia's testimony about Hale threatening his father was inadmissible hearsay and violated the Sixth Amendment's Confrontation Clause. (*Id*. citing *Lilly v. Virginia*, 527 U.S. 116, 124, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999)).) As noted above, the Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend VI. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) (citation omitted).

In *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), the Supreme Court held that the Clause permits the admission of out-of-court statements by an unavailable witness, so long as the statements carried "adequate 'indicia of reliability.'" *Id*. at 66. Such indicia are present, it explained, if "the evidence falls within a firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." *Id.* More recently, however, in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the Court adopted a different approach. It concluded that "witnesses" under the Confrontation Clause are those "who bear

testimony," and defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51 (internal quotation marks and alteration omitted). The Sixth Amendment, the Court reasoned, prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is "unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 54. It has force outside traditional hearsay rules. *Id.* at 50–51. In *Crawford*, the Court held that statements by a witness during police questioning at the station house were testimonial and thus could not be admitted. *Id*. at 65–69. The Court did not provide an exhaustive definition of "testimonial" statements, but it explained that the label "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68.

Here, Hale does not argue that his sister's testimony about his prior death threats was "testimonial." And for good reason; it was not. Laquashia testified only that she "heard about" this incident. There is no indication that she is relaying prior testimony at any kind of legal proceeding or a statement made during a police interrogation. *Crawford,* 541 U.S. at 54. And if a statement does not qualify as testimonial, its "admissibility . . . is the concern of state and federal rules of evidence, not the Confrontation Clause." *Michigan v. Bryant,* 562 U.S. 344, 359, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011).

Hale further contends that the testimony about Hale's death threat and parole history violated his rights to due process and a reliable sentencing determination, ostensibly because it was "inflammatory and prejudicial bad-character evidence." (Doc. No. 31 at 332, 336.) As the Ohio Supreme Court concluded, however, the testimony about Hale's threats to his father was cumulative to the testimony of Hale's sister, Latisha, who was present when Hale made similar threats. (*See* Doc. No. 8-5 (Trial Tr.) at 305–07, 323–24.) And, as the Ohio Supreme Court noted,

89

even if the trial court's alleged error rose to the level of a due process violation, it cured that error through its independent reweighing of aggravated and mitigating circumstances in reviewing Hale's death sentence. *See Hoffner v. Bradshaw*, 622 F.3d 487, 497 (6th Cir. 2010) (holding that "even if the trial court's alleged error rose to the level of a due process violation, the state supreme court cured it through independent reweighing").

Lastly, Hale claims the prosecution's questioning that elicited this testimony amounted to prosecutorial misconduct. (Doc. No. 31 at 336-37.) As will be discussed in relation to Hale's twenty-first ground for relief, the Court finds those claims meritless, and it therefore follows that the trial court did not err in admitting the testimony at issue.

Hale's fourteenth ground for relief, therefore, is denied.

### 13. Consideration of victim-impact evidence at sentencing phase of trial (Ground Fifteen)

Hale argues for his fifteenth ground for relief that the trial court improperly considered victim-impact evidence at the sentencing phase of trial. (Doc. No. 13 at 240–44.) Hale presented this claim on direct appeal to the Ohio Supreme Court, which reviewed the merits of the claim as follows:

{¶ 146} In his 15th proposition of law, Hale contends that the trial judge improperly considered victim-impact evidence in sentencing him to death.

{¶ 147} After the jury returned its sentencing recommendation on June 16, 2005, the trial judge scheduled a final hearing for the purpose of imposing sentence. This hearing was held on July 18, 2005. At that time, after hearing from counsel for both parties and giving Hale an opportunity for allocution, the trial judge explained why the aggravating circumstance outweighed the mitigating factors and announced his decision to sentence Hale to death. *After* that, the judge heard the statements of Douglas Green's sister and daughter. He then imposed sentence on all counts, both capital and noncapital.

{¶ 148} "Absent an indication that the trial court considered the victim-impact evidence in arriving at its sentencing decision, the admission of such evidence is

90

not reversible error. * * * [T]his court will presume that a trial court considered only the relevant, material, and competent evidence in arriving at its judgment, unless the contrary affirmatively appears from the record." *State v. Myers,* 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 131.

{¶ 149} The record contains no affirmative indication that the trial judge considered the statements of Green's relatives in sentencing Hale to death. To the contrary, the judge announced his findings and sentence on the aggravated murder *before* hearing from Green's relatives. We therefore overrule Hale's 15th proposition of law.

*Hale*, 892 N.E.2d at 896.

Hale argues that the state court's decision was contrary to, and an unreasonable application of, clearly established Supreme Court precedent and is based on an unreasonable determination of fact. (Doc. No. 31 at 350–52.)

In *Booth v. Maryland*, 482 U.S. 496, 509, 107 S. Ct. 2529, 96 L. Ed. 2d 440 (1987), the Supreme Court held that the introduction of evidence of evidence and argument relating to the victim and the impact of the victim's death on the victim's family at the sentencing phase of a capital murder trial violates the Eighth Amendment. As explained above, however, the Court later reversed that holding in *Payne,* 501 U.S. at 827, removing *Booth*'s *per se* constitutional bar to a prosecutor's use of victim-impact evidence. But the Court did not disturb *Booth*'s proscription against "a victim's family members' characterization and opinions about the crime, the defendant, and the appropriate sentence." *Id.* at 830 n.2.

Hale argues that the Green family's testimony went beyond *Payne*'s permissible victim-impact evidence into areas still forbidden under *Booth*. (Doc. No. 31 at 350–51.) Green's sister, Rose Reeves, for example, called Hale a "heartless, ruthless person," and testified that "[t]here is nothing that you can say or do to convince me that my brother – that you were threatened [by] my brother." (Doc. No. 8-5 (Trial Tr.) at 820–21.) Green's daughter, Christian Green, contradicted

Hale's defense by testifying that "[m]y father always told someone where he was going, or when he was going to be late." (*Id.* at 823–24.)

Respondent maintains that the Ohio Supreme Court did not misapply *Payne* or *Booth* because the judge heard the family members' testimony after he had already announced his sentencing decision. (Doc. No. 17 at 126–27.) The Court agrees. In both cases, the Supreme Court was clear that the issue before them was whether this type of evidence was relevant to a capital sentencer's decision. In *Booth*, the Supreme Court held, "[W]e find that this information is *irrelevant to a capital sentencing decision*, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Booth*, 482 U.S. at 502–03 (emphasis added). In *Payne*, the Supreme Court declared:

> We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family *is relevant to the jury's decision* as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne,* 501 U.S. at 25 (emphasis added). *See also Fautenberry*, 515 F.3d at 637–39 (holding that the Ohio Supreme Court did not unreasonably apply *Booth* in finding that a three-judge panel's consideration of victim-impact evidence did not require reversal of petitioner's death sentence because there was no evidence that the judges considered the evidence in sentencing the defendant).

Hale further challenges the Ohio Supreme Court's finding that the trial judge did not consider the family's improper testimony because he did not impose Hale's death sentence until immediately after hearing the family's testimony. (Doc. No. 31 at 351.) But the record supports the state court's finding. As the state court described, the judge carefully explained each

aggravating circumstance and mitigating factor presented, heard argument from both parties, asked Hale if he would like to make a statement, and described how he weighed the aggravating circumstances and mitigating factors. (Doc. No. 8-5 (Trial Tr.) at 791–819.) The trial judge then pronounced, "the Court finds that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt, and therefore find[s] that the sentence of death is appropriate in this case." (*Id*. at 819.) After so ruling, the judge asked if anyone wished to speak on behalf of Green. (*Id*.) It was then that Green's family testified. (*Id*. at 820–25.) Afterward, the judge declared Hale's formal sentence for each separate conviction. (*Id*. at 825–27.) The Ohio Supreme Court, therefore, correctly determined that the judge announced Hale's death sentence before hearing Hale's family's testimony.

Accordingly, Hale's fifteenth ground for relief is denied.

## IV.  Fifth Ground for Relief: *Right to Presence*

Hale argues for his fifth ground for relief that he was not present at all critical stages of his trial in violation of his constitutional right to be present. (Doc. No. 13 at 129–31.) Specifically, Hale alleges the trial court permitted his absence from seven pretrial hearings and from four trial proceedings without securing a valid waiver. (*Id*. at 129.) Respondent contends this claim is partially procedurally defaulted and meritless. (Doc. No. 17 at 85–89.)

### A.  Procedural Posture

Hale raised a right-to-presence claim on direct appeal to the Ohio Supreme Court. (*See* Doc. No. 7-3 at 174–77.) The court resolved the claim on its merits. *See Hale*, 892 N.E.2d at 890–91. Respondent maintains, however, that the claim is partially procedurally defaulted because Hale alleges here two additional instances in which he was denied his right to presence at trial proceedings. (Doc. No. 17 at 86.)

93

Determining when a claim has been "fairly presented" because of variations in legal theory or factual allegations "is contextual and individual to each case." *Houston v. Waller*, 420 F. App'x 501, 509 (6th Cir. 2011). With a right-to-presence claim, each individual allegation of an improper absence can constitute a separate constitutional violation and must be evaluated in light of its particular circumstances. *See Snyder v. Massachusetts*, 291 U.S. 97, 115, 54 S. Ct. 330, 78 L. Ed. 674 (1934) (overruled in part on other grounds) (explaining the issue in a right-to-presence claim is "whether in the particular conditions exhibited by the record the enforced absence of the defendant [was] . . . flagrantly unjust"). Hale's allegations regarding his absence from trial proceedings on January 11, 2005, and March 24, 2005, therefore, are procedurally defaulted as they are record-based (*see* Doc. No. 8-1 (Trial Tr.) at 14–25 (Jan. 11, 2005 pretrial); *id. at* 39–43 (March 24, 2005 pretrial)) and were never raised on direct appeal in state court.

Hale argues that even if he defaulted the two new claims, he could demonstrate cause and prejudice to excuse the defaults in the ineffectiveness of his counsel. (Doc. No. 31 at 157.) As will be discussed below in relation to the underlying ineffective-assistance claims, however, those claims themselves are either procedurally defaulted and/or meritless.

### B.  Merits Analysis

The Ohio Supreme Court was the last state court to address this claim, which it rejected, reasoning:

> {¶ 100} In his fourth proposition of law, Hale contends that trial proceedings were conducted in his absence. An accused has a fundamental right to be present at all critical stages of his criminal trial. However, "the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*." (Emphasis added.) *Snyder v. Massachusetts* (1934), 291 U.S. 97, 107–108, 54 S.Ct. 330, 78 L.Ed. 674, overruled on other grounds by *Malloy v. Hogan* (1964), 378 U.S. 1, 17, 84 S.Ct. 1489, 12 L.Ed.2d 653. The question is whether his presence has a "reasonably substantial"

94

relationship to "the fullness of his opportunity to defend against the charge." *Id.* at 105–106, 54 S.Ct. 330, 78 L.Ed. 674.

{¶ 101} On May 12, 2005, Hale was absent during all or part of a brief, inconclusive discussion between the trial judge and counsel for the parties. The defense complained that the state was still disclosing evidence that should have been disclosed earlier. The state asserted that it had already informally disclosed the evidence in question and was now merely doing so "in a formal written fashion" for the record.

{¶ 102} Hale's "absence was not prejudicial because the jury received neither testimony nor evidence, and no critical stage of the trial was involved." *State v. Frazier,* 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 145. Hale contends that his presence during this discussion "would have been important" because it "would have alerted him to the ineffective assistance of counsel he was receiving * * * which would have prompted him to raise the issue before the trial court." We reject this speculative claim.

{¶ 103} Hale was also absent from a proceeding in chambers on May 25, 2005. This proceeding involved a discussion of "technical and procedural and evidentiary matters," and defense counsel waived Hale's presence. Hale contends that counsel may not waive a client's right to be present, but he is incorrect. See, e.g., *Frazier,* 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 144; *State v. Green* (2000), 90 Ohio St.3d 352, 372, 738 N.E.2d 1208. Moreover, Hale's absence was not prejudicial, as the jury received no testimony or evidence in his absence. See *Frazier* at ¶ 145.

{¶ 104} Hale also contends that he was not present during ten "pretrial hearings" held between August 23, 2004, and March 10, 2005. The record does not show that any hearings actually took place on the dates indicated. The trial court's docket and journal entries state only that "pretrial[s]" were held on those dates. These may have been pretrial *conferences*. See generally Crim.R. 17.1.

{¶ 105} Whatever the "pretrials" were, none of them was recorded.[4] "[T]he record must affirmatively indicate the absence of a defendant or his counsel during a particular stage of the trial." *State v. Clark* (1988), 38 Ohio St.3d 252, 258, 527 N.E.2d 844. As no record was made, we cannot determine whether Hale was absent from the pretrials in question. Hale's fourth proposition of law is overruled.

---

[4] Pretrial conferences need not be recorded if the defendant is represented by counsel. Crim.R. 17.1.

*Hale*, 892 N.E.2d at 890–91.

Hale asserts that the state court's decision was contrary to, and an unreasonable application of, clearly established Supreme Court precedent and was based on an unreasonable determination of facts in light of the evidence presented under AEDPA's § 2254(d). (Doc. No. 31 at 155–56.) This Court reviews *de novo* Hale's new claims regarding the January 11 and March 24 proceedings.

The Constitution guarantees a criminal defendant the right to be present at trial. *United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 846 (1985) (noting the right to presence is "rooted to a large extent in the Confrontation Clause of the Sixth Amendment . . . [and] is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him."). But this right is not absolute: "'[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" *Id.* (quoting *Snyder*, 291 U.S. at 105–06 *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 17, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)) (alteration in original). It exists, therefore, only "at [a] stage of the criminal proceeding that is critical to its outcome" and "if [the defendant's] presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987); *see also Taylor*, 484 U.S. at 418 ("The adversary process could not function effectively if every tactical decision required client approval."). Whether a defendant has been improperly excluded from a trial proceeding must be considered in light of all of the circumstances. *Snyder*, 291 U.S. at 115.

As to Hale's allegations regarding his absence from ten "pretrial hearings," Hale challenges the Ohio Supreme Court's conclusion that the record does not show he was actually absent from them. (Doc. No. 31 at 156.) The state court noted that the trial court's docket showed only that

"pretrials" took place on the dates in question, not hearings, and because the proceedings were not recorded, which was not required under Ohio court rules, it could not determine if Hale attended them or not. *Hale*, 892 N.E.2d at 890–91. That said, Hale insists that he "was not present" at the pretrial proceedings at issue. (Doc. No. 31 at 152, 156.) As support, he cites an assertion of his state appellate counsel that Hale was absent from the pretrials in a motion he filed in the Ohio Supreme Court requesting police reports that he claimed may have reported on the pretrials. (*Id*. at 152 (citing Doc. No. 7-3 at 465–68).) But the only supporting evidence submitted with that motion was an affidavit of one of Hale's trial counsel, who averred only that the pretrials in question concerned discovery and "some" were canceled—not that Hale was absent from them. (Doc. No. 7-3 at 468.)[16] The Ohio Supreme Court, therefore, correctly determined that the record does not establish Hale's absence from the pretrials at issue, and reasonably rejected Hale's right-to-presence claim based on court proceedings from which he could not prove his absence.

Hale asserts that he also was absent from four "trial" proceedings in violation of his presence rights. (Doc. No. 31 at 152.) Two occurred during his 2005 trial, on May 12 and May 25, which the Ohio Supreme Court examined. *See Hale*, 892 N.E.2d at 890. As the state court noted, the May 12 proceeding was a "brief, inconclusive discussion" about a discovery dispute; the May 25 proceeding dealt with "'technical and procedural and evidentiary matters'" and defense counsel waived Hale's presence. *Id*. The other two proceedings, which Hale did not complain of in his state-court appeals, took place before the trial began, on January 11 and March 24 of that year. The judge stated at both of those recorded proceedings that Hale had waived his right to be present; he described the January proceeding as concerning a "procedural matter" regarding discovery and

---

[16] The Ohio Supreme Court denied Hale's motion for discovery of the police reports. (Doc. No. 7-3 at 471.)

the March proceeding as addressing "housekeeping" matters. (Doc. No. 8-1 (Trial Tr.) at 15 (Jan. 11); *id.* at 39 (March 24).)

The Ohio Supreme Court reasonably concluded that the May 12 and 25 proceedings did not occur during critical stages of the trial, as the jury received no evidence or testimony. *Hale*, *Hale*, 892 N.E.2d at 890. The same is true of the other two proceedings, which occurred before trial and concerned only discovery and housekeeping matters. *See, e.g., United States v. Taylor*, 489 F. App'x 34, 44 (6th Cir. 2012) (finding no violation of presence right where defendant was absent from sidebar conferences and chambers conferences considering matters of law or decisions regarding trial procedures and the progress of the trial) (colleting cases). The record does not show that the pretrials were "critical to [the trial's] outcome" and Hale's "presence would [have] contribute[d] to the fairness of the procedure." *Stincer*, 482 U.S. at 745. Hale "could have done nothing had [he] been at the conference[s], nor would [he] have gained anything by attending." *Gagnon*, 470 U.S. at 527.

Despite the mundane nature of these proceedings, Hale argues that his presence rights were violated at each of them because he did not personally waive his right to attend on the record. (Doc. No. 31 at 152–53.) As the state court explained, however, Hale is incorrect. The Supreme Court held in *United States v. Gagnon, supra,* that a trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend." *Gagnon,* 470 U.S. at 528. A defendant's failure to assert the right to presence is an adequate waiver. *Id.* at 528–29. The Court declared, "[i]f a defendant is entitled . . . to attend certain 'stages of the trial' which do not take place in open court, the defendant or his counsel must assert that right at the time; they may not claim it for the first time on appeal . . . ." *Id.* at 529. Here, Hale's counsel waived Hale's right to attend three of the proceedings at issue. And because neither

Hale nor his attorneys objected to his absence from the fourth, Hale waived his right to be present at the fourth as well.

Hale attempts to distinguish his case from *Gagnon* because *Gagnon* concerned a federal, rather than state, trial and the Court analyzed the waiver issue in the context of a federal evidentiary rule rather than constitutional principles. (Doc. No. 31 at 154.) Instead, he argues the Court's decision in *Taylor v. Illinois, supra,* is controlling, as it "held" that counsel cannot waive the accused's right to presence without a "fully informed and publicly acknowledged consent." (*Id*. at 153.) But this argument, too, is unavailing. The Court held in *Gagnon* that the defendants' due process rights were violated when they were excluded from an *in camera* conference between the judge, defense counsel, and a juror regarding the juror's possible bias. *Gagnon*, 470 U.S. at 526. The fact that the Supreme Court went on to analyze the defendants' waiver of that right in the context of an evidentiary rule (because the lower court had) did not strip the right of its constitutional underpinning. Indeed, the Supreme Court itself has cited *Gagnon* for the proposition that the constitutional right to presence can be waived. *See, e.g., Peretz v. United States*, 501 U.S. 923, 936, 111 S. Ct. 2661, 115 L. Ed. 2d 808 (1991).

*Taylor*, on the other hand, did not squarely address the right to presence at all. That case concerned whether exclusion of testimony of a material defense witness as a discovery sanction against the defendant violated the Compulsory Process Clause. *Taylor*, 484 U.S. at 401–02. The Court only mentioned the right to presence in a footnote as an example of a right an attorney cannot waive without the "fully informed and publicly acknowledged consent of the client," citing a 1963 court of appeals case, *Cross v. United States*, 325 F.2d 629 (D.C. Cir. 1963), for that proposition. *Taylor,* 484 U.S at 418 n.24. *Gagnon*, therefore, not *Taylor,* clearly established the controlling law regarding a defendant's waiver of the right to be present. *See also White*, 572 U.S. at 419 ("clearly

99

established Federal law" for purposes of § 2254(d)(1) includes "only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions") (internal quotation marks and citations omitted). And in applying *Gagnon*, the Ohio Supreme Court correctly found that Hale had waived his right to attend the May 25, 2005, proceedings. Hale also waived his presence right through his counsel or his silence at the other proceedings.

Accordingly, the Ohio Supreme Court did not misapply or contravene clearly established Supreme Court precedent in rejecting Hale's right-to-presence claim or base its decision on an unreasonable determination of fact in light of the evidence presented. In addition, even if Hale's new allegations were not procedurally defaulted, they also would fail. Hale's fifth ground for relief is denied.

## V.  Sixth Ground for Relief: *Unreasonable Search and Seizure*

For this sixth ground for relief, Hale claims that the trial court erred in denying his motion to suppress oral and written statements he gave to the police after he was apprehended. (Doc. No. 13 at 132–36.) Hale raised this claim on direct appeal to the Ohio Supreme Court, which rejected it on the merits. Respondent concedes the claim is properly preserved for habeas review but contends it lacks merit. (Doc. No. 17 at 89.)

The Ohio Supreme Court, the last state court to adjudicate this claim, rejected the claim, stating:

{¶ 20} In his third proposition of law, Hale contends that the trial court erred by denying his motion to suppress the oral and written statements he gave Sergeant Baird on June 28, 2004.

{¶ 21} Sergeant Baird initially questioned Hale in order to obtain his personal information before administering *Miranda*[2] warnings. Only after giving the *Miranda* warnings did Baird interrogate Hale about the murder. In response to Baird's post-*Miranda* interrogation, Hale gave Baird both oral and

written statements admitting that he had killed Green and setting forth his version of the killing.

[2] *Miranda v. Arizona* (1966), 384 U.S. 436, 460–61, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 22} Hale argues that because Baird had asked him questions before giving Miranda warnings—even though the pre-*Miranda* questions did not deal with the murder in any way—his oral and written statements about the murder should have been suppressed.

{¶ 23} The record of the suppression hearing establishes the following sequence of events:

{¶ 24} Sergeant Pestak arrested Hale at approximately 2:30 p.m., June 28, and informed Hale of his *Miranda* rights, which Sergeant Pestak recited from memory. Hale was then driven to the Euclid police station, arriving at 3:35 p.m. Before his shift ended at 5:00 p.m., Sergeant Pestak asked Sergeant Baird to "get a personal history" from Hale.

{¶ 25} Pestak's request referred to the standard personal-history form used by the Euclid detective bureau. The form contains such information as the arrestee's name, address, age, phone number, Social Security number, physical description, employer, education, and the names of his immediate family members. The detective bureau routinely obtains this information from every felony suspect and uses it to complete the form. The bureau gathers this information for police records and to verify the arrestee's identity.

{¶ 26} At 7:50 p.m., Baird had Hale escorted from his cell to the detective bureau. For 20 to 25 minutes, Baird questioned Hale to obtain information for the personal-history form.

{¶ 27} When questioning finished, Baird told Hale that Baird "was going to talk to him briefly about the crime that he was being charged with, and that before [Baird] asked him any questions or talked to him at all about it, that [Baird] had to advise him of his rights." Baird asked Hale to read a form containing the *Miranda* warnings. Baird then read the *Miranda* form aloud to him. Baird asked if Hale understood his rights. Hale said yes and signed the form, acknowledging that he understood them. Baird then showed Hale the waiver portion of the *Miranda* form and told Hale that if he wanted to talk to Baird, he needed to sign the waiver. Hale signed the *Miranda* waiver at 8:22 p.m.

{¶ 28} Baird explained to Hale that he was under arrest for murder, then began what Baird described as a "soft interrogation." Baird discussed the case with Hale for about 20 minutes. Hale then orally stated his version of the events of June 21.[3] When Hale finished, Baird said, "I'd really like to get this on paper so we can

101

have your side of the story." At 8:53 p.m., Baird gave Hale a statement sheet and asked him to write his statement in his own words. Over the next two hours, Hale wrote out a four-page statement, which was ultimately introduced at trial.

> [3] The trial court later excluded Hale's oral statement (but not his written statement) pursuant to Crim.R. 16 as a sanction for the state's failure to make timely discovery. See discussion of section (A) of Hale's eighth proposition of law, below.

{¶ 29} Hale was given *Miranda* warnings twice on June 28: first by Pestak at 3:00 p.m., during his arrest, and then by Baird at approximately 8:15 p.m., just before he began to interrogate Hale about the murder. Hale contends that *neither* set of warnings was effective and that his statement should therefore have suppressed.

{¶ 30} We need not determine whether Pestak's warnings were still effective by the time Baird interrogated Hale. See generally *State v. Roberts* (1987), 32 Ohio St.3d 225, 232, 513 N.E.2d 720. It is undisputed that Baird administered full *Miranda* warnings and obtained an express, written waiver immediately before he interrogated Hale about Green's murder.

{¶ 31} Hale argues that the *Miranda* warnings given by Baird were ineffective and should be ignored because Baird questioned him about his personal history before giving those warnings. Because Baird's warnings did not precede *all* questioning, including the personal-history questions, Hale contends that they were ineffective for *any* portion of the questioning.

{¶ 32} We disagree. Baird was not required to preface the personal-history questions with *Miranda* warnings. The personal-history questions were routine booking questions, and the requirement that police administer *Miranda* warnings before questioning a suspect in custody does not apply to routine booking questions.

{¶ 33} Routine booking questions are questions asked in order "to secure the 'biographical data necessary to complete booking or pretrial services.'" *Pennsylvania v. Muniz* (1990), 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528, quoting *United States v. Horton* (C.A.8, 1989), 873 F.2d 180, 181, fn. 2. The personal-history questions in this case clearly fit within that definition. The information elicited for the personal-history form was routinely requested for record-keeping and identification purposes. Moreover, the personal-history form was not "designed to elicit incriminatory admissions." *Id*. at 602, 110 S.Ct. 2638, 110 L.Ed.2d 528, fn. 14. Hence, the personal-history questions were "reasonably related to the police's administrative concerns." *Id*. at 601–602, 110 S.Ct. 2638, 110 L.Ed.2d 528.

{¶ 34} Thus, no reason exists to suppress Hale's statement. Baird was not required to administer *Miranda* warnings any sooner than he did. By giving complete *Miranda* warnings and obtaining an express waiver before asking Hale

any questions about the crime, Baird complied fully with the relevant constitutional requirements. That fact distinguishes this case from cases such as *Oregon v. Elstad* (1985), 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, and *Missouri v. Seibert* (2004), 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643, in which police first interrogated suspects about their crimes, then administered *Miranda* warnings, then engaged in further interrogation. Cf. *Seibert,* 542 U.S. at 616, 124 S.Ct. 2601, 159 L.Ed.2d 643 (plurality opinion) (postwarning interrogation was "a mere continuation" of prewarning interrogation) and 542 U.S. at 622, 124 S.Ct. 2601, 159 L.Ed.2d 643 (Kennedy, J., concurring) (postwarning interrogation was "related to the substance of [the suspect's] prewarning statements"). We therefore overrule Hale's third proposition of law.

*Hale*, 892 N.E.2d at 879–81.

Hale argues that the state court's decision unreasonably applied clearly established federal law and was based on an unreasonable determination of facts in light of the evidence presented. (Doc. No. 31 at 170.) The Court disagrees.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694  (1966), the Supreme Court held that the Fifth Amendment privilege against self-incrimination is implicated whenever an individual is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." *Id*. at 478. Because custodial interrogations are said to be inherently coercive, *Miranda* established that a suspect must be apprised of certain rights to protect this privilege, including the right to remain silent. *Id*. at 444.

For *Miranda* to apply, the defendant must be in custody and "subjected to questioning." *Id*. at 478. *Miranda* defined interrogation simply as "questioning initiated by law enforcement officers." *Id.* at 444. In *Rhode Island v. Innis,* 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the Court clarified that an "interrogation" for purposes of triggering *Miranda*'s protections refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301. The intent of the

103

police is relevant, the Court explained, as it may have bearing on whether the police should have known their words were reasonably likely to elicit an incriminating response. *Id*. at 301 n.7. Ten years later, in *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990), a plurality of the Supreme Court expanded on *Innis*' exclusion of police activity "normally attendant to arrest and custody" from its definition of an interrogation under *Miranda.* It recognized the so-called "routine booking exception" to *Miranda*, in which "questions . . . reasonably related to the police's administrative concerns . . . fall outside the protections of *Miranda* and the answers thereto need not be suppressed." *Id*. at 601–02.[17]

Hale argues that the Ohio Supreme Court unreasonably applied *Muniz* in concluding that Detective Baird was not required to administer *Miranda* warnings before asking him questions about his "personal history," as they were "routine booking questions," and that Baird properly gave him *Miranda* warnings and obtained his express waiver before he later provided statements regarding his crime. (Doc. No. 31 at 168–70.) Hale alleges that several of the questions Baird asked him do not fall within *Muniz*'s routine booking exception because the information requested was "not necessary for administrative and booking purposes." (*Id*. at 170). He cites the detective's questions about the brand of cigarettes that he smoked, each school he attended, the names of and identifying information about his siblings, and whether he was right- or left-handed. (*Id*.) Hale

---

[17] The Supreme Court has since described the *Muniz* plurality's recognition of the routine booking exception as its holding in that case. *Maryland v. King*, 569 U.S. 435, 456, 133 S. Ct. 1958, 186 L. Ed. 2d 1 (2013) ("[T]he Court has held that 'questions . . . reasonably related to the police's administrative concerns . . . fall outside the protections of *Miranda* and the answers thereto need not be suppressed.'") (quoting *Muniz*, 496 U.S. at 601–02) (alteration omitted); *see also United States v. Woods*, 711 F.3d 737, 743 (6th Cir. 2013); ("[I]n *Pennsylvania v. Muniz*, . . . the Court held that the defendant's incriminating statements in response to the police officer's question as to whether the defendant understood the instructions for certain sobriety tests was not the product of custodial interrogation . . . ."); *United States v. Gaston*, 357 F.3d 77, 82 (D.C. Cir. 2004) ("The Supreme Court held in *Pennsylvania v. Muniz* . . . that officers asking routine booking questions 'reasonably related to the police's administrative concerns' are not engaged in interrogation within *Miranda*'s meaning and therefore do not have to give *Miranda* warnings.") (quoting *Muniz*, 496 U.S. at 601–02). *Muniz*, therefore, "clearly established" the "routine booking exception" to *Miranda* for purposes of § 2254(d)(1). *See, e.g., White*, 572 U.S. at 419.

points out that one of those questions, about his handedness, was not included on the personal-history form Baird was working with, but the prosecution used evidence of Hale's answer that he was ambidextrous and mostly left-handed, when Baird could see that he was not, in his closing argument as evidence of deception. (*Id*.; Doc. No. 13 at 135 (citing Doc. No. 8-5 (Trial Tr.) at 173–75).)

The standard established in *Muniz*, however, was not whether police questions were "necessary" for administrative reasons, as Hale asserts, but whether they were routine booking questions "reasonably related to the police's administrative concerns." *Muniz,* 496 U.S. at 601–02. And the state court reasonably applied that test, finding Detective Baird's initial inquiry of Hale "clearly fit" within the *Muniz* plurality's definition of routine booking questions, which specifically included questions asked "to secure the biographical data necessary to complete booking or pretrial services" and those "for record-keeping purposes only." *Muniz*, 496 U.S. at 601–02 (internal quotation marks and citations omitted). As the state court noted, the personal-history form was routinely used in the Euclid Police Department. Baird explained at the suppression hearing that the form was "an administrative form that we have in the detective bureau. We use it for our records and also to verify identification to make sure that we have the right person in jail." (Doc. No. 8-1 (Trial Tr.) at 328.) Baird testified that he was not charged with "undertak[ing] a full interrogation" of Hale. (*Id*. at 328–29.) Some of the questions Hale challenges, such as those concerning Hale's education and family members, were included on the personal-history form itself. (*See* Doc. No. 7-8 at 94 (Personal History Form).) As to the detective's questions that were not on the form, like whether Hale was left- or right-handed and what brand of cigarettes he smoked, Hale makes no showing that they were "designed to elicit incriminatory admissions." *Muniz*, 496 U.S. at 602. As Hale argues, the prosecutor commented on Hale's

105

handedness in his closing argument, stating: "The first thing that he does with Detective Baird is to try and use left hand. He later goes on to use his right hand." (Doc. No. 8-5 (Trial Tr.) at 173.) But Baird's observation stemmed from his routine requests that Hale sign the personal-history form to verify its accuracy and later the *Miranda* form to verify he understood his rights. (Doc. No. 8-3 (Trial Tr.) at 473–75, 497.) And the court sustained defense counsel's objection to that statement, instructing the prosecutor at a sidebar to limit any comment about Hale's handedness to Baird's observations. (Doc. No. 8-5 (Trial Tr.) at 173–74.) The State, therefore, did not use Hale's response to Baird's question about his handedness against him.

The Ohio Supreme Court reasonably concluded, therefore, that Detective Baird's initial questioning of Hale in completing Hale's personal history form fell within the *Muniz* routine booking exception and outside *Miranda*'s protections, and the trial court did not err in denying Hale's motion to suppress his statements to the police. The court's decision did not misapply *Muniz* or other Supreme Court precedent or make any unreasonable determination of fact. Hale's sixth ground for relief is meritless.

## VI.  Seventh Ground for Relief: *Right to Testify*

Hale asserts in his seventh ground for relief that he did not knowingly, voluntarily, and intelligently waive his right to testify on his own behalf during the guilt phase of his trial. (Doc. No. 13 at 137–42.) Respondent argues this claim is procedurally defaulted and meritless. (Doc. No. 17 at 95–99.)

### A.  Procedural Posture

Hale did not raise this record-based claim on direct appeal in state court. As Hale no longer is able to raise this claim in state court, it is procedurally defaulted.

Hale contends he can demonstrate cause and prejudice for the default in the ineffective assistance of his trial, appellate, and post-conviction counsel. (Doc. No. 31 at 180–84.) However, as will be discussed below, those claims themselves are either procedurally defaulted and/or meritless.

### B.  Merits Analysis

Even if Hale's right-to-testify claim were not procedurally defaulted, it would fail. Because no state court has addressed this claim, this Court reviews it *de novo*.

"[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). This right is grounded in several provisions of the Constitution, including the Due Process Clauses of the Fifth and Fourteenth Amendments, the Compulsory Process Clause of the Sixth Amendment, and the Fifth Amendment's guarantee against compelled testimony. *Id*. at 51–52.

The right to testify is personal to the defendant and may be relinquished only by the defendant's knowing and intentional waiver of that right. *United States v. Webber*, 208 F.3d 545, 550–51 (6th Cir. 2000) (citing *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)). Defense counsel's role is to advise their client about testifying, but it is ultimately the defendant's choice. *Id.* at 551 (citation omitted). However, where a tactical decision is made that the defendant will not testify, the defendant's assent is presumed. *Id.* (citing *Joelson*, 7 F.3d at 177). This is because the defendant's attorney is presumed to follow the professional rules of conduct and is "'strongly presumed to have rendered adequate assistance'" in carrying out the general duty "'to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the

prosecution." *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 688–90, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

Thus, if a defendant wishes to testify or disagrees with counsel regarding whether he should, he "must alert the trial court." *Id.* (internal quotation marks and citation omitted). "Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so." *Id.* (citing *Joelson*, 7 F.3d at 177). And without any such notice from the defendant, "the trial court is neither required to sua sponte address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record." *Id.* (citing *Joelson*, 7 F.3d at 177; *United States v. Ortiz*, 82 F.3d 1066, 1069 n.8 (D.C. Cir. 1996) (noting the agreement of the First, Third, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits that the trial court does not have a duty to *sua sponte* conduct an on-the-record colloquy regarding waiver)).[18]

---

[18] Hale also appears to assert a separate claim based on his right to "autonomy," recently recognized by the Supreme Court in *McCoy v. Louisiana*, 138 S. Ct. 1500, 200 L. Ed. 2d 821 (2018). (*See* Doc. No. 13 at 185.) But *McCoy* does not apply here. In *McCoy*, the Court held that the trial court violated the defendant's "right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." *McCoy,*138 S. Ct. at 1505. It clarified that at issue was the defendant's Sixth Amendment right to "autonomy"—in that case, the autonomy to decide that the objective of the defense was to assert innocence—not his right to the effective assistance of counsel. *Id.* at 1510–11. And it determined that the error was structural and ordered a new trial. *Id.* at 1511–12. Although the Court relied on *Florida v. Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004), which also concerned a trial attorney's concession of guilt, the dissent considered the right to autonomy "a new right" that was "likely to appear only rarely[.]" *McCoy,* 138 S. Ct. at 1515 (Alito, J., dissenting). Hale argues that "[f]airly read, *McCoy* simply confirms that the defendant must make his objection [to counsel's decision that he not testify] to defense counsel *or* the court." (Doc. No. 31 at 185.) *McCoy*, however, addressed the defendant's right to insist that counsel contest guilt. The Court noted that the right to testify is one of the choices in a trial "reserved for the client," but only in *dicta*. *McCoy,* 138 S. Ct. at 1508. The Court did not overrule existing precedent and hold that a defendant may assert the right to testify merely by informing counsel. Moreover, the Court stressed in *McCoy* that the defendant had "opposed [his counsel's] assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." *Id.* at 1509. He requested new counsel two days before trial because he disagreed with his attorney's plan to concede guilt; protested to the court about counsel's strategy outside the presence of the jury; and, most significantly, testified on his own behalf, maintaining his innocence. *Id.* at 1506–07. Hale did none of those things, and *McCoy* does not apply to his right-to-testify claim.

Here, Hale claims that any "presumed waiver" of his right to testify was not knowing, intelligent, or voluntary because it was the result of "threats, coercion and misrepresentations made to him by trial counsel." (Doc. No. 31 at 172.) As support, he points to remarks he made in his unsworn statement during the sentencing phase of his trial and the trial court's references to his unsworn statement in the court's sentencing ruling.

Toward the end of Hale's unsworn statement, his attorney asked him if he had anything else to say. (Doc. No. 8-5 (Trial Tr.) at 661.) Hale launched into a discussion of the merits of his robbery conviction and an explanation for false statements he had made to the police. (*Id.*) His counsel then tried to turn Hale's focus from his defense to expressing remorse for his crime and the pain he had caused. (*Id.*) Hale then stated:

> I'm very sorry. But I know you're trying to cut me off from going off into pretty much of that, but the fact that I wasn't allowed to make a statement weighs heavy on my mind and my heart, very heavy. As I said, I've never blamed anyone for anything I've ever done, any crime that I've ever committed, I've admitted to. . . . I understood you guys' reasons for not allowing me to testify, but I also don't understand none of them. I felt that they had a right to hear as well as them, especially them, they had a right to hear exactly what happened in that room because both scenarios were unrealistic, his as well as what was in that statement.
>
> As I said, I've never blamed anybody else for what I've done, but I don't understand things that other people do as well. I truly don't believe if I had made a statement, I'd even be sitting up here right now because it clearly was not about a robbery. It was too many things leading elsewhere. If you look at my notes over there that I wouldn't allow you guys to read, you see how I actually felt during this trial and about this trial. But I had to sit over there like a good soldier and not say nothing, otherwise as you guys have said I would have been held in contempt, and it wouldn't have benefited nobody. My question is who is it benefiting right now? I'm done.

(*Id.* at 661–62.)

Hale claims that when he said, "the fact that I wasn't allowed to make a statement weighs heavy on my mind and my heart, very heavy[,]" he was "explain[ing] to the trial court that he was

unaware of any right to testify." (Doc. No. 31 at 172.) And when he stated, "I understood you guys' reasons for not allowing me to testify, but I also don't understand none of them[,]" he was telling "the trial court unambiguously that counsel did not allow him to testify." (*Id.*) Finally, Hale argues, when he told the court and jury, "But I had to sit over there like a good soldier and not say nothing, otherwise as you guys have said I would have been held in contempt, and it wouldn't have benefited nobody[,]" he was "inform[ing] the trial court that counsel threatened him with legal consequences if he had testified at the trial phase[.]" (*Id.*)

Even accepting Hale's interpretation of his remarks, his unsworn statement did not adequately alert the trial court that he wanted to testify on his own behalf and disagreed with this attorney's position that he should not for one simple reason: it was too late. At that point, the guilt phase of his trial was over, the jury had rendered its verdict, and his chance to testify had passed.

Furthermore, Hale did not "unambiguously" inform the court in his unsworn statement of any of the things he now claims. He did not tell the court he was "unaware" of his right to testify; he seemed to suggest the opposite by saying, "I felt that they had a right to hear . . . exactly what happened in that room . . . ." Hale did not clearly alert the trial court that counsel "did not allow him to testify"; he said on the stand, "I understood you guys' reasons for not allowing me to testify[,]" suggesting that he *initially agreed* with counsel's decision that he not testify. Hale then backtracked in his statement by saying, "but I also don't understand none of [the reasons,]" but that reasonably could be interpreted to mean that *in hindsight* he did not understand counsel's strategy. And Hale did not unambiguously inform the court that counsel "threatened" him with the chance of a contempt ruling *if he testified*; he stated that counsel advised him to "sit . . . and not say nothing" in court because not doing so "wouldn't have benefited nobody[,]" suggesting that

counsel spoke of a possible contempt finding to encourage Hale to refrain from disrupting the proceedings, not to prevent him from testifying.

Hale also cites references the trial court made to his unsworn statement in his sentencing decision as evidence that he asserted his right to testify. (Doc. No. 31 at 173.) In finding no weight to Hale's expression of remorse as a mitigating factor, the court stated,

> Moreover, when given the opportunity to express his feelings about responding to a question posed by his attorney, the defendant insisted that he did not commit the aggravated robbery, and intimated if his attorneys would have allowed him to testify at trial, he wouldn't be sitting up here right now.

> The defendant's statements that he believes in taking responsibility for his actions are belied by the blame that he placed on his attorneys for his conviction on the charge upon which the death penalty is based.

(Doc. No. 8-5 (Trial Tr.) at 818.)

Hale argues that, in this statement, the trial court "acknowledged that defense counsel did not allow Hale to testify." (Doc. No. 31 at 173.) But "[r]ather than inquiring further," Hale continues, the judge used the statement against him in his sentencing judgment. (*Id.*) Again, however, Hale's comments during his unsworn statement could not trigger any obligation on the part of the trial court because they were simply too late. And even though the court acknowledged that Hale's attorneys did not allow him to testify, that does not mean it was aware of Hale's desire to testify or any disagreement between Hale and his counsel about that decision.

During the guilt phase of his trial, Hale never alerted the trial court that he wished to testify on his own behalf or that he disagreed with his counsel's decision that he should not testify. His waiver of the right to testify, therefore, is presumed, and the trial court had no duty to inquire into his choice any further. Hale's seventh ground for relief is meritless.

111

## VII.    Twelfth Ground for Relief: *Trial-Court Error/Jury Instructions*

For his twelfth ground for relief, Hale asserts that the trial court improperly instructed the jury regarding what evidence was relevant for consideration in its sentencing deliberations. (Doc. No. 13 at 220–25.) Specifically, he challenges the court's instruction on: (1) the definition of mitigation evidence; and (2) the relevance of evidence admitted in the guilt phase of trial. (*Id*.) Hale presented this claim on direct appeal to the Ohio Supreme Court. Respondent states that the claim is ripe for federal habeas review. (Doc. No. 17 at 117.)[19]

The state court disposed of the claim as follows:

{¶ 133} In his 13th proposition of law, Hale argues that erroneous instructions rendered the penalty phase unreliable.

{¶ 134} During closing argument, the prosecutor asked the jury to consider whether there was "any mitigation in" the circumstances of the crime, specifically the robbery and the defendant's attempts to conceal the murder. The defense objected on the ground that the prosecutor could not argue mitigating factors not raised by the defense. See *State v. DePew* (1988), 38 Ohio St.3d 275, 289, 528 N.E.2d 542. The trial court sustained the objection and gave, without objection, the following curative instruction:

{¶ 135} "Mitigation evidence is the evidence that was presented by the defense during this portion of the trial or that would have been presented during the trial phase. *It does not exist within the context of the crime itself*." (Emphasis added.)

{¶ 136} It is unclear what the judge meant by the last sentence of this instruction, but Hale contends that it can reasonably be understood to mean that the circumstances of the crime cannot be considered in mitigation. Such an instruction would, of course, be incorrect. See R.C. 2929.04(B) (sentencer "shall consider" the nature and circumstances of the offense).

---

[19] As shown below in the state court's decision, the court found the first of this claim's two sub-claims waived because defense counsel did not object to the jury instruction at issue. This portion of Ground Twelve, therefore, may be procedurally defaulted. *See, e.g., Keith*, 455 F.3d at 673 (failure to adhere to the "firmly-established" contemporaneous objection rule is "an independent and adequate state ground" upon which to find federal habeas claims procedurally defaulted). Respondent did not assert this defense to the sub-claim, however, and failure to raise the defense of procedural default results in its waiver. *See, e.g., Trest v. Cain*, 522 U.S. 87, 89, 118 S. Ct. 478, 139 L. Ed. 2d 444 (1997) ("procedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter'") (quoting *Gray*, 518 U.S. at 166); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) ("The state may waive a defense," including procedural default, "by not asserting it.").

{¶ 137} However, on the facts of this case, we cannot find that this instruction constituted plain error. The only "circumstances of the offense" in which Hale claims to find mitigation is that Green allegedly provoked the murder by making an unwanted sexual advance. However, the physical evidence is inconsistent with that claim. Furthermore, the trial judge did instruct the jury, correctly, that "duress, coercion or strong provocation" was a mitigating factor. Under these circumstances, it is unlikely that the jury would have imposed a life sentence even if the trial court had not given the instruction at issue. Hence, we cannot find that the instruction constituted plain error, and this claim is waived.

{¶ 138} The trial court also instructed the jury to consider "only that evidence admitted in the trial phase that is relevant to the aggravating circumstances and to any of the mitigating factors." This instruction was erroneous, as we have held it to be the trial court's responsibility to determine what guilt-phase evidence is relevant in the penalty phase. See *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866.

{¶ 139} Hale contends that this instruction was prejudicial because it allowed the jury to consider guilt-phase evidence about the gunshot wounds. However, the gunshot wounds were "neither irrelevant nor prejudicial to the penalty phase." *State v. Lindsey* (2000), 87 Ohio St.3d 479, 485, 721 N.E.2d 995. The execution-style nature of the murder—four shots, at least three at close range, to the head—tends to show prior calculation and design, which are elements of the felony-murder aggravating circumstance. See *State v. Campbell* (2000), 90 Ohio St.3d 320, 330, 738 N.E.2d 1178. The wounds also disprove Hale's story of a sexual assault by Green, thus refuting the claimed mitigating factor of provocation. In any event, the nature and circumstances of the offense are relevant and must be considered in the penalty phase. See *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus; *State v. Hill* (1996), 75 Ohio St.3d 195, 201, 661 N.E.2d 1068; *State v. Fears* (1999), 86 Ohio St.3d 329, 345, 715 N.E.2d 136, quoting *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542.

{¶ 140} In fact, practically all the guilt-phase evidence was relevant to the aggravating circumstance, the nature and circumstances of the offense, or the claim of provocation. Thus, the trial court's instruction was not prejudicial. See *State v. Jones* (2001), 91 Ohio St.3d 335, 350, 744 N.E.2d 1163.

*Hale*, 892 N.E.2d at 894–95.

The state court's plain-error analysis of the first sub-claim did not address the evidentiary issue under federal law and therefore must be reviewed *de novo*. AEDPA applies to the second sub-claim.  Regardless, under either standard of review, the claims lack merit.

113

Errors in jury instructions generally do not rise to the level of federal constitutional violations. Federal habeas courts must determine "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)). "'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" *Boyde v. California*, 494 U.S. 370, 378, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990) (quoting *Cupp*, 414 U.S. at 146–47). If the instructions as a whole are ambiguous, the question is whether there is a "'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle*, 502 U.S. at 72 (quoting *Boyde*, 494 U.S. at 380).

Hale first claims that the trial court's curative instruction defining mitigation evidence removed from the jury's consideration relevant mitigating evidence. (Doc. No. 31 at 317.) Indeed, the Ohio Supreme Court found this instruction erroneous under Ohio law. *Hale,* 892 N.E. 2d at 895. And, as Hale argues, "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at (emphasis in original). However, as the state court observed, any prejudice to Hale was remedied by the trial court's correct instruction that one of the mitigating factors to consider was "duress, coercion or strong provocation," and Green's unwanted sexual advance was the precise "circumstance of the offense" that Hale presented as a mitigating factor. (*See* Doc. No. 8-5 (Trial Tr.) at 747 (in closing argument, defense counsel asked the jury to consider as a mitigating factor evidence from trial regarding "whether the victim

114

facilitated, induced or facilitated the offense, and whether the defendant acted under duress or coercion or strong provocation").) "[T]he ailing instruction by itself[,]" therefore, did not "so infect[] the entire trial that the resulting conviction violate[d] due process[.]" *Kibbe*, 431 U.S. at 154 (citation omitted).

The second sub-claim fails for a similar reason. Hale argues that the trial court's instruction regarding the relevance of evidence admitted in the guilt phase improperly gave the jurors too much discretion in determining what was relevant evidence to consider. (Doc. No. 31 at 317.) The state court agreed with Hale but found no prejudice as "practically all the guilt-phase evidence was relevant to the aggravating circumstance, the nature and circumstances of the offense, or the claim of provocation." *Hale*, 892 N.E.2d at 895. Hale refutes this finding by arguing that the jury could have considered "Hale's bad acts and bad character and erroneously admitted victim-impact evidence." (Doc. No. 31 at 321.) But this Court has already found no erroneously admitted victim-impact evidence, and it finds the state court reasonably concluded that Hale was not prejudiced by the instruction given the evidence adduced at trial and the aggravating circumstances and mitigating factors presented. This instruction, too, did not "so infect[] the entire trial that the resulting conviction violate[d] due process[.]" *Kibbe*, 431 U.S. at 154 (internal parenthesis and citation omitted).

Hale's twelfth ground for relief is unfounded.

## VIII. Sixteenth, Seventeenth, Nineteenth, and Twentieth Grounds for Relief: *Trial-Court Error/Sentencing*

Hale claims for his sixteenth, seventeenth, nineteenth, and twentieth grounds for relief that the trial court committed various errors in sentencing. Specifically, he alleges the trial court: (1) improperly weighed each mitigation factor separately against the aggravating circumstance

(Ground Sixteen); (2) relied on an improper expert opinion (Ground Sixteen); (3) improperly diminished relevant mitigating evidence (Ground Sixteen); (4) failed to specify why the statutory aggravating circumstance outweighed the mitigating factors (Ground Sixteen); (5) was biased in favor of death (Ground Seventeen); (6) imposed improper sentences for non-capital offenses (Ground Nineteen); and (7) improperly imposed costs on an indigent defendant (Ground Twenty). (Doc. No. 13 at 245–54; *id.* at 277–82.) Respondent contends these claims are procedurally defaulted and/or meritless. (Doc. No. 17 at 127–33.)

### A.  Procedural Posture

Hale raised each of these seven sub-claims on direct appeal to the Ohio Supreme Court. *See Hale*, 892 N.E.2d at 895–98, 908. Respondent concedes that Hale raised sub-claims 1 through 4, as listed above, on direct appeal to the Ohio Supreme Court, which adjudicated them on the merits, and therefore preserved them for federal habeas review. (Doc. No. 17 at 127.) The parties disagree, however, about the procedural status of sub-claims 5 through 7.

Hale first asserted sub-claim 5, alleging judicial bias in sentencing, during his trial in an affidavit of disqualification filed with the Ohio Supreme Court pursuant to Ohio Rev. Code § 2701.03. *See In re Disqualification of Ambrose*, 850 N.E.2d 722 (Mem.) (Ohio 2005) (Moyer, C.J.). The chief justice reviewed the merits of the affidavit, which he has sole authority to do under Section 5(C), Article IV of the Ohio Constitution, and denied it on July 11, 2005. (*Id.*) Hale then raised the same claim on direct appeal to the Ohio Supreme Court, adding the factual allegation that "[a]t least three times during voir dire, the trial court indicated to prospective jurors that if they recommended death, the court would impose death." (Doc. No. 7-3 at 244 (Merit Brief).) The court noted the chief judge's judgment denying Hale's affidavit of disqualification on the ground that "'[i]solated remarks made by a judge near the end of a three- or four-week trial are not

116

sufficient to prove that the judge is biased or prejudiced." *Hale*, 892 N.E.2d at 896. But it invoked the *res judicata* bar to preclude a merits review of the claim, rejecting Hale's "attempt to relitigate a settled issue," as the chief judge had already found no bias in the judge's conduct at issue. *Id*.

Respondent argues that on direct appeal, the Ohio Supreme Court "essentially reiterated" the chief judge's judgment on the disqualification affidavit, conducting an "adjudication on the merits" under AEDPA. (Doc. No. 17 at 129–30.) Hale contends the Ohio Supreme Court did not adjudicate this claim on the merits at all but found it barred under the doctrine of *res judicata* on direct appeal and AEDPA therefore does not apply. (Doc. No. 31 at 365–66.) Neither position is persuasive.

Hale is correct that the Ohio Supreme Court on direct appeal invoked the *res judicata* bar to preclude a merits review of this claim. But he is wrong that AEDPA does not apply to the claim. Where a later state-court decision rests upon a prohibition against *further* state review, as the state direct-appeal decision did here, that decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ." *Ylst*, 501 U.S. at 804 n.3. Rather, habeas courts "look through" the later decision to the prior reasoned state-court judgment. *Id*. at 805. Here, the prior reasoned state-court decision is the chief justice's judgment on Hale's affidavit of disqualification. Hale's claim of judicial bias in sentencing, therefore, was adjudicated on the merits in state court and is preserved for federal habeas review, as Respondent contends. But it is the earlier judgment to which AEDPA applies.

The parties also disagree about the procedural posture of sub-claim 6. Respondent argues that that Hale defaulted sub-claim 6, regarding his non-capital sentencing, because the Ohio Supreme Court found it forfeited, as he did not object at trial to the sentences under the then-new Supreme Court case *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403

(2004). (Doc. No. 17 at 131–32.) Hale counters that the claim was not barred on a "firmly established and regularly followed" state procedural rule governing *Blakely* claims under *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), and is therefore not procedurally defaulted. (Doc. No. 31 at 450–51.) He argues that the Ohio Supreme Court remanded numerous cases for re-sentencing after the court issued a decision following *Blakely*, *State v. Foster*, 845 N.E.2d 470 (Ohio 2006), regardless of defendants' waiver of the issue, citing as support an unreported Sixth Circuit opinion, *Smith v. Moore*, 415 F. App'x 624, 628 (6th Cir. 2011). (Doc. No. 31 at 450.) Further, Hale asserts, the State waived the procedural-default defense by agreeing on direct appeal that Hale was entitled to a remand and resentencing under *Blakely*. (*Id*. at 451 (citing Doc. No. 7-3 at 72 (Reply to Appellant's Motion to Remand)).) Respondent replies that, as the warden, he was not a party to Hale's appeals and is not bound by any representations made in those proceedings. (Doc. No. 33 at 64–65.)

The Court need not reach this issue, however, because this claim is easily resolved on the merits. *See* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits); *Lambrix*, 520 U.S. at 525, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner").

Finally, Respondent argues Hale procedurally defaulted sub-claim 7 because the Ohio Supreme Court found it waived, as Hale failed to object to the alleged error at trial. (Doc. No. 17 at 131–32.) Hale does not dispute the default but contends he can demonstrate cause and prejudice to excuse it through the ineffectiveness of counsel. (Doc. No. 31 at 457.) As will be shown below, Hale's ineffective-assistance claims themselves are either procedurally defaulted and/or meritless. Sub-claim 7, therefore, is procedurally defaulted.

118

### B. Merits Analysis

Challenges to a state court's interpretation and application of state sentencing laws generally are not cognizable in federal habeas corpus. *See, e.g., Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000); *Kipen v. Renico*, 65 F. App'x 958, 959 (6th Cir. 2003). A trial court's failure to conform with Ohio law in rendering a sentencing opinion in a capital case may warrant relief in federal habeas corpus only if the trial court's errors "'rise for some reason to the level of a denial of rights protected by the United States Constitution.'" *Hoffner*, 622 F.3d at 495–96 (quoting *Barclay v. Florida*, 463 U.S. 939, 957–58, 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983)). Abuse of discretion by a state-court judge does not necessarily violate federal constitutional law and, without more, does not warrant habeas corpus relief. *See Sinistaj v. Burt*, 66 F.3d 804, 807–08 (6th Cir. 1995).

### 1.    Weighing mitigating factors separately (Ground Sixteen)

Hale argues that in its sentencing opinion, the trial court improperly weighed each mitigation factor separately against the aggravating circumstance. (Doc. No. 13 at 246–47.) The Ohio Supreme Court, in rejecting this claim, reasoned:

> {¶ 150} In his 16th proposition of law, Hale contends that flaws in the trial court's sentencing opinion invalidate his death sentence. Hale's principal claim is that the trial court failed to weigh the mitigating factors *collectively* against the aggravating circumstances. See *State v. Bays* (1999), 87 Ohio St.3d 15, 30, 716 N.E.2d 1126.

> {¶ 151} In analyzing Hale's history, character, and background evidence, the trial court stated that the evidence deserved "some weight" but that its weight was "not *sufficient on its own* to overcome the Aggravating Circumstance." (Emphasis added.) However, the court later stated that the love and support of Hale's family would not be considered under the R.C. 2929.04(B)(7) catchall provision because "the Court previously considered this factor in mitigation and gave it some weight when the Court considered the Defendant's Character, Background and History." It appears from this passage that the trial court was trying to avoid giving double weight to the love and support of Hale's family and that the court was weighing history, character, and background together with the other factors. Thus, it is not

119

clear that the trial court failed to weigh the mitigating circumstances collectively. Even if the trial court did make this mistake, our independent review will cure it. See *Bays,* 87 Ohio St.3d at 30–31, 716 N.E.2d 1126.

*Hale*, 892 N.E.2d at 896–97.

Hale argues that AEDPA does not apply to this claim, or his other three claims challenging the trial court's sentencing opinion, because the Ohio Supreme Court did not consider his federal constitutional claims, only his state-law claims. (Doc. No. 31 at 358–59.) A state court need not cite any federal law, however, for its decision to be an "adjudication on the merits" for purposes of § 2254(d). *See Early*, 537 U.S. at 8 (a state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent); *Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Alternatively, Hale asserts that by failing to evaluate the mitigating evidence, the trial court's sentencing decision misapplied *Gregg v. Georgia*, 428 U.S. 153, 96 L. Sc. 2909, 49 L. Ed. 2d 859 (1976), and *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972). (Doc. No. 31 at 356–57.) He claims these decisions clearly establish that if a sentencer does not act under the "guided discretion" of state law defining specifically enumerated sentencing factors in sentencing a defendant to death, then the death sentence is arbitrary and void under the Eighth and Fourteenth Amendments. (*Id.*) But these cases do not hold that if a trial court fails to apply a state's constitutional statutory capital sentencing scheme in every respect, then the resulting sentence is unconstitutional. Rather, those cases established standards for state capital-sentencing schemes. *See McCleskey v. Kemp*, 481 U.S. 279, 322, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987)

("*Furman* held that the death penalty may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner.") (internal quotation marks and citation omitted); *Godfrey v. Georgia*, 446 U.S. 420, 422–23, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980) (explaining *Gregg* held that Georgia's capital sentencing statute was not unconstitutional on its face). *Gregg* and *Furman*, therefore, do not constitute "clearly established law" that would govern Hale's claim under § 2254(d)(1). *See Woods*, 575 U.S. at 318 (cautioning habeas courts to avoid framing Supreme Court decisions "at too high a level of generality" when identifying what a Supreme Court decision actually holds).

Moreover, as the Ohio Supreme Court noted, even if the trial court did err in the manner Hale contends, and that error rose to the level of a due process violation, the court's independent review of the trial court's sentencing determination cured it. *See, e.g., Hoffner*, 622 F.3d at 495–96 ("Nonetheless, if a trial court considers unconstitutional aggravating factors, the Supreme Court has held that this error can be cured by the state appellate court 'independently 'reweighing' aggravating and mitigating factors and reaching a sentence without the consideration of the factors found impermissible at the trial level.'") (quoting *Lundgren*, 440 F.3d at 783 (citing *Clemons v. Mississippi*, 494 U.S. 738, 740, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990) and Ohio Rev. Code § 2929.05(A) ("The . . . supreme court . . . shall review and independently weigh all of the facts . . . and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate."))). This claim is meritless.

### 2. Relying on expert opinion (Ground Sixteen)

The Ohio Supreme Court also considered Hale's claim that the trial court improperly relied on the blood-spatter testimony of Curtiss Jones, stating:

121

{¶ 152} Hale also faults the trial judge for relying on Curtiss Jones's expert opinion on blood-spatter evidence to support its finding that Green did not sexually assault Hale. This claim essentially duplicates Hale's tenth proposition of law, which we have already rejected, and which we now reject again.

*Hale*, 892 N.E.2d at 897.

This Court, too, already has determined that Jones' testimony regarding blood spatter was properly admitted. The trial court, therefore, properly considered it in sentencing Hale. This claim also fails.

### 3.    Diminished weight of adjustment to prison (Ground Sixteen)

Hale next complains that the trial court did not assign enough weight to the mitigating factor of adjustment to prison. The Ohio Supreme Court reviewed this claim, stating:

{¶ 153} Next, Hale contends that the trial court "improperly diminished" the mitigating weight of his adjustment to prison. However, a trial court need not accept mitigating factors at the defendant's proposed valuation; their weight is for the trial court to determine. *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293. See also *State v. Fox* (1994), 69 Ohio St.3d 183, 193, 631 N.E.2d 124; *State v. Wiles* (1991), 59 Ohio St.3d 71, 91, 571 N.E.2d 97.

*Hale*, 892 N.E.2d at 897.

Hale argues that the state court misapplied *Skipper v. South Carolina*, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986), by "determining that Hale's inability to adjust to free society somehow lessened the importance of his ability to conduct himself appropriately in prison." (Doc. No. 31 at 355.) The trial court wrote in the sentencing opinion:

{¶ 44} Defendant's ability to function as a productive person while in prison is given little weight in mitigation. The institutional record produced by Defendant during the Sentencing Phase indicates that the Defendant adjusted to prison during past incarcerations. However, it is equally clear that Defendant's pattern of criminal behavior has escalated to a more serious crime with each offense and has now culminated in murder. Therefore, minimal weight is given to this factor.

(Doc. No. 7-3 at 26.)

*Skipper* does not apply to Hale's claim. The Supreme Court did not hold in that case that the sentencer must accord prison adjustment "substantial weight" in capital sentencing as Hale asserts. (Doc. No. 31 at 361.) Rather, *Skipper* held that if the defendant presents such evidence as a mitigation factor, the trial court cannot exclude it. *Skipper*, 476 U.S. at 4. And here, the court admitted the evidence and expressly considered it, although it reasonably found Hale's escalating violence undercut any assumptions about his future behavior based on prior conduct while incarcerated. The Ohio Supreme Court reasonably concluded that the trial court acted within its discretion in determining the weight to assign Hale's proffered mitigation evidence of prison adjustment, and its decision did not contravene or misapply clearly established Supreme Court precedent.

### 4. Insufficient explanation (Ground Sixteen)

Hale further challenges the trial court's sentencing judgment on the ground that it provides insufficient explanation. The Ohio Supreme Court overruled this challenge, as follows:

{¶ 154} Finally, Hale contends that the trial court failed to explain why the aggravating circumstance outweighed the mitigating factors. We find that the opinion as a whole adequately explains this issue. The trial court explained that Hale's history, character, and background had some weight, but "there was also testimony concerning aspects of [Hale's] family life that were normal." The court further stated that Hale's adjustment to prison deserved "minimal" weight because of his pattern of escalating criminal behavior, culminating in murder. The court also explained why no other mitigating factors deserved any weight.

{¶ 155} In any case, "inadequate explanations of the weighing process do not constitute reversible error because any such error may be readily cured by this court's independent review." *State v. Keith* (1997), 79 Ohio St.3d 514, 533, 684 N.E.2d 47. Hale's 16th proposition of law is overruled.

*Hale*, 892 N.E.2d at 897.

This claim is meritless. There is no error here that rises to the level of a due process violation. And, as the Ohio Supreme Court noted, any such error was readily cured by that court's

independent review. *See Tibbetts v. Bradshaw*, 633 F.3d 436, 446 (6th Cir. 2011) ("Even assuming, *arguendo*, that the state trial judge's sentencing opinion failed to meet the requirements of § 2929.03(F), [which governs a trial judge's capital sentencing opinion,] the Ohio Supreme Court's independent consideration of the mitigating evidence allegedly ignored by the trial judge cured any error.") (citation omitted).

### 5.  Bias toward death (Ground Seventeen)

Hale also contends the trial court was biased in favor of a death sentence. (Doc. No. 31 at 362–67.) As explained above, the last reasoned state-court judgment on this claim is from the chief justice of Ohio's high court, upon review of Hale's affidavit of disqualification. He ruled:

{¶ 1} Attorney John T. Martin—counsel for the defendant—has filed an affidavit with the clerk of this court under R.C. 2701.03 seeking the disqualification of Judge Dick Ambrose from acting on any further proceedings in case No. CR 454857 in the Court of Common Pleas of Cuyahoga County.

{¶ 2} Martin alleges that Judge Ambrose has expressed a predisposition to impose a death sentence on the defendant, who was recently tried on aggravated-murder charges in the judge's courtroom. The defendant has evidently been convicted by a jury on those charges, and that jury has recommended a death sentence. When the jury's sentencing recommendation was received by the trial court on June 16, 2005, Judge Ambrose said, "[T]he sentence of death shall be imposed upon the Defendant. A sentencing hearing will be set in this case * * * to place that verdict into effect. The Court will enter that verdict at that time."

{¶ 3} The judge's statement was improper, affiant Martin alleges, and shows that the judge has already decided to impose a death sentence without first hearing a statement from the defendant before a sentence is imposed.

{¶ 4} Judge Ambrose has responded to the affidavit, saying that his words were "imprecise" and were "spoken in error" when the jury returned its verdict at the end of the penalty phase of the trial. His words did not reflect his true intent, he states, which is "to follow the law at all times" and to "review all of the evidence presented during the sentencing phase before determining what sentence to impose." The judge explains that since receiving the jury's recommendation, he has ordered a complete transcript of the penalty-phase proceedings and has given defense counsel an opportunity to file a sentencing memorandum addressing any mitigating factors that might support a life sentence for the defendant.

124

{¶ 5} I find no basis for ordering the disqualification of Judge Ambrose. Both the tone and content of his written response show that the judge is neither biased nor prejudiced against the defendant. The affidavit cites no other grounds for the judge's removal except his brief remarks quoted above, and in fact the affidavit notes that the judge earlier made other statements that could be perceived as favorable to the defense. Isolated remarks made by a judge near the end of a three- or four-week trial are not sufficient to prove that the judge is biased or prejudiced. And the remarks themselves were spoken in error and do not reflect his true intentions, the judge contends.

{¶ 6} Given that defense counsel has cited no other words or conduct on the judge's part suggesting any bias or prejudice, given that the judge has readily acknowledged his misstatement, and given that his conduct since June 16, 2005, suggests that he is carefully weighing the jury's sentencing recommendation and is taking very seriously his own independent responsibility to weigh the aggravating circumstances and mitigating factors before imposing a sentence, I find no reason on the record before me to disqualify him from the case.

{¶ 7} As I have said, "[a] judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions." *In re Disqualification of George,* 100 Ohio St.3d 1241, 2003-Ohio-5489, 798 N.E.2d 23, ¶ 5. Those presumptions have not been overcome in this case.

{¶ 8} For the reasons stated above, the affidavit of disqualification is denied. The case may proceed before Judge Ambrose.

*In re Disqualification of Ambrose*, 850 N.E.2d 722 at 722–723.

Due process requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of a particular case. *Bracy v. Gramley*, 520 U.S. 899, 904–05, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997). "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994).

125

Hale assumes that if AEDPA applies to this claim, the Court would examine the decision the Ohio Supreme Court issued on direct appeal. (Doc. No. 31 at 366–67.) And he asserts that that court's reliance on the chief justice's decision and invocation of *res judicata* on direct appeal was "unreasonable" because his claim before the court at that point included three additional allegations that "[a]t least three times during voir dire, the trial court indicated to prospective jurors that if they recommended death, the court would impose death." (Doc. No. 7-3 at 244 (Merit Br.).) Yet, on direct appeal, Hale maintains, the Ohio Supreme Court cited only the chief judge's finding that "'[i]solated remarks made by a judge near the end of a three- or four-week trial are not sufficient to prove that the judge is biased or prejudiced.'" *Hale*, 892 N.E.2d at 896 (quoting *In re Disqualification of Ambrose*, 850 N.E.2d 722 (2005)).

But it is telling that the Ohio Supreme Court did not discuss Hale's additional evidence on direct review, as it was weak support for his claim and did not alter or strengthen it. Although Hale only provides a page citation for these comments, the Court presumes they are:

(1)    And if that verdict was returned by the jury, and the Court would carry out that sentence. So it is important that we know whether or not you would have any religious, moral or conscientious objection to imposing the death penalty . . . .

(2)    So if the aggravating circumstances outweigh the mitigating, in that second phase, then death should be the verdict. And the Court will carry out that sentence. You have to, you know, agree all 12 jurors would have to agree on that, but then once that verdict is made, the Court will carry out that sentence.

(3)    [If] you do enter [a death] verdict, then the Court will carry out that verdict, so that is serious and that would be carried out.

(Respectively, Doc. No. 8-1 (Trial Tr.) at 771, 868; Doc. No. 8-2 (Trial Tr.) at 71.) In his merit brief to the Ohio Supreme Court on direct review, Hale offered the most reasonable interpretation of these remarks, stating: "At the time, defense counsel likely presumed that this was merely the

126

court impressing on the jury the significance and importance of their sentencing recommendation."
(Doc. No. 7-3 at 244 (Merit Br.).) It was only in hindsight, he argued, that "those earlier statements
are more proof of the bias evidenced during the sentencing phase of Hale's capital trial." (*Id*.) The
remarks during *voir dire* do not demonstrate bias, either standing alone or in conjunction with the
judge's remarks at sentencing.

Hale has not put forth any credible argument that the Ohio Supreme Court's decision
denying his affidavit of disqualification was unreasonable in any respect, either by contravening
or misapplying clearly established Supreme Court precedent or by being based upon unreasonable
determinations of fact. Hale's seventeenth ground for relief lacks merit.

### 6.    Sentencing for non-capital offenses (Ground Nineteen)

For his nineteenth ground for relief, Hale asserts that the trial court erred in sentencing on
his non-capital offenses. (Doc. No. 31 at 443-52.) The Ohio Supreme Court addressed this claim
on direct review, reasoning:

> {¶ 241} In his second proposition of law, Hale contends that his sentences on
> the noncapital offenses should be vacated, and his case remanded for resentencing
> on those offenses, pursuant to our decision in *State v. Foster,* 109 Ohio St.3d 1,
> 2006-Ohio-856, 845 N.E.2d 470, following *Blakely v. Washington* (2004), 542
> U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403. See also *State v. Elmore,* 111 Ohio
> St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547. The state agrees that Hale's case
> should be remanded for resentencing on the noncapital crimes.

> {¶ 242} However, Hale was sentenced on July 18, 2005. Although *Blakely* had
> been decided the previous year, Hale did not raise a *Blakely* objection in the trial
> court. Thus, he has forfeited this claim. See *State v. Payne,* 114 Ohio St.3d 502,
> 2007-Ohio-4642, 873 N.E.2d 306, ¶ 31; *State v. Frazier,* 115 Ohio St.3d 139, 2007-
> Ohio-5048, 873 N.E.2d 1263, ¶ 205.

> {¶ 243} The noncapital sentences imposed in this case were not plain error.
> "Nothing in the record suggests that the noncapital sentencing would have been
> different if [the defendant] had been sentenced in accordance
> with *Blakely* and *Foster*." *Frazier* at ¶ 208. Accordingly, we overrule Hale's

127

second proposition of law and, for the same reason, deny Hale's motion to remand for resentencing.

*Hale*, 892 N.E.2d at 907–08.

AEDPA applies to the state court's plain-error analysis, which considered federal law. Hale argues the Ohio Supreme Court's decision was contrary to, and an unreasonable application of, clearly established federal law. (Doc. No. 31 at 448–50.)

In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. The Court broadened and clarified *Apprendi* in the 2004 case *Blakely*, 542 U.S. 296, holding:

> [T]he "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Blakely,* 542 U.S. at 304 (internal citations omitted) (emphasis in original).

The trial court sentenced Hale a year later, on July 18, 2005. The court recorded its sentencing judgment in a journal entry, listing Hale's convictions and sentences (Doc. No. 7-2 at 267), and the judge announced the sentences, along with his findings underpinning the sentences, at a sentencing hearing that day. (Doc. No. 8-5 (Trial Tr.) at 815–28.) After stating his findings and sentencing Hale to death on the merged counts of aggravated murder (*see id.* at 815–19, 825–26), the court turned to Hale's non-capital convictions—for aggravated robbery, tampering with evidence, escape, and having a weapon while under disability. It found that Hale "committed the

128

worst form of the offense[s]" and was "on parole at the time of the offense[s]," and imposed the maximum sentence for each, with the aggravated-robbery and escape sentences to run consecutively. (*Id*. at 826–27.)

Seven months later, on February 27, 2006, the Ohio Supreme Court, in *State v. Foster*, 845 N.E.2d 470 (2006), held that Ohio's non-capital sentencing scheme, under which Hale was sentenced, violated *Apprendi* and *Blakely* in four areas. *Id*. at 494. The court reaffirmed the principle that "'[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.'" *Id*. (quoting *United States v. Booker*, 543 U.S. 220, 244, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005)). And, of relevance here, the court invalidated two sentencing statutes that the trial court applied in sentencing Hale: Ohio Rev. Code § 2929.14(C), which required a judicial finding that "only those offenders who committed the worst forms of the offense" before imposing a maximum sentence; and Ohio Rev. Code § 2929.14(E)(4), which required a judicial finding that "the offender was already under the control of the court due to an earlier conviction" before imposing consecutive sentences. *Id*. at 490–91. In the future, the Ohio Supreme Court concluded in *Foster*, trial courts would "have full discretion to impose a prison sentence within the statutory range and [were] no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *Id*. at 498.[20]

---

[20] In 2009, the Supreme Court changed course in *Oregon v. Ice*, 555 U.S. 160 (2009), holding that judicial fact-finding for the imposition of consecutive sentences was constitutional. The Ohio Supreme Court followed suit. *See State v. Hodge*, 941 N.E.2d 768, 769 (Ohio 2010) ("The jury-trial guarantee of the Sixth Amendment to the United States Constitution does not preclude states from requiring trial court judges to engage in judicial fact-finding prior to imposing consecutive sentences.") (citing *Oregon v. Ice*, 555 U.S. 160, 129 S. Ct. 711, 172 L. Ed. 2d 517 (2009) construed).

Hale argues that the trial court violated *Foster* and *Blakely* because it, not the jury, made the prescribed factual findings under Ohio Rev. Code §§ 2929.14(C) and (E)(4) before imposing maximum and consecutive sentences for his non-capital offenses. (Doc. No. 31 at 445.) And, he contends, the Ohio Supreme Court on direct review unreasonably applied *Blakely*, the clearly established law at the time of its decision in 2008, by finding any error in his non-capital sentencing under *Foster* and *Blakely* harmless. (*Id*. at 449–50.) Hale notes that the Sixth Circuit has declined to find a *Blakely* error harmless because, given the wide range of factors a sentencing judge now may consider, it "'simply [could not] know whether the sentencing judge would accord the relevant factors the same weight when reassessing the matter outside the dictates of the severed provisions.'" (*Id.* at 450 (quoting *Villagarcia v. Warden, Noble Corr. Inst.,* 599 F.3d 529, 539 (6th Cir. 2010)).

The Ohio Supreme Court was correct to employ a harmless-error analysis to Hale's *Blakely* claim. In *Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006), the Supreme Court held that a *Blakely* error from "[f]ailure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error." *Id*. at 222. The Court stressed that it has "repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal. Instead, 'most constitutional errors can be harmless.'" *Id*. at 218 (quoting *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

On habeas review, an error is harmful only if it had a "substantial and injurious effect" upon the petitioner's sentence, or if the court has "grave doubt" as to whether the error had such an effect. *Owens v. Parris*, 932 F.3d 456, 459 (6th Cir. 2019) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995)). And a habeas court may not grant relief

130

"if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner." *Mitchell*, 540 U.S. at 18 (quoting *Lockyer,* 538 U.S. at 65–77).

In *Owens v. Parris*, the Sixth Circuit held that, contrary to its earlier decision in *Villagarcia,* which Hale cites as support, the "dispositive" question under *Recuenco* for a *Blakely* harmless-error analysis is "'whether the jury would have returned the same verdict absent the error[.]'" *Owens*, 932 F.3d at 460 (quoting *Recuenco*, 548 U.S. at 221). Here, the Ohio Supreme Court reasonably concluded that Hale's sentence would not have been different even if his sentencing had comported with *Blakely*. Given that Hale's non-capital offenses—aggravated robbery, tampering with evidence, escape, and having a weapon while under disability—were committed in connection with an execution-style murder and disposed of his victim's body in garbage bags, it is reasonable to believe the jury would have found the crimes "the worst forms of the offenses." And the fact that Hale was on parole at the time of these offenses and therefore "already under the control of the court due to an earlier conviction" was an easily verifiable fact, whether determined by the court or jury upon sentencing. The Ohio Supreme Court, therefore, reasonably concluded that the *Blakely* error in his sentencing was harmless, and its decision neither contravened nor misapplied *Blakely* or *Recuenco*.

### 7.      Imposed court costs (Ground Twenty)

Hale asserts in his twentieth ground for relief that the trial court's imposition of court costs "violates the spirit of the Eighth Amendment." (Doc. No. 13 at 281–82.) He raised this claim in the Ohio Supreme Court on direct appeal, which determined:

{¶ 244} The trial court imposed court costs on Hale in the amount of $2,826.52. Hale did not then object. Now, in his 17th proposition of law, he claims that he is indigent and that assessing costs violates the "spirit" of the Eighth Amendment.

131

{¶ 245} Hale has waived this issue by failing to object. See *State v. Threatt,* 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164, ¶ 23 (indigent defendant's motion for waiver of costs must be made at time of sentencing). There was no plain error. *State v. White,* 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, paragraphs one and two of the syllabus, holds that costs must be assessed against, and may be collected from, indigent defendants, and Hale cites no authority to support his "spirit-of-the-Eighth-Amendment" claim. Hale's 17th proposition of law is overruled.

*Hale*, 892 N.E.2d at 908.

Hale has not presented any authority to support his claim that the Eighth Amendment prohibits the collection of costs from an incarcerated and indigent defendant. (Doc. No. 31 at 453.) And for good reason: This claim is not cognizable on habeas corpus review.

AEDPA grants district courts subject-matter jurisdiction "only for claims that a person 'is in custody in violation of the Constitution or laws or treaties of the United States.'" *Dickerson v. United States*, 530 U.S. 428, 439 n.3, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (quoting 28 U.S.C. § 2254(a)). Generally, fines or restitution orders fall outside the scope of the federal habeas review because they do not satisfy the "in custody" requirement of a cognizable habeas claim. *Washington v. McQuiggin*, 529 F. App'x 766, 773 (6th Cir. 2013) (citing, among other cases, *United States v. Watroba*, 56 F.3d 28 (6th Cir. 1995) (holding that § 2255 does not grant subject-matter jurisdiction over restitution orders); and *Michaels v. Hackel*, 491 F. App'x 670, 671 (6th Cir. 2012) (stating that a fine is not cognizable under § 2254 and citing *Watroba*, 56 F.3d at 29)). "'[C]ollateral relief from a noncustodial punishment, such as a fine or restitution order, is not made readily available to a defendant just because he happens at that time to also be subject to custodial penalties.'" *Id.* (quoting Brian R. Means, Federal Habeas Manual § 1:21 (2012 ed.)). A claim regarding a fee-repayment order, for example, "falls outside of even 'the margins of habeas,' . . . because it is 'not a serious restraint on . . . liberty as to warrant habeas relief.'" *Id.* (quoting, respectively, *Nelson v.*

*Campbell*, 541 U.S. 637, 646, 124 S. Ct. 2117, 158 L. Ed. 2d 924 (2004) and *Tinder v. Paula*, 725 F.2d 801, 805 (1st Cir. 1984)). So, too, does Hale's challenge to the trial court's imposition of court costs.

Hale's twentieth ground for relief, therefore, is denied.

## IX.     Third, Eleventh, and Eighteenth Grounds for Relief: *Ineffective Assistance of Trial Counsel*

Hale asserts numerous claims of ineffective assistance of trial counsel in his third, eleventh, and eighteenth grounds for relief, presenting them chronologically in three categories: *voir dire*, guilt phase, and sentencing phase. (Doc. No. 13 at 110–22; 171–219; 255–76.) Combined, he alleges trial counsel failed to: (1) challenge a juror's racial bias  (Ground Three); (2) challenge impartial jurors for cause (Ground Three); (3) challenge a juror who knew the victim (Ground Three); (4) rehabilitate "death-hesitant" jurors (Ground Three); (5) correctly state the law during *voir dire* (Ground Three); (6) object to the trial court and prosecution's misstatement of the law during *voir dire* (Ground Three); (7) object to impartial panel of jurors and question potential jurors about race (Ground Three); (8) ensure jurors understood aggravating circumstances (Ground Three); (9) properly investigate the case and retain experts and witnesses on forensic sciences, Hale's background, and Hale's activities shortly before the murder  (Ground Eleven); (10) present Hale's testimony; (11) present a defense supported by law and evidence (Ground Eleven); (12) effectively cross-examine State witnesses (Ground Eleven); (13) prevent introduction of evidence of Hale's prior incarceration (Ground Eleven); (14) effectively cross-examine Detective Baird (Ground Eleven); (15) review records related to a State witness before she testified (Ground Eleven); (16) opened the door to excluded information (Ground Eleven); (17) object to Hale's absence and waived his presence (Ground Eleven); (18) object to exclusion from review of witness

statements (Ground Eleven); (19) object to admission of gruesome photographs (Ground Eleven); (20) object to improper expert testimony (Ground Eleven); (21) object to prosecutorial misconduct (Ground Eleven); (22) properly investigate mitigating evidence (Ground Eighteen); (23) obtain and present available mitigating evidence, including expert witnesses, lay witnesses, and parole and prison records (Ground Eighteen); (24) interview the jury after the verdict (Ground Eighteen); (25) object to victim-impact evidence admitted during the sentencing phase of trial (Ground Eighteen); (26) object to instructional errors at the sentencing phase of trial (Ground Eighteen); (27) object to unconstitutional non-capital sentences (Ground Eighteen); and (28) object to imposition of costs (Ground Eighteen). (*Id*.)

Respondent contends these claims are procedurally defaulted and/or meritless. (Doc. No. 17 at 56–83.)

### A.    Procedural Posture

#### 1.    Claims preserved for habeas review

Hale raised in state courts sub-claims 3 through 6, 8, 11, 13 through 21, and 24 through 28, as listed above, and they were adjudicated on the merits. (*See* Doc. No. 7-3 at 302–25 (Hale Direct Appeal Merit Br.); Doc. No. 7-4 at 70–88 (PCR Petition).) Respondent argues, however, that of those sub-claims 3 and 5 are partially procedurally defaulted because Hale added new factual allegations or legal theories to the claims he presents here. (*See* Doc. No. 17 at 62, 64–65, 72–73.) But the Court finds that Hale fairly presented the fundamental legal basis of those claims to state courts "such that the ultimate question would have been the same despite variations in the legal theory or factual allegations urged in its support." *Jells*, 538 F.3d at 504 (citing *Picard*, 404 U.S. at 277-78). These claims, therefore, are properly preserved for federal habeas review.

134

### 2.    Procedurally defaulted claims

Respondent contends that only one of Hale's trial counsel ineffective-assistance claims, the first, is entirely procedurally defaulted. (Doc. No. 17 at 59–60.) Sub-claim 1, as listed above, relates to trial counsel's failure to question and remove a juror whom Hale alleges was racially biased. Hale never raised this claim in state court and no longer may do so. It is procedurally defaulted.

Respondent further argues that claims 2, 7, 9, 10, 12, 22, and 23, as listed above, are partially procedurally defaulted, again, because Hale added new factual allegations or legal theories in his petition before this Court. (Doc. No. 17 at 61, 66, 71, 72–73, 76–77.) The Court agrees. Petitioner is no longer able to raise the claims in state court due to Ohio's filing deadlines, post-conviction procedures, and *res judicata* rules. *See Wong*, 142 F.3d at 322 ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of *res judicata*."); *Perry*, 226 N.E.2d at 108 (Ohio's *res judicata* rule precludes a defendant from raising for the first time in post-conviction proceedings a claim that was fully litigated or could have been fully litigated at trial or on direct appeal.); Ohio R. Crim. P. 33(B) (defendant may be entitled to new trial after deadline for filing motion for new trial if he was "unavoidably prevented" from filing motion or there is "newly discovered evidence"); Ohio Rev. Code § 2953.23(A)(1) (second, successive, or untimely post-conviction petition permitted if petitioner shows: (1) that he was "unavoidably prevented from discovery of the facts" of the claim, or the claim is based on a new federal or state right the Supreme Court has recognized that applies retroactively; and (2) but for constitutional error at trial, no reasonable factfinder would have found petitioner guilty of offense or eligible for death sentence). For the sake of clarity and brevity,

135

however, the Court will specify which sub-claims are procedurally defaulted and which are not in connection with its merits analysis of the individual sub-claims.

### 3.      Cause and prejudice

Hale argues that any default of his trial counsel ineffective-assistance claims should be excused for cause due to the ineffective assistance of his appellate and post-conviction counsel. (Doc. No. 31 at 135–38; 282–83; 312–13; 423.) The Court disagrees.

To the extent that the defaulted ineffective-assistance claims arise from the trial record, Hale would have had to raise them on direct appeal, but he did not. And, as will be explained in greater detail in relation to Hale's twenty-second ground for relief, Hale cannot establish cause for the default of those claims through the ineffective assistance of his appellate counsel, because he did not assert any appellate counsel ineffective-assistance claims in state court, so those claims also are procedurally defaulted. *Edwards*, 529 U.S. at 453 (claims of ineffective assistance of counsel cannot provide cause for the procedural default of another claim, if the ineffective-assistance claim itself is  procedurally defaulted).

For those trial counsel ineffective-assistance claims that are not record-based but rely on evidence outside the record, Hale argues that the defaults should be excused by the ineffective assistance of his post-conviction counsel. Defendants have no constitutional right to an attorney in state post-conviction proceedings, and an attorney's negligence in those proceedings, therefore, generally cannot establish cause to excuse a habeas petitioner's procedural default of claims in state court. *Coleman*, 501 U.S. at 756-57; *see also* 28 U.S.C § 2254(i). In *Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012), however, the Supreme Court created a "narrow exception" to *Coleman*, holding that "[i]nadequate  assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective

136

assistance at trial." *Id*. at 9. The Supreme Court recognized, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel, or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Id*. at 14.

The following year, the Supreme Court clarified and expanded the *Martinez* exception in *Trevino v. Thaler*, 569 U.S. 413, 133 S. Ct. 1911, 185 L. Ed. 2d 1044 (2013). It explained that under *Martinez*, federal habeas courts may find cause to excuse a petitioner's procedural default of a claim of ineffective assistance of trial counsel where: (1) the defaulted claim is "substantial"; (2) the "cause" consists of there being "no counsel" or "ineffective" counsel in the state collateral-review proceeding; (3) the state collateral-review proceeding was the "initial" review of the claim; and (4) state law required that ineffective-assistance-of-trial-counsel claims be raised in the first instance in a collateral-review proceeding. *Id.* at 423. But the Court modified the fourth requirement so that *Martinez* would apply to Texas' procedural system, which "as a matter of its structure, design, and operation[, did] not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Id*. at 428.

The Sixth Circuit "[has] held that *Martinez* does not apply in Ohio because Ohio permits ineffective-assistance-of-trial-counsel claims on direct appeal[,]" and, until recently, had questioned whether *Trevino* applies to Ohio prisoners. *Williams v. Mitchell*, 792 F.3d 606, 615 (6th Cir. 2015); *see also Hill v. Mitchell*, 842 F.3d 910, 937 (6th Cir. 2016) ("We have yet to decide whether *Trevino* applies in Ohio, but we have suggested it may not on multiple occasions.") (collecting cases); *McGuire v. Warden, Chillicothe Corr. Inst.,* 738 F.3d 741, 752 (6th Cir. 2013) (observing that *Trevino*'s application to Ohio cases was neither "obvious nor inevitable" as, "[a]rguably, . . . the review of trial counsel ineffectiveness claims in Ohio is more 'meaningful'

137

than in Texas, because in Ohio there is 'ordinarily' the availability of direct review with constitutionally required counsel, with the back-up of collateral attack where evidence outside the record is required").

But in *White v. Warden, Ross Corr. Inst.*, 940 F.3d 270 (6th Cir. 2019), the circuit court applied the *Martinez/Trevino* exception to excuse the default of an Ohio prisoner's ineffective-assistance-of-trial-counsel claim. In that case, the petitioner's appellate counsel had advised him that the claim at issue could be adequately addressed on direct appeal, but the appellate court determined that the claim needed factual development beyond the record and suggested it should be raised in post-conviction proceedings. *Id*. at 272–74. By the time the appellate court issued its opinion, however, the deadline to file a post-conviction petition had passed, and the prisoner had no post-conviction counsel. *Id*. The circuit court held that, under those circumstances, *Trevino* applied to the petitioner's claim, because "[t]he confluence of Ohio's general rule requiring the presentation of ineffective-assistance claims on direct review *unless* the record lacks sufficient evidence, the incorrect advice from [the prisoner's] appellate counsel that his record *did* contain sufficient evidence, and the tight procedural timeline imposed by Ohio's post-conviction-relief statute left [the *pro se* prisoner] without a 'meaningful opportunity' to obtain review of his substantial ineffective-assistance claim." *Id.* at 278 (citing *Trevino*, 569 U.S. at 428) (emphasis in original).

Respondent argues that *White* applies only to its narrow set of facts and not to Hale's claims. (Doc. No. 33 at 36–37.) The Court agrees. Hale had both appellate and post-conviction counsel in state court and does not allege that either set of attorneys failed to adhere to the proper procedures for filing his trial counsel ineffective-assistance claims. In essence, he makes no equitable argument that he was not provided a "meaningful opportunity" to obtain review of his

ineffective-assistance claims under Ohio's procedural scheme—the premise of the *Martinez*, *Trevino*, and *White* decisions. *See Martinez*, 566 U.S. at 14; *Trevino*, 569 U.S. at 428; *White*, 940 F.3d. at 278. Instead, he claims his appellate and post-conviction counsel were ineffective for failing to raise his defaulted claims at all. The Court agrees with Respondent, therefore, that the *Martinez/Trevino* exception does not apply here. *See Statzer v. Marquis*, No. 1:18-cv-626, 2020 WL 1510241, at *15 (S.D. Ohio March 30, 2020) (Merz, M.J.) (distinguishing *White* and finding it did not apply to Ohio prisoner's claim).[21]

Nevertheless, even if the fourth prong of the *Martinez/Trevino* framework were satisfied in this case, and the exception applied, it would not assist Hale. As discussed below, Hale's ineffective-assistance-of-trial-counsel claims are not strong enough to satisfy the exception's first requirement—that they are "substantial."

## B. Merits Analysis

Although many of Hale's ineffective-assistance claims are procedurally defaulted, each of the claims also lacks merit.

The Supreme Court has long recognized the Sixth Amendment right to the effective assistance of counsel at trial as a "bedrock principle in our justice system." *Martinez*, 566 U.S. at 12; *see also Gideon v. Wainwright*, 372 U.S. 335, 342–44, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). The Court announced a two-prong test for claims of ineffective assistance of counsel in *Strickland,* 466 U.S. at 687. First, the petitioner must demonstrate that counsel's errors were so egregious that

---

[21] *Supplemented,* No. 1:18-cv-626, 2020 WL 4220463 (S.D. Ohio July 23, 2020), *report and recommendation adopted sub nom. Statzer v. Warden, Richland Corr. Inst.*, No. 2018-cv-626WOBMRM, 2020 WL 7029281 (S.D. Ohio Nov. 30, 2020), and *report and recommendation adopted sub nom. Statzer v. Warden, Richland Corr. Inst.*, No. 2018-cv-626WOBMRM, 2020 WL 7029281 (S.D. Ohio Nov. 30, 2020).

"counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation fell "below an objective standard of reasonableness." *Id*. at 688. It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id*. at 689.

Second, the petitioner must show that he was prejudiced by counsel's errors. He must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail. *Id.*

The Supreme Court has emphasized that "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Harrington,* 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010)). It has explained,

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.

*Id*. (internal quotation marks and citations omitted). Thus, "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ." *Strickland,* 466 U.S. at 689. "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "'the constitutionally protected

140

independence of counsel and . . . the wide latitude counsel must have in making tactical decisions.'" *Pinholster*, 563 U.S. at 195–96 (quoting *Strickland,* 466 U.S. at 689).

The Supreme Court further has observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so." *Harrington,* 562 U.S. at 105 (internal quotation marks and citations omitted). It has cautioned:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id*.

### 1.       Voir Dire (Sub-claims 1, 2, 3, 4, 5, 6, 7, and 8)

*Juror No. 34*. Hale claims that his trial counsel were ineffective in failing to strike or challenge Juror No. 34, whom he contends exhibited racial bias in his *voir dire* responses. (Doc. No. 31 at 110-11.) Hale did not present this claim to state courts, so this Court reviews the claim *de novo*.

Trial counsel's questioning during *voir dire* is presumed to be a matter of sound trial strategy. *See, e.g., Keith*, 455 F.3d at 676 (noting the "particular deference" owed to counsel's decisions when conducting *voir dire*) (citing *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)); *Stanford*, 266 F.3d at 454 ("Stanford presents no evidence to counteract our presumption that his counsel's failure to ask life-qualifying questions during general voir dire constituted trial strategy."). And, here, this Court previously has found in relation to Hale's second ground for relief, that the record does not show that Juror No. 34 exhibited overt racial bias in his responses to questioning during *voir dire* such that it was clear he could not perform his duties as a juror with

141

impartiality and in accordance with the court's instructions. Hale's counsel, therefore, did not perform deficiently in failing to further question or strike this juror.

*Juror Nos. 1, 4, 5, and 6.* Hale also complains that his counsel should have challenged four jurors who were "facially biased." Hale never raised this claim as to Juror No. 6, so that claim is procedurally defaulted and will be reviewed *de novo*. He presented the claim as to Juror Nos. 1, 4, and 5 on direct appeal to the Ohio Supreme Court, and those claims are preserved for habeas review. The Ohio Supreme Court addressed Hale's claims as to Jurors Nos. 1, 4, and 5 as follows:

> {¶ 206} . . . Hale contends that his counsel were ineffective because they did not challenge jurors No. 4 and 5 for cause. Hale claims these jurors were automatic-death-penalty jurors. However, the case for so regarding them was weak, as we explain above in discussing Hale's seventh proposition of law. It was therefore not ineffective assistance to fail to challenge them.
>
> * * *
>
> {¶ 210} Hale contends that his counsel should have challenged juror No. 1 for cause because she could not fairly consider all three possible life sentences. Juror No. 1 stated that she would be open to a sentence of life without parole, but "probably would be against" anything less.
>
> {¶ 211} But juror No. 1 also had strong leanings against capital punishment and thus was a desirable juror for the defense. She said in her questionnaire that the death penalty should be used only if there was "absolutely no doubt" of guilt. A death sentence "would be very hard for [her] to agree to." Her statements also reveal her strong sense of the seriousness and finality of the decision: "[I]t's so final that that's really a big decision to make." "[I]t's an incredibly serious undertaking."
>
> {¶ 212} In the penalty phase of a capital case, counsel's primary objective is to avoid a death sentence. Obtaining a life sentence with the possibility of parole, as opposed to without it, is a secondary consideration. Thus, competent counsel could make a reasonable tactical decision to accept a juror whose answers indicated a strong reluctance to impose death, even though that reluctance may have come packaged with a predisposition against parole. Juror No. 1 was such a juror, and Hale's counsel did not perform deficiently by accepting her.

*Hale*, 892 N.E.2d at 903–05.

Hale argues that the state court's decision contravened and misapplied Supreme Court precedent and was based on unreasonable determinations of fact. (Doc. No. 31 at 126.) But he does not specify any basis for that claim, and this Court finds none. As the Ohio Supreme Court explained, the record does not demonstrate that Jurors No. 1, 4, and 5 revealed during *voir dire* that they would automatically impose the death penalty or not fairly consider the appropriate range of sentences available for Hale's offenses as instructed. The record shows the same regarding Juror No. 6. Counsel, therefore, did not provide ineffective assistance in failing to remove Juror Nos. 1, 4, 5, and 6 from the jury.

*Juror No. 7.* Hale further complains that counsel should have challenged Juror No. 7, who disclosed during *voir dire* that she knew the victim. Hale raised this claim on direct appeal to the Ohio Supreme Court, which determined, as follows:

{¶ 207} Hale contends that his counsel should have challenged juror No. 7 for cause because the juror knew the victim. Juror No. 7 remembered Green as an entertainer who had been known locally when the juror was in her teens. However, juror No. 7 "didn't know him personally." Green was a "friend of a friend of a friend." The juror's interaction with Green was limited to saying "Hello" or "[H]ow you doing?" About three years before the trial, Green had sung at the wedding of the juror's brother, but the juror had been ill and did not remember him well. Juror No. 7 stated that her acquaintance with Green would not affect her ability to be fair and impartial.

{¶ 208} "There is no constitutional prohibition against jurors simply knowing the parties involved or having knowledge of the case." *McQueen v. Scroggy* (C.A.6, 1996), 99 F.3d 1302, 1320. Juror No. 7 testified that her slight acquaintance with Green would not affect her impartiality, and her voir dire gives no reason to doubt this. The relationship was distant and casual, not "close and ongoing" as in *Wolfe v. Brigano* (C.A.6, 2000), 232 F.3d 499, 502. See *Miller v. Francis* (C.A.6, 2001), 269 F.3d 609, 618 (distinguishing *Wolfe*).

{¶ 209} Moreover, the defense had strong tactical reasons for wanting juror No. 7 to sit on the jury. Her religious beliefs emphasized that "thou shall not judge," and she believed her religion would deem it a sin to vote for a death sentence. In fact, for this very reason, the prosecution repeatedly (but unsuccessfully) challenged

143

juror No. 7 for cause. Accordingly, defense counsel's failure to challenge juror No. 7 was neither deficient nor prejudicial.

*Hale*, 892 N.E.2d at 903–04.

Hale contends this decision is "unreasonable." (Doc. No. 31 at 126.) He does not, however, identify any Supreme Court precedent the state court unreasonably applied. He challenges the court's reliance on the two Sixth Circuit cases, but those cases addressed the issue of juror bias based on knowing a party, and the court reasonably looked to them for guidance. Hale also does not identify any unreasonable determination of fact upon which the state court relied. He criticizes the court's observation that the juror "testified that her slight acquaintance with Green would not affect her impartiality," *Hale*, 892 N.E.2d at 903, as an insufficient basis for its conclusion that she lacked bias. (Doc. No. 31 at 126–27.) But the state court cited many other remarks of the juror during *voir dire* from which it assessed the closeness of her relationship with Green. *See id*. Hale also asserts that the court unreasonably found defense counsel had a strong tactical reason for wanting the juror seated on the jury when the juror made critical remarks about repeat offenders during *voir dire*. (Doc. No. 31 at 127–28.) But Hale has not rebutted the "strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. This claim also fails.

*Juror Nos. 8 and 41*. Hale also faults his trial attorneys for not rehabilitating Jurors Nos. 8 and 41, who had expressed some hesitancy toward the death penalty during *voir dire*. (Doc. No. 31 at 128–29.) The Ohio Supreme Court reviewed this claim on direct appeal, stating:

> {¶ 213} Hale contends that defense counsel should have tried to rehabilitate prospective jurors No. 8, 28, and 41, each of whom was excused as unwilling to consider a death sentence. Hale's claim of prejudice is necessarily speculative, because we cannot know whether these jurors could have been rehabilitated. Hale's trial counsel saw and heard the jurors respond to the voir dire questions; we did not.

144

>We are therefore in no position to second-guess counsel on this point. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 143, 538 N.E.2d 373.

*Hale*, 892 N.E.2d at 904.

Hale again argues that the state court's decision contravened and misapplied Supreme Court precedent and was based on unreasonable determinations of fact. (Doc. No. 31 at 128.) He argues the state court's decision was contrary to *Witt*, 469 U.S. at 424, which established the constitutional standard for challenging a juror for cause because of the juror's views on the death penalty, and an Ohio statute to the same effect, which he contends created a liberty interest under *Michigan v. Long*, 463 U.S. 1032, 1038–42, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). (Doc. No. 31 at 129.) But neither of these decisions clearly established that the State may not challenge for cause a potential juror who voices "[a]ny equivocations" about imposing the death penalty, as Hale argues. (Doc. No. 31 at 129.) The Supreme Court in *Witt* held that the standard for such a challenge "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt*, 469 U.S. at 424. Indeed, the Court explicitly noted that "this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.'" *Id*. Moreover, neither case clearly established that defense counsel has a duty to "rehabilitate" a venireperson who expresses some (reluctant) willingness to consider capital punishment—which is the actual basis of this ineffective-assistance claim.

Hale also argues that the state court unreasonably deferred to counsel in evaluating the jurors' views on the death penalty when, according to him, the record was "clear" that trial counsel were deficient in that respect. (Doc. No. 31 at 128.) As noted above, trial counsel's questioning during *voir dire* is presumed to be a matter of sound trial strategy. *See, e.g., Keith*, 455 F.3d at 676. But the record shows that Juror No. 8 was in fact nearly unequivocal in her objection to the death

145

penalty. (*See* Doc. No. 8-1 (Trial Tr.) at 588–93.) And Juror No. 41 expressed views veering between hesitancy toward the death penalty and strong support of it—surely not an attractive juror for the defense. (*See* Doc. No. 8-2 (Trial Tr.) at 435–37, 448–50.) The Ohio Supreme Court reasonably ruled, therefore, that it is entirely speculative as to whether these jurors even could be "rehabilitated," and Hale was not prejudiced by his counsel's performance with regard to these potential jurors.

*Misstating Ohio law to the trial court.* Hale next asserts that his trial counsel were ineffective by misstating the law to the trial court during *voir dire*, which he alleges resulted in an incorrect jury instruction. (Doc. No. 31 at 129–30.) The Ohio Supreme Court rejected this claim on direct appeal, stating:

> {¶ 214} Hale claims his trial counsel misstated the law to the trial judge during voir dire. Trial counsel stated that in the penalty phase, the jury must initially consider whether the aggravating circumstances outweigh the mitigating factors. But Hale's trial counsel correctly stated the law. See *State v. Lindsey* (2000), 87 Ohio St.3d 479, 487, 721 N.E.2d 995; *State v. Brooks* (1996), 75 Ohio St.3d 148, 162, 661 N.E.2d 1030 (when jury cannot unanimously agree on a death sentence, it must move on to consider which life sentence is appropriate).

> {¶ 215} There would have been no prejudice to Hale even if counsel's statement had been incorrect. No jurors were present when counsel made the statement at issue, and Hale makes no claim that the trial court gave incorrect jury instructions as a result of counsel's alleged error.

*Hale*, 892 N.E.2d at 904.

Hale argues that the Ohio Supreme Court incorrectly found no error in his counsel's characterization of Ohio law regarding capital sentencing and made an unreasonable factual determination regarding the trial court's jury instruction on the law at issue, which incorporated his counsel's misstatement. (Doc. No. 31 at 129–30.) But "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court

146

sitting in habeas corpus." *Bradshaw*, 546 U.S. at 76 (citing *Estelle*, 502 U.S. at 67–68.). And Hale cites no Supreme Court precedent that the state court contravened or misapplied. This claim is meritless.

   *Misstating Ohio law to Juror No. 30*. Hale further contends that his trial counsel performed deficiently when both he and the trial judge misstated the law to Juror No. 30 regarding the burden of proof in weighing mitigating factors and aggravating circumstances in capital sentencing. (Doc. No 31 at 130.) He raised this claim on direct appeal to the Ohio Supreme Court, which found no prejudice:

> {¶ 216} Defense counsel did make an incorrect statement during the voir dire of juror No. 30. Both the trial court and defense counsel incorrectly referred to the mitigating factors outweighing the aggravating circumstances. However, in the penalty phase, the trial court correctly instructed the jury that the state had the burden of proving that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Thus, Hale was not prejudiced.

*Hale*, 892 N.E.2d at 904.

   Hale claims the state court's conclusion that Hale was not prejudiced by this misstatement of law was an unreasonable determination of fact because the court "ignored the earlier misstatements" and Juror No. 30 was seated. (Doc. No. 31 at 130.) This argument is too vague to establish that the state court's decision was unreasonable in any respect. The trial court's correct jury instruction on the law at issue precluded any prejudice to Hale from his counsel's misstatement. *See, e.g., United States v. Carter*, 236 F.3d 777, 787 (6th Cir. 2001) ("As a general matter, juries are presumed to understand and follow directions from the court."). This claim, too, is unfounded.

   *Questioning venire about race.* Hale also complains that his attorneys failed to question the venire about race and to object to the prosecution's questions on that topic. (Doc. No. 31 at

147

131.) Hale raised this claim on direct appeal as to counsel's failure to question jurors but did not

present the assertion in state court as to counsel's failure to object. A failure to object is an

independent and separate factual allegation from a failure to question and it constitutes a new

claim. The objection claim, therefore, is procedurally defaulted, and the Court will review it *de

novo*. The Ohio Supreme Court on direct review rejected Hale's claim regarding counsel failure to

question the venire about race, as follows:

> {¶ 217} Citing *Turner v. Murray* (1986), 476 U.S. 28, 36–37, 106 S.Ct. 1683, 90 L.Ed.2d 27, Hale contends that his counsel performed deficiently by failing to question the jurors about racial bias. However, *Turner* has no application to this case. *Turner* holds that a capital defendant accused of an interracial murder is entitled, upon request, to have prospective jurors informed of the race of the victim and questioned concerning racial bias. But this case does not involve an interracial murder.

> {¶ 218} And *Turner* held only that the defense was entitled to engage in racial-bias inquiry, not that defense counsel must do so in order to effectively assist their client. We have recognized that "the actual decision to voir dire on racial prejudice is a choice best left to a capital defendant's counsel," *State v. Smith* (2000), 89 Ohio St.3d 323, 327, 731 N.E.2d 645, and we normally defer to counsel's judgment on this question. *Id*. at 328, 731 N.E.2d 645.

> {¶ 219} We decline to deviate from that practice here. There was no discernible reason to ask about racial bias. This case did not involve an interracial murder, nor did the evidence raise any racial issues. In *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97, we held that defense counsel's failure to examine racial attitudes on voir dire was not ineffective assistance, even though Watson did involve an interracial murder. Because the case did not involve any issue of "racial confrontation," defense counsel "could have properly determined that the examination of jurors' racial views * * * would be unwise." *Smith,* 89 Ohio St.3d at 328, 731 N.E.2d 645 (noting risks of examining racial prejudice on voir dire). Hence, it was neither deficient performance nor prejudicial for counsel not to ask racial-bias questions.

*Hale*, 892 N.E.2d at 904–05.

Hale contends this decision was contrary to clearly established Supreme Court precedent

and based on an unreasonable determination of the facts. (Doc. No. 31 at 131.) He argues the state

148

court "ignore[d] . . . that the prosecution injected the issue of race into voir dire through its questioning" and should have responded by questioning the jurors because there was a "'risk that racial prejudice *may have* infected petitioner's capital sentencing[.]" (*Id.* (quoting *Turner*, 476 U.S. at 36 (alterations added).) But, again, Hale does not identify any Supreme Court precedent, including *Turner*, that the Ohio Supreme Court misapplied or contravened in its decision. Nor does he offer any evidence to rebut the presumption that his trial counsel employed sound trial strategy in their decision not to question the potential jurors about race or to object to the prosecution's questioning on that issue. *See Stojetz v. Ishee*, 892 F.3d 175, 194–95 (6th Cir. 2018) (rejecting petitioner's *per se* ineffective-assistance claim based on trial counsel's failure to ask venire questions about racial attitudes). It is possible, for example, that counsel was concerned such questions would be offensive to potential jurors or unlikely to actually uncover conscious or unconscious bias. *See Stanford*, 266 F.3d at 454 ("The record is silent as to the rationale behind [petitioner's] counsel's performance. Thus, we can do no more than speculate as to some of the reasons why Stanford's counsel might not have asked life-qualifying questions during general voir dire."). This claim also fails.

*Ensuring venire understood aggravating circumstances*. For his final sub-claim to his claim of ineffective assistance of trial counsel during *voir dire*, Hale asserts that his attorneys were ineffective for failing to ensure that the venire understood the meaning of aggravating circumstances for purposes of capital sentencing. (Doc. No. 31 at 132.) He raised this claim on direct appeal to the Ohio Supreme Court, which concluded:

> {¶ 220} Hale contends that his counsel, during voir dire, failed to ensure that prospective jurors understood the meaning of aggravating circumstances. In essence, this issue recasts Hale's sixth proposition of law as an ineffective-counsel claim. However, because Hale does not contend that the penalty-phase instructions were incorrect, no reason exists to believe that the jurors actually seated at trial

misunderstood the meaning of aggravating circumstances. Hale accordingly has failed to show the prejudice requisite to an ineffective-assistance claim.

*Hale*, 892 N.E.2d at 905.

As this Court explained in relation to Hale's second ground for relief, the Ohio Supreme Court reasonably rejected Hale's claim that the jurors' remarks during *voir dire* demonstrated a misunderstanding of the meaning of aggravating circumstances for purposes of capital sentencing after being correctly instructed on the law by the court. It follows, therefore, that Hale, has not shown that he was prejudiced by his counsel's conduct in this respect, and the claim fails. *See Henness v. Bagley*, 644 F.3d 308, 319 (6th Cir. 2011) (finding that because the petitioner had not demonstrated that an underlying Fourth Amendment claim had merit, his related ineffective-assistance-of-trial-counsel claim failed, along with the ineffective-assistance-of-appellate-counsel claim) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008)).

### 2.       Trial (Sub-claims 10, 11, 12, 13, 14, 15, 16, and 24)

*Failure to present Hale's testimony*. Hale further complains that his trial counsel should have permitted Hale to take the stand in his own defense but instead coerced him into not testifying. (Doc. No. 31 at 278–82.) Hale acknowledges that he did not previously allege the coercion portion of this claim. (*Id*. at 282.) It is therefore procedurally defaulted and will be reviewed *de novo*. The Ohio Supreme Court addressed the remaining portion of the claim on direct appeal, stating:

> {¶ 222} Hale claims his counsel erred by failing to call him to testify in his own behalf. Hale contends that, in a self-defense case, it can never be sound trial strategy to decline to present the defendant's testimony.

> {¶ 223} No such blanket statement can be made. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052, 80 L.Ed.2d 674. In this case, by relying on Hale's confession instead of his live testimony, Hale's counsel were

150

able to present his story to the jury without subjecting him to cross-examination. In view of the many weaknesses in Hale's story, this defense strategy was reasonable.

*Hale*, 892 N.E.2d at 905.

Hale again contends the state court's decision contravenes or misapplies Supreme Court precedent and was based on an unreasonable determination of fact, without identifying one on-point Supreme Court holding or factual dispute. (Doc. No. 31 at 281–82.) He contends "the need for the jury to hear and see from [him] personally . . . clearly outweigh[ed] any concerns about cross-examination." (Doc. No. 31 at 282.) Yet aside from that conclusory assertion, he does not explain why. As the state court reasonably concluded, Hale was able to present his account of the events surrounding the murder and claim of self-defense through his statement, without the risk of a grueling and potentially devastating cross-examination. Moreover, this Court already has found, in relation to Hale's seventh ground for relief, that Hale waived his right to testify by failing to clearly inform the court in a timely fashion that he wished to do so or that he disagreed with his counsel on the matter, and there was no evidence of coercion on the part of his attorneys. Defense counsel's strategic decision that Hale should not take the stand, therefore, did not fall "below an objective standard of reasonableness," and this claim fails. *Strickland,* 466 U.S. at 688.

*Presenting a stronger defense*. For his next claim, Hale argues that his trial counsel were ineffective for arguing that no robbery occurred. (Doc. No. 31 at 283–84.) Hale raised this claim on direct appeal to the Ohio Supreme Court, which concluded:

{¶ 226} Hale claims that his counsel, by arguing that Hale did not commit aggravated robbery by taking Green's property after killing him, undermined their credibility with the jury. This claim is inherently speculative and finds no support in the record.

*Hale*, 892 N.E.2d at 906.

As the *Strickland* Court noted, "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. And the Ohio Supreme Court reasonably determined that this claim was inherently speculative – it is impossible to know how the jury assessed defense counsel's credibility or why – and Hale has not shown otherwise. This claim is also meritless.

*Cross-examinations of Lashayla Hale and Ricardo Cuffari.* Hale further asserts that his counsel performed deficiently in their cross-examinations of his sister Lashayla and Green's friend Ricardo Cufffari. (Doc. No. 31 at 286–90.) He did not present this claim as to Cuffari in state court; that claim, therefore is procedurally defaulted and will be reviewed *de novo*. Hale raised this claim as to Lashayla in state post-conviction proceedings. The last court to address this issue was the Ohio court of appeals, which determined, as follows:

> {¶ 28} Hale argues that he discovered after the trial that his sister Lashayla was threatened by the prosecutor that if she did not testify that their sickly father would be called to testify instead. He claims that his defense counsel knew about this threat and failed to cross-examine Lashayla regarding the threat. He claims this would have shown that Lashayla was testifying under duress. He further states that Lashayla's testimony was prejudicial because she testified that Hale had a gun several months prior to the murder. In support of this claim, he attached the affidavit of his trial counsel who stated that she knew about the threat and that the failure to question Lashayla about the threat was not the result of trial strategy.

> {¶ 29} We do not see how defense counsel's failure to question Lashayla about the prosecutor's threat was prejudicial to Hale. Lashayla appeared as a defense witness; therefore, the prosecutor would have been able to cross-examine her regardless of whether or not she testified for the state. Lashayla was also under subpoena and had to testify. Thus, the trial court did not err by refusing to conduct a hearing based on this evidence.

*Hale*, 2016 WL 4978449, at *5-6.

Hale argues the state court "made an unreasonable determination of facts by finding that the defense calling Lashayla as a witness meant that there could be no deficiency in their cross-

examination of her" and by finding "that Lashayla's subpoena erased any concerns about the defense's cross-examination of her . . . ." (Doc. No. 31 at 290.) But, factual or not, that is not what the court stated. Rather, it concluded that cross-examination about the prosecution's alleged threat would not have helped Hale by lessening the impact of Layshala's damaging testimony, as Hale contends, because she appeared voluntarily for the defense anyway, and even if she had not, she would have been compelled to testify under a subpoena. Hale's claim that the "jury very well may have discounted her testimony if they thought that she felt like she had to testify in a certain way to protect her sick father from having to testify" is speculative. The Ohio court reasonably found no "reasonable probability that, but for counsel's [decision not to question Lashayla about the prosecution's alleged threat], the result of the proceeding would have been different." *Id.* at 694.

Hale also argues that his trial counsel performed deficiently in failing to properly cross-examine Ricardo Cuffari, Green's friend, about a telephone call Cuffari allegedly had with a police officer. (Doc. No. 31 at 287–88.) Hale claims in his twenty-third ground for relief, however, that the prosecution suppressed notes taken of this phone call, and he did not learn of the call until 2018. Counsel cannot be ineffective for failing to cross-examine a witness about something of which they knew nothing. This claim is meritless.

*Introducing evidence of prior incarceration*. Hale also complains that his attorneys were ineffective in introducing to the jury his entire written statement to police, in which he referenced a prior criminal conviction and his twelve-year incarceration. (Doc. No. 31 at 292–94.) The Ohio Supreme Court addressed this claim, as follows:

> {¶ 224} Hale also contends that introducing his written statement, instead of his live testimony, prejudiced him because the written statement mentioned that Hale had served 12 years in prison. Hale admits that had he testified, his felony conviction might have been introduced to impeach him. But he says that had he testified, he could have explained that he had been sexually abused in prison, thus

153

explaining why he feared rape when he allegedly encountered Green nude on his bed.

{¶ 225} But Hale ignores the fact that his written statement contains precisely the information that he claims only his live testimony could have provided. Hale's statement says: "I not too long ago served 12 long years in prison *and had fought off unwanted advances before*. I was prepared in prison though. You expected this type of thing. No way in hell did I expect this out here." (Emphasis added.) Thus, Hale's argument lacks merit.

*Hale*, 892 N.E.2d at 905–06.

Hale argues that the state court's conclusion was unreasonable because the information regarding his prior conviction and prison term may not have been permitted in impeachment had he testified and defense counsel did not even attempt to use his prior prison term to his benefit by placing it in the context of his history of sexual assault in his childhood and later in prison. (Doc. No. 31 at 293–94.) But Hale's argument is precisely the type of second-guessing of counsel with its attendant "distorting effect[] of hindsight" the Supreme Court in *Strickland* cautioned against. *Strickland,* 466 U.S. at 689. As noted above, the Ohio Supreme Court reasonably concluded that it was sound trial strategy to use Hale's statement rather than testimony to present his self-defense theory to the jury, including any history of sexual assault in prison. This claim, too, fails.

*Deficient cross-examination of Sergeant Baird.* Hale contends his trial counsel performed deficiently in their cross-examination of Sergeant Baird. (Doc. No. 31 at 294–98.) Hale raised this claim on direct appeal to the Ohio Supreme Court, which reasoned:

{¶ 227} Hale contends that counsel, in cross-examining Sergeant Baird, "improperly emphasized" Baird's claim that he had told Hale that Green might be bisexual, thus planting the idea of a sexual assault in Hale's head. But the cross-examination was a matter of debatable trial tactics, which do not constitute ineffective assistance. See *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 402 N.E.2d 1189.

*Hale*, 892 N.E.2d at 906.

154

Hale argues that the state court's decision was "contrary to and an unreasonable application of federal law." (Doc. No. 31 at 297.) But he does not identify any Supreme Court precedent the court misapplied or contravened. Indeed, as the state court noted, courts "generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel, and tactical decisions are not ineffective assistance of counsel simply because, in retrospect, better tactics may have been available." *Sowell v. Collins*, 557 F. Supp. 2d 843, 886 (S.D. Ohio 2008) (internal quotation marks and citation omitted).

Hale also claims there is "no identifiable strategic reason" for eliciting Baird's testimony that he told Hale that Green might have been bisexual. (Doc. No. 31 at 297–98.) The Court does not agree. Baird testified on cross-examination that before Hale wrote out his statement, he told Hale that the police department "had reason to believe that Mr. Green was possibly bisexual and that if this was a case of self-defense, then that would be understandable if he felt that Mr. Green had attacked him." (Doc. No. 8-3 (Trial Tr.) at 494.) When the prosecution questioned him moments later on redirect examination, Baird acknowledged again what he told Hale about Green. (*Id*. at 495.) He then explained that he was "giving the defendant a straw, something to grab on to[,]" which worked, because Hale then "began to speak to me and gave me the confession." (*Id*. at 495–96.)

Baird's testimony was double-edged. The jury may have concluded from this testimony, as Hale argues, that the detective planted the idea of self-defense with Hale before Hale wrote his statement, undercutting Hale's self-defense claim. But the jury also may have found this information, coming from a police sergeant, strong corroboration of Hale's story. Moreover, the value of the testimony for the defense may explain why the prosecution did not question Baird about this on direct examination and did not suggest during redirect examination of Baird that the

155

statement was untruthful or that Hale appeared to be just following Baird's lead in his account of the shooting. Defense counsel's cross-examination of Baird, therefore, did not amount to constitutional ineffective assistance.

*Reviewing records while witness testified*. Hale further asserts that his counsel were ineffective because they reviewed criminal records relating to a State witness (a lodge housekeeper who knocked on Hale's room door and briefly spoke to him) while she testified because  the State produced the records just before she took the stand. (Doc. No. 31 at 304 (citing Doc. No. 8-3 (Trial Tr.) at 181.) The Ohio Supreme Court, in reviewing this claim on direct appeal, rejected the claim because "Hale fail[ed] to identify any resulting prejudice." *Hale*, 892 N.E.2d at 906.

Hale claims that this decision unreasonably applies *United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), which held that courts may presume that a defendant has suffered unconstitutional prejudice if he "is denied counsel at a critical stage of his trial." *Id*. at 659. But Hale has not established that he was denied assistance of counsel during the witnesses' testimony. Defense agreed to proceed with her testimony as a courtesy to the court to avoid further delay and under the condition that if she denied anything in the records, they would have a recess to inquire further into the matter. (Doc. No. 8-3 (Trial Tr.) at 183–84.) Counsel then cross-examined this witness extensively about her criminal record. (*Id*. at 193–98.) It also is worth noting that Hale had three attorneys representing him at trial; it is doubtful he was ever entirely without attentive counsel during the witness' testimony. *Cronic* does not apply here. The Ohio Supreme Court reasonably found no prejudice in counsel's performance at issue here, and this claim is denied.

*Permitting introduction of damaging evidence*. Hale contends his trial counsel performed deficiently while cross-examining Sergeant Pestak by "opening the door" to incriminating

evidence that had been excluded—evidence of bounced checks and post-interrogation oral statements recorded in a report of Sergeant Baird, including Hale's statement that he threw away the gun and some of Green's belongings. (Doc. No. 31 at 301–03.) On direct appeal, the Ohio Supreme Court found "these alleged errors were not prejudicial in light of overwhelming evidence of Hale's guilt."

Arguably, Hale's counsel's performance in cross-examining Pestak "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688. But the state court reasonably concluded that, given the strong evidence of Hale's guilt, these errors were not prejudicial. Hale has not demonstrated that if his attorneys had not allowed that evidence to be introduced, there was a "reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This claim also fails.

*Interviewing the jury after the guilt phase of trial.* In this sub-claim, Hale contends his counsel should have interviewed the jury after their verdict and discharge. (Doc. No. 31 at 435–37.) The Ohio Supreme Court rejected this claim on direct appeal, stating:

> {¶ 230} . . . After the guilt-phase verdicts, the trial court released the jurors from sequestration and stated that they were "discharged." However, the court asked them to remain for further instructions. Those instructions informed the jurors that they were "still jurors on this case" and that they must continue to obey the court's instructions not to discuss the case with anyone and not to watch newscasts or read newspapers.

> {¶ 231} Hale contends that because the jurors had been "discharged" after the guilt phase, his trial counsel should have requested a voir dire of the jury before the penalty phase to ensure that they had not discussed the case in the interim. See generally *Remmer v. United States* (1954), 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654. However, a *Remmer* hearing is required only "when the trial court learns of 'private communication, contact, or tampering * * * with a juror during a trial about the matter pending before the jury.'" *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 263, quoting *Remmer*, 347 U.S. at 229, 74 S.Ct. 450, 98 L.Ed. 654. In this case, there was no allegation that any such contact occurred. Nor does the trial court's use of the word "discharged" justify the

157

supposition that the jurors discussed the case between the guilt and penalty phases. There was thus no reason for counsel to ask for a voir dire.

*Hale*, 892 N.E.2d at 906.

Hale argues that the state court did not respond to his true claim that his counsel "failed to even try to protect Hale's constitutional right to an impartial and indifferent jury by questioning the jurors to ensure that they were not improperly influenced during this period of discharge." (Doc. No. 31 at 437.) Even under Hale's characterization of his claim, it fails. Hale offers no evidence that he was prejudiced by his attorney's omission—namely, proof that the jury was improperly contacted or influenced during the time between their verdict and the sentencing phase of trial. This claim is meritless.

### 3.    Investigation and experts (Sub-claims 9, 22, and 23)

Hale claims that his trial counsel did not conduct adequate investigations for either the guilt or sentencing phases of trial, retain the necessary experts, or obtain and present available evidence. (Doc. No. 13 at 171–219; 255–76.) Specifically, Hale alleges that his attorneys performed deficiently during the guilt phase of trial because they did not: (1) retain experts in forensic pathology, prison conditions, bloodstain pattern analysis and gunshot residue, crime scenes and crime-scene reconstruction, and sexual abuse and trauma; (2) investigate Green's background and discover corroborating witness Steven Key and the fact that Green may have been suicidal before his death; and (3) investigate Hale's activities in the weeks before Green's death and discover Hale's parole records and financial information. (Doc. No. 31 at 235.) And he asserts that for the sentencing phase of trial, they failed to: (1) retain experts in forensic psychiatry, sexual abuse and assault, prison conditions, and substance abuse; (2) sufficiently interview his sisters and present lay witness Steven Key; and (3) obtain his parole and prison records. (*Id*. at 377–99.)

Hale raised a claim of ineffective assistance of trial counsel related to their investigation and preparation for the sentencing phase of trial on direct appeal to the Ohio Supreme Court. He claimed that they should have called more witnesses and better supervised and prepared their witness Dr. John Fabian, a psychologist. *See Hale*, 892 N.E.2d at 907. The court rejected the claim as speculative. *Id*. Hale again raised an ineffective-assistance claim related to guilt-and sentencing-phase investigation in state post-conviction proceedings, asserting that counsel failed to: (1) retain experts in crime scenes, prison conditions, substance abuse, neurology, and culture; and (2) present lay witness Steven Key. *See Hale*, 2016 WL 4978449, at *2–7. The last state court to review the post-conviction claims, the state appellate court, adjudicated the claims on the merits without an evidentiary hearing. *Id*. These claims are ripe for habeas review.

Hale concedes that he did not raise in state court the remaining claims, alleging counsel were ineffective for failing to: (1) hire experts in forensic pathology, bloodstain pattern analysis, forensic psychiatry, and sexual abuse and trauma; (2) discover Green's alleged suicidal condition before his murder; and (3) obtain parole and prison records. (*See* Doc. No. 31 at 312.) The court reviews those claims *de novo*.

### a.     State post-conviction claims/guilt phase

*Crime-scene expert*. The state post-conviction appellate court rejected Hale's claim that trial counsel should have hired a crime scene reconstructionist for the guilt phase of trial, reasoning:

> {¶ 30} Hale argues that the trial court erred by not finding merit to his claim that counsel was ineffective for failing to retain a crime scene expert to refute the forensic evidence presented by the state. Attached to Hale's petition in support of this argument was the affidavit of Gary Rini, who opined that the evidence could be viewed as being consistent with Hale's story that he shot Green to stop his sexual advances. Although the trial court held that res judicata prevented this claim because the Ohio Supreme Court in Hale's direct appeal held that the failure to hire

159

a crime scene expert was speculative, Hale at that time of the direct appeal, did not have Rini's expert opinion, which is dehors the record. Although the trial court erred by concluding res judicata prevented the claim, we agree that the evidence did not support the claim.

{¶ 31} Hale stated in his statement to detectives that the victim, while seated at the foot of the bed, grabbed both of his wrists and laid his head in Hale's crotch area. Hale then allegedly freed his right wrist, reached into the bag of the victim and grabbed the gun from the bag and placed it near the victim's head. The victim told him it was not loaded. Hale stated he pulled the trigger and the victim "reeled back still gripping my wrist." Hale fired the gun again while backing away toward the mirror. He was not sure whether Green was incapacitated, so he retrieved some bullets from the victim's bag and reloaded the gun. When the victim again attempted to stand, he fired "once or twice again."

{¶ 32} According to the state's forensic witnesses at trial, the bullet wounds showed an execution style killing with three out of the four gunshots being clear contact wounds to the right side of Green's head in the area behind the ear. Because Hale is right handed, the victim had to be standing facing forward with Hale behind him or facing forward with Hale to his right. Both of these positions indicate an execution-style killing. Green also had gunshot residue to his right hand, indicating he lifted his hand to protect himself when the shots were fired. Hale had claimed that Green was at the foot of the bed when he shot him, but a circular spot of blood was found on the head board showing the origin was no more than three to four feet from the headboard.

{¶ 33} The pathologist also testified that at least three of the four gunshot wounds would have immediately rendered the victim incapacitated. This conflicts with Hale's statement in which he stated that he shot the victim two times and that as the victim got up from the bed he grabbed a handful of bullets, reloaded the gun, and shot him two more times. There is no way that the victim could have been moving towards Hale due to the incapacitating shots.

{¶ 34} Hale contends that Rini's expert report supports his statement to police that he acted in self-defense. Rini claimed that "the state did not take into account the possibility that, while seated at the edge of the bed, the decedent could have turned his head down and to his left, thereby exposing the right side of his head to a right handed shooter." While this would account for the location of the entrance wounds, the evidence showed the bullets traveled towards the front of Green's head, not straight to the other side. So Green's head would have to be turned so far to the left that he was facing away from Green. Hale stated that Green attempted to stand up and advance toward him when he fired the last two shots. Thus, he would have been facing towards Green, not away from Green. Rini also fails to address how the gunshot residue got onto Green's right hand. Thus, because Rini's expert report

160

does not refute the state's evidence, counsel was not ineffective for failing to retain him and there was no reason for the trial court to conduct an evidentiary hearing.

*Hale*, 2016 WL 4978449, at *6-7.

Hale argues the state appellate court based its conclusion that "Rini's expert report does not refute the state's evidence" on three unreasonable determinations of fact (Doc. No. 31 at 255–58): (1) the court's characterization of Hale's statement as attesting that, after being shot twice, Green "got up from the bed" and "advanced toward" Hale, "facing forward," before Hale fired again, when Hale wrote only that when Green "attempted to stand, I fired again once or twice"; (2) the court found that Rini "fail[ed] to address how the gunshot residue got onto Green's right hand," when Rini addressed that issue in his report; and (3) the court noted that the State's blood spatter evidence demonstrated that Green could not have been at the foot of the bed when Hale shot him, as Hale maintained, because a circular spot of blood found on the headboard indicated Green was no more than three to four feet away, but the court did not acknowledge Rini's interpretation of the blood evidence. (*Id.* (citing Doc. No. 7-10 at 4 (Hale Statement); Doc. No. 7-5 at 219–23 (Rini Rpt.)).)

Two of Hale's claims of factual error are unfounded. The court correctly noted that Rini's report does not include an analysis of the gunshot residue on Green's hand. And the court's omission in its analysis of the expert's opinion regarding the blood spatter was not a factual finding, much less an error. Rini's conclusion about the bloodstain evidence was based on his hypothesis that Green's head was faced down and to the left, which the court addressed and rejected. (*See* Doc. No. 7-5 at 222 (Rini Rpt.).)

Hale is correct, however, that the state court mischaracterized his account of the shooting. The court stated that after Hale shot Green twice, Green "got up from the bed" and was "moving

161

toward him," when Hale only said that Green "attempted to stand." (Doc. No. 7-10 at 4 (Hale Statement).) But "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice*, 660 F.3d at 250. Rini wrote that the focus of his report was "[w]hether the sequence of the gunshots, as described by Hale, can be supported by the physical evidence, and if the bloodstain patterns found on the head board could be produced as the result of Green being shot in the head while seated at the foot of the bed." (*See* Doc. No. 7-5 at 222 (Rini Rpt.).) Rini did not contest in his report the rest of the State's forensic and autopsy evidence, which was straightforward and damaging to the defense. As the Ohio Supreme Court summarized:

> An autopsy disclosed that Green had been shot four times in the right side of the head. Two shots went into Green's right ear, one entered his skull directly behind the ear, and one entered about two and one-half inches behind the ear. Three of the four shots entered Green's brain. Any one of these three wounds would have immediately stopped any voluntary movement on Green's part. Three of the wounds were contact wounds, meaning that the shots were fired from no more than an inch away.

*Hale*, 892 N.E.2d at 878. Thus, the court reasonably concluded that Rini did not effectively "refute the state's evidence" based on the entirety of the State's forensic evidence, not just the State's evidence refuting certain details of Hale's statement, such as Green's position on the bed when he was shot. And, therefore, there was no "reasonable probability that [if Hale's trial counsel had presented a crime-scene expert such as Rini,] the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

*Prison-conditions expert*. Hale also asserted in state post-conviction proceedings that his attorneys should have hired a prison expert, such as Clemens Bartollas, for both the guilt and sentencing phases of trial. In rejecting this claim, the state appellate court stated:

162

{¶ 16} A review of Dr. Bartollas's affidavit shows that it mostly consists of general statements regarding prison conditions in Ohio and around the country as related to sexual assaults. He concluded, based on a one-hour telephone conversation with Hale, that Hale suffered from post traumatic stress disorder from his time previously spent in prison. Hale told him that during that time he was pressured for sex, but was admittedly never sexually assaulted in prison. Because most of Bartollas's information deals with sexual assault in prison, it is not directly relevant to Hale because Hale was not sexually assaulted in prison.

{¶ 17} A review of Dr. Fabian's testimony at trial shows he interviewed Hale for eight hours. Dr. Fabian acknowledged that prison life is violent and that during his time in prison, Hale was confronted with "stressors." The fact that Dr. Bartollas provided more general information than Dr. Fabian regarding violence in prison did not result in prejudice. Although Dr. Fabian did not discuss sexual assaults in prison, Hale was not sexually assaulted in prison. Dr. Fabian, however, stressed that the sexual abuse that Hale suffered as a child may have caused him to react violently if Green did make sexual advances toward him.

*Hale*, 2016 WL 4978449, at *3. The court further stated that it rejected Hale's arguments regarding the value of Dr. Bartollas' testimony for mitigation purposes for the same reasons, stressing that trial counsel was not ineffective in not having him testify "regarding Hale's prior sexual assaults in prison" when there was no evidence that Hale was actually sexually assaulted in prison. *Hale*, 2016 WL 4978449, at *7.

Hale contends the state court's decision also was based on several unreasonable determinations of fact. (Doc. No. 31 at 264–66.) In essence, he argues the court did not fully examine Dr. Bartollas' affidavit, which explained how Hale's "*entire prison experience*, including numerous violent assault threats, and the witnessing of rapes, had given him [post-traumatic syndrome]" and affected his state of mind at the time of the murder. (*Id*. at 264–65 (citing Doc. No. 7-5 at 127–37 (Bartollas Aff.) (emphasis in original)).) The appellate court, however, addressed many of these issues in its decision, and the court's failure to address any particular argument raised is not factual error.

163

As to counsel failing to presenting this type of expert at the guilt phase, "expert testimony discussing [Hale's] mental state, seeking to explain his behavior, or putting it in some favorable context [may] have exposed [him] to [damaging rebuttal] evidence." *Wong v. Belmontes*, 558 U.S. 15, 24, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009); *see also Strickland*, 466 U.S. at 699 ("Restricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude, would not come in."). This was sound trial strategy.

In regard to counsel's failure to present this type of expert at the sentencing phase, the state court reasonably found Dr. Bartollas' testimony would have been cumulative to Dr. Fabian's testimony, as Bartollas' affidavit contained more general information and less information relevant to Hale. To demonstrate prejudice, a petitioner must show that any new evidence differs "in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Eley v. Bagley*, 604 F.3d 958, 968 (6th Cir. 2010) (internal quotation marks and citation omitted). And the "failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." *Id.* (internal quotation marks and citation omitted).

*Steven Key*. Hale also argued on post-conviction that his trial counsel should have uncovered and presented the testimony of Steven Key, a corrections officer in the jail where Hale was incarcerated during trial and who was friends with Hale as a child. (Doc. No. 31 at 393–94.) The state appellate court rejected this claim, as follows:

> {¶ 23} Hale also contends that the trial court erred by not granting an evidentiary hearing based on the affidavit of Stephen Key that he attached to his petition. He argued that Key's testimony would have bolstered Hale's statement to police that the victim made sexual advances on him, which provoked Hale into shooting him. Hale argued that Key's position as a correction officer would have made him a

164

credible witness. In the affidavit, Key averred that the victim approached him several times to come to his studio to audition to sing, which was odd because Key did not sing. Key stated that every time he saw Green, Green "seemed to be hitting on me" and that he thought he was "very aggressive."

{¶ 24} . . . Hale's contention that the victim provoked the murder was refuted by the physical evidence, as we will discuss in more detail later. Moreover, the jury was already aware that the victim had raped another man by forcefully performing oral sex on him. Thus, the fact he "hit on Key" would not have added to his defense. Also, although Key was a corrections officer, he also admitted that he and Hale went to school together when they were children.

*Hale*, 2016 WL 4978449, at *4–5. The court further stated that it rejected Hale's arguments regarding the value of Key's testimony for mitigation purposes for the same reasons. *Id*. at *7.

Hale argues this decision was unreasonable on several counts, including: his self-defense claim was not refuted by the physical evidence; the facts of Green's prior conviction were disputed; and Key's testimony was new corroborative evidence of how he met Green and refuted evidence at trial that Green did not approach people in this manner. (Doc. No. 31 at 421–23.) This does not satisfy *Strickland*'s burden. The state court reasonably concluded that due to the evidence of Green's conviction already before the jury and Key's relationship with Hale, there is not a reasonable probability that if defense counsel had presented Kay as a witness in either the guilt or sentencing phases, the result of the trial would have been different.

### b.    State post-conviction claims/sentencing phase

The Ohio Supreme Court provided this summary of the evidence Hale introduced at the sentencing phase of his trial:

{¶ 250} In the penalty phase, Hale introduced testimony from his three sisters and from Dr. John Fabian, a forensic and clinical psychologist. Hale also made an unsworn statement.

{¶ 251} The defense witnesses testified extensively regarding Hale's family and childhood. Hale was born in 1968, the eldest of four children. His father, who worked for LTV Steel for 30 years, was described by Hale's sister Latisha as pretty

165

stable. Hale's mother worked for 19 years for the Cleveland Catholic Diocese. However, she had a drinking problem and was unfaithful to her husband. These issues caused conflict in their marriage, sometimes leading to physical violence between the spouses. According to Dr. Fabian, Hale's father also had a drinking problem.

{¶ 252} Hale had an unusually close relationship with his mother, who treated him less as a child than as a "best friend" and confidant. According to Dr. Fabian, some of her confidences involved things "that perhaps he was too young to understand or to hear about." Hale usually sided with his mother against his father, conflict that sometimes led to physical confrontations between the two.

{¶ 253} When Hale was about seven, his mother left his father. She took Hale and his sister Laquatia to California. Initially, they stayed with Mrs. Hale's sister and her husband in the Watts neighborhood of Los Angeles. According to Laquatia, an older female cousin sexually molested Hale during this period.

{¶ 254} Hale was exposed to a violent environment during this period. There were conflicts among the adults, with Mrs. Hale's sister accusing her of sleeping with her husband. Eventually, the Hales moved out and went to live in "the projects." According to Laquatia, Mrs. Hale "had * * * different men in and out" during this time. According to Hale, his mother attempted suicide twice while in California.

{¶ 255} After about a year, Hale's mother returned to Cleveland and to her husband. Hale's father forgave her and took her back into his household. Hale's mother stopped drinking, spent more time with her children and became "nurturing." During this period, Hale "calmed down," became more outgoing, and did well in school. Life was "basically decent" and "kind of peaceful."

{¶ 256} Hale's life changed for the worse when he was about 13. His mother resumed drinking, fighting with her husband, and seeing other men. Hale began associating with delinquent peers, cutting school, stealing, and rebelling.

{¶ 257} Hale's sisters all testified that they love him. They credited him with numerous good qualities: intelligence, creativity and artistic ability, the ability to plan and to solve problems, a positive attitude, enthusiasm, willingness to work, compassion, and "big dreams" about helping the homeless. They described him as loving, gentle, pleasant, helpful, religious, a comforter, and a "defender" who protected his sisters. They felt that after his release from prison, he had been trying to "keep straight," to "get * * * on the right track." Laquatia testified that Hale assisted her with a mentoring program at her church.

{¶ 258} Dr. Fabian, the defense psychologist, interviewed Hale four times and also interviewed Hale's sisters. Dr. Fabian's opinion was that Hale's personality and background exhibit a number of risk factors associated with violent behavior.

{¶ 259} He divided these factors into four categories. "Individual factors" were Hale's aggressive personality and antisocial attitudes. "Family factors" included the instability of Hale's family, his early separation from a parent, "caregiver disruption," his parents' substance abuse, family conflict, and exposure to violence. "School factors" were Hale's academic failure and lack of commitment to school. "Peer-related factors" included Hale's growing up in a poor neighborhood where he was exposed to crime, weapons, and substance abuse.

{¶ 260} Dr. Fabian further opined that Hale has "very poor" coping skills. He has poor judgment, difficulty tolerating stress, poor impulse control, and a tendency to misperceive events. He uses substance abuse and violence to cope.

{¶ 261} However, Fabian also believed that Hale's prison records showed adequate or good adjustment to prison. Hale obtained a GED in prison, took college courses, obtained counseling, and completed two programs for substance abuse. He became a counselor himself and also tutored illiterate prisoners.

{¶ 262} Despite the stress of prison, Fabian testified that Hale had committed no "violent infractions" during his 12–year incarceration. However, in his unsworn statement, Hale said that he did "a lot of fighting" during his first two years, resulting in "a lot of hole time."

{¶ 263} Fabian also believed that Hale is unlikely to commit violent acts in prison. Fabian testified that life-sentenced inmates have rates of prison violence similar to the low rates of death-row inmates and "much lower" than those of "general offenders." He also noted the phenomenon of "age burn-out": beginning between the ages of 35 and 40, an inmate's risk of violent behavior drops. (Hale was 37 when he was tried.)

{¶ 264} Hale has no history of mental illness, and Fabian did not diagnose him as mentally ill. Fabian placed Hale's intelligence in the low-average-to-average range, making him "brighter than most capital offenders." Hale was not intoxicated at the time of the murder.

*Hale*, 892 N.E.2d at 909–10.

*Mitigation experts.* In addition to Bartollas and Kay, Hale proffered several additional experts whom he claimed in post-conviction proceedings that trial counsel should have retained for mitigation purposes, including a substance abuse expert, neurologist, and cultural expert. (Doc. No. 31 at 417–21.)

167

The state appellate court addressed these claims, stating:

{¶ 18} We also conclude that the evidence submitted in support of Hale's claim that counsel was ineffective for failing to obtain a substance abuse expert was cumulative. The Ohio Supreme Court has held that a defendant in a capital case is not deprived of mitigating evidence in the form of a substance abuse expert, where the defense presented " 'alternative devices that * * * fulfill[ed] the same functions as the expert assistance sought [by the defendant].'" *State v. Foust,* 105 Ohio St.3d 137, 2004–Ohio–7006, 823 N.E.2d 836, ¶ 103, quoting *State v. Jenkins,* 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph four of the syllabus. Dr. Fabian testified at length during the mitigation hearing regarding Hale's and Hale's parent's substance abuse. He testified that Hale abused alcohol and drugs since the age of 12 and that substance abuse was one of the factors that contributed to the cycle of violence that Hale experienced. Based on Dr. Fabian's testimony, having another expert testify regarding the affect of substance abuse on Hale would have been cumulative.

{¶ 19} Hale also argues that a neurologist could have testified to any neurological defect caused by the substance abuse. However, without any evidence that Hale in fact suffered from a neurological disorder, such an allegation is speculative. Although social worker Hall stated that counsel should have explored "potential neurological impairment caused by his substance abuse," the social worker was not a doctor and had no interaction with Hale. Dr. Fabian, a forensic psychologist had extensive interaction with Hale and found he did not suffer from a mental illness. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins v. Smith,* 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Here, the retaining of a neurological expert to test Hale, or the presentation of one at trial, when there was no evidence that Hale had a neurological defect, did not constitute ineffective assistance of counsel.

{¶ 20} We also conclude the presentation of a cultural expert would have been cumulative. Hale attached the affidavit of social worker Hall in which he stated that Hale's family history and culture and surrounding environment in which he was raised influenced him as an adult. He stated that an expert should have been obtained to facilitate how these factors influenced Hale in order to "humanize" Hale to the jury.

{¶ 21} Again, we conclude such an expert would have been cumulative to the testimony presented by Dr. Fabian, who testified to the unstable family environment in which Hale was raised. Dr. Fabian also described the low income neighborhood where gang violence and drugs existed and described in detail the sexual abuse that Hale suffered as a child. Dr. Fabian concluded that all of these factors caused Hale to be an aggressive, impulsive, and violent adult.

168

{¶ 22} Additionally, Hale's sisters testified regarding Hale's close relationships to his mother and Father Lynch, the priest who was like a surrogate father to Hale, and how the loss of those relationships affected him. Hale, himself, testified to his childhood, his close relationship to his mother and Father Lynch, his attempts to become closer to his sisters, and his difficult relationship with his father. These concepts that would "humanize" Hale to the jury, were not so difficult or complicated to understand that an expert would have been necessary to explain the influences on Hale. Moreover, as the Ohio Supreme Court stated in Hale's direct appeal, "Hale's history, character, and background have some mitigating weight. * * * But we have seldom given decisive weight to this factor." *Hale,* 119 Ohio St.3d 118, 2008–Ohio–3426, 892 N.E.2d 864, at ¶ 265.

*Hale*, 2016 WL 4978449, at *3–4.

Hale primarily faults the state court's conclusion that his proposed expert testimony was cumulative to the trial testimony of Dr. Fabian and his sisters. (*See* Doc. No. 31 at 417–21.) He lists dozens of points on which these experts could have testified that he contends were stronger and different than what was presented at trial. (*See, e.g., id.* at 396–98.)

But this "'more-evidence-is-better' approach to mitigation" has been roundly rejected by habeas courts, as it often is cumulative and would open the door to damaging evidence. *See Wong*, 558 U.S. at 24. It is true that counsel in a capital case have an "obligation to conduct a thorough investigation of the defendant's background" for mitigation purposes. *T. Williams*, 529 U.S. at 396. But that duty "does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Compare Wiggins v. Smith*, 539 U.S. 510, 525, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (counsel ineffective where petitioner had an "excruciating life history," yet counsel focused exclusively on his direct responsibility for murder), and *Rompilla v. Beard*, 545 U.S. 374, 389–93, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (counsel ineffective where he failed to examine court file of defendant's prior conviction that contained a range of vital mitigation leads regarding defendant's childhood and mental health problems), and *Frazier*, 343

F.3d at 795–99 (counsel ineffective where he failed to introduce any mitigating evidence in either guilt or penalty phases of trial and he was aware of petitioner's brain injury), *with Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise . . . that character and psychological evidence would be of little help"), and *Burger v. Kemp*, 483 U.S. 776, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987) (finding limited investigation reasonable because all witnesses brought to counsel's attention provided predominantly harmful information). As the Supreme Court has explained,

> [T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties. . . . This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained. It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."

*Bobby v. Van Hook*, 558 U.S. 4, 11–12, 130 S. Ct. 13, 175, L. Ed. 2d 255 (2009) (internal citations omitted).

This, too, is such a case. Hale points to a great deal of evidence that these experts could have offered, but none that is so powerful and would have been so obvious to trial counsel that there is a reasonable probability that it would have caused a different result in Hale's sentence. The state appellate court's decision rejecting this claim, therefore, was not contrary to, or an unreasonable application, of *Strickland* or other Supreme Court precedent.

      **c.**      **Habeas claims**

This is also true of the mitigation ineffective-assistance claims Hale raises here for the first time. Despite having raised numerous claims in state post-conviction proceedings regarding counsel's failure to hire experts and present additional witnesses for mitigation purposes, Hale argues his post-conviction counsel should have raised several more—including a forensic

psychiatrist, forensic pathologist, bloodstain pattern expert, and sexual abuse and trauma expert (Doc. No. 31 at 244–50; 377–84.)  Hale also contends trial counsel should have discovered Green's alleged suicidal condition before his murder; sufficiently interviewed Hale's sisters and family; "discovered" Hale's prison records and "favorable parole records"; discovered State witness Ricardo Cuffari's views on whether Green was bisexual and what police told him about that issue so they could better cross-examine him; and obtained information about gunshot residue and overdraft loan programs. (*Id*. at 312.)[22]

These new experts provide similar or overlapping expertise and opinions to those presented at trial and proffered at post-conviction proceedings, however, and the other evidence also provides little additional information of any weight.[23]  It is possible that Hale's trial and post-conviction counsel was aware of some or all of this evidence and chose not to pursue it, or investigated and rejected it, for sound strategic reasons. Moreover, Hale has not demonstrated a reasonable probability that trial counsel's discovery and presentation of this evidence would have resulted in an acquittal on any offense for which he was convicted or led to a different sentence.

### 4.    Objections (Sub-claims 17, 18, 19, 20, 21, 25, 26, 27, and 28)

Hale also asserts numerous claims that trial counsel were ineffective for failing to object. These claims relate to his underlying claims of: right to presence (Ground Five); exclusion from

---

[22] Hale has attached the following exhibits to his petition in support of these claims: expert report of Dr. Fradkin (Doc. No. 13-1); expert report of Dr. Dudley (Doc. No. 13-2); Gardner Affidavit (sister) (Doc. No. 13-3); Chisholm Affidavit (sister) (Doc. No. 13-4); expert report of Dr. Filkins (Doc. No. 13-5); expert report of T. Paulette Sutton (Doc. No. 13-6); FBI communication on gunshot residue (Doc. No. 13-7); Hale Declaration (Doc. No. 13-20); Police report regarding Green voicemail (Doc. No. 13-21); Hale parole records (Doc. No. 13-22); Payday Loan and NSF fee information (Doc. No. 13-23); Police notes of Cuffari interview (Doc. No. 13-24); and Hale prison records (Doc. No. 13-25). He has moved to have the record expanded to include these documents (*see* Doc. No. 37), which the Court fully analyzes in Section XVII of this opinion.

[23] The police records regarding Green's voice mail and their interview of Cuffari and Hale's prison and parole records are discussed in greater detail in relation to Hale's twenty-third ground for relief asserting the prosecution's wrongful suppression of material exculpatory and impeachment evidence.

reviewing witness statements (Ground Four); admission of gruesome photographs (Ground Nine);

admission of unqualified expert testimony (Ground Eight); prosecutorial misconduct (Ground

Twenty-One); admission of victim-impact evidence (Ground Fifteen); improper jury instructions

(Ground Twelve); non-capital sentencing (Ground Nineteen); and imposition of court costs

(Ground Twenty). (Doc. No. 13 at 214–17; 273–75.) Hale raised these claims on direct appeal to

the Ohio Supreme Court, which addressed their merits. It ruled:

> {¶ 233}. . . Finally, Hale complains that his trial counsel failed to object to
> numerous alleged errors. Each of Hale's claims recasts one of his substantive
> propositions of law into an ineffective-assistance claim. However, "[t]he failure to
> object to error, alone, is not enough to sustain a claim of ineffective assistance of
> counsel." *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831. In
> our view, none of Hale's claims of error is so compelling that competent counsel
> would have been obligated to object to them at trial, nor were they prejudicial.

*Hale*, 892 N.E.2d at 907.

Hale provides little argumentation supporting these claims. Regardless, they fail. The

Constitution "does not insure that defense counsel will recognize and raise every conceivable

constitutional claim." *Engle*, 456 U.S. at 134. As the Sixth Circuit has observed:

> [I]n a trial of any size, numerous potentially objectionable events occur . . . .
> [E]xperienced trial counsel learn that objections to each potentially objectionable
> event could actually act to their party's detriment. Learned counsel therefore use
> objections in a tactical manner. In light of this, any single failure to object usually
> cannot be said to have been error unless the evidence sought is so prejudicial to a
> client that failure to object essentially defaults the case to the state. Otherwise,
> defense counsel must so consistently fail to use objections, despite numerous and
> clear reasons for doing so, that counsel's failure cannot reasonably have been said
> to have been part of a trial strategy or tactical choice.

172

*Lundgren*, 440 F.3d at 774. This Court has found no constitutional error in the claims underlying these ineffective-assistance claims. The Ohio Supreme Court reasonably decided that Hale was not prejudiced by his trial counsel's failure to object to those matters.[24]

Accordingly, Hale's third, eleventh, and eighteenth grounds for relief are denied.

## X.     Twenty-Second Ground for Relief: *Ineffective Assistance of Appellate Counsel*

For his twenty-second ground for relief, Hale claims his appellate counsel provided ineffective assistance. (Doc. No. 13 at 311–12.) Specifically, he argues that his appellate counsel should have raised claims on direct appeal relating to his second, third, seventh, eleventh, sixteenth, and eighteenth grounds for relief. (*Id*.) Respondent contends these claims are procedurally defaulted and meritless. (Doc. No. 17 at 143–45.)

### A.  Procedural Posture

Respondent asserts that Hale waived all claims of ineffective assistance of appellate counsel when his appointed counsel for the purpose of filing an application to reopen his direct appeal notified the Ohio Supreme Court that he had reviewed the record and found no such claims and did not file a reopening application.  (*See* Doc. No. 17 at 143.) The Court agrees.

Soon after his direct appeal was denied, Hale asked the Ohio Supreme Court to appoint counsel to assist him in filing a timely application for reopening his direct appeal pursuant to Ohio Supreme Court Practice Rule XI, § 6. (*Id*. at 3, 707–13.) That rule permits defendants to request to reopen the direct appeal from a judgment to present claims of ineffective assistance of appellate counsel within ninety days from issuance of the court's direct-appeal mandate, or later for "good cause." *See* Ohio S. Ct. Prac. R. 11.06(A) (the current version of Ohio S. Ct. Prac. R. XI, § 6); *see*

---

[24] As this Court found no constitutional ineffective assistance on the part of Hale's trial counsel, it also rejects Hale's claim of cumulative ineffective assistance. (*See* Doc. No. 31 at 310, 432–33.)

*also State v. Murnahan,* 584 N.E.2d 1204 (Ohio 1992). The court granted the motion and appointed Attorney Dennis Sipe. (Doc. No. 7-3 at 3.) Sipe then filed a notice with the Ohio Supreme Court that he had "reviewed the record as it existed before this Court and determined that there exists no irregularities that would raise a genuine issue as to whether appellant received ineffective assistance of counsel." (*Id*. at 714–15.) As the time limit in Ohio has long since passed to file such an application, Hale no longer has the ability to seek relief in state court for his appellate counsel ineffective-assistance claims, and they are procedurally defaulted.

Hale argues that he can establish cause for the default through Sipe's ineffective assistance under *Martinez*, 566 U.S. 1 and *Trevino*, 569 U.S. 413. But as explained above in relation to Hale's trial counsel ineffective-assistance claims, *Martinez* and *Trevino*'s equitable exception allowing the ineffective assistance of post-conviction counsel to constitute cause for procedural default applies *only* to claims of ineffective assistance of *trial counsel*; it does not apply to any other claims, including ineffective assistance of *appellate counsel*. *See Martinez*, 566 U.S. at 9; *Trevino*, 569 U.S. at 423. Indeed, the Supreme Court recently reaffirmed the *Martinez/Trevino* exception's narrow application in *Davila v. Davis*, 137 S. Ct. 2058, 198 L. Ed. 2d 603 (2017), noting that the exception applies to "a single claim—ineffective assistance of trial counsel—in a single context" and expressly declining to extend it "to allow federal courts to consider a different kind of defaulted claim—ineffective assistance of appellate counsel." *Id*. at 2062–63. The Sixth Circuit has reached the same conclusion. *See, e.g., Porter v. Genovese,* 676 F. App'x 428, 434 (6th Cir. 2017) ("[T]he law of this circuit is that *Martinez/Trevino*'s limited exception does not extend to claims of ineffective assistance of appellate counsel") (citing *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013)).

174

Furthermore, the Sixth Circuit repeatedly has held that because a reopening proceeding is a separate collateral proceeding from the original appeal, petitioners have no constitutional right to assistance of counsel in such proceedings. *See, e.g., Lopez v. Wilson,* 426 F.3d 339, 351 (6th Cir. 2005). Thus, appellate counsel's conduct in connection with a reopening application cannot establish ineffective assistance of counsel or, of relevance here, cause to overcome a procedural default. *See, e.g., Carter v. Mitchell*, 693 F.3d 555, 565 (6th Cir. 2012) (appellate counsel's failure to appeal denial of Rule 26(B) application to Ohio Supreme Court not sufficient cause); *Scuba v. Brigano,* 527 F.3d 479, 489 (6th Cir. 2007) (appellate counsel's failure to file a timely Rule 26(B) application on petitioner's behalf not sufficient cause). Hale's claims of ineffective assistance of appellate counsel, therefore, are procedurally defaulted.[25]

### B. Merits Analysis

Even if these claims were preserved for federal habeas review, they would fail.

A criminal defendant is entitled to effective assistance of counsel in his or her first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985). The two-part test enunciated in *Strickland v. Washington* applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000). Hale, therefore, must demonstrate that appellate counsel's performance was deficient, and that the deficient performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable. *Strickland*, 466 U.S. at 687.

---

[25] Accordingly, Hale cannot assert that appellate-counsel ineffective assistance constitutes cause to excuse the default of other claims that should have been raised on direct appeal because they were based on the trial-court record but were not. *Edwards*, 529 U.S. at 453 (claims of ineffective assistance of counsel cannot provide cause for the procedural default of another claim if the ineffective-assistance claim itself is procedurally defaulted).

Appellants have no constitutional right, however, to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750–54, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

Here, this Court has found no merit in the claims underlying Hale's ineffective-assistance-of-appellate-counsel claims. There is not prejudice, therefore, resulting from appellate counsel's failure to raise those claims on direct appeal in state court. Hale's twenty-second ground for relief is procedurally defaulted and meritless.

## XI.     Twenty-First Ground for Relief: *Prosecutorial Misconduct*

Hale asserts in his twenty-first ground for relief that prosecutors rendered his trial fundamentally unfair through the following improper conduct: (1) non-compliance with discovery obligations; (2) *voir dire* questioning; (3) questioning Lashayla Hale; (4) questioning Detective Baird; (5) questioning Detective Grida; (6) questioning Detective Pestak; eliciting hearsay testimony; (7) leading witnesses; (8) eliciting victim-impact testimony; (9) impeaching Johnny Smith; (10) improper statements in closing argument in the guilt phase; (11) questioning Dr. Fabian; and (12) improper statements in closing argument in the sentencing phase. (Doc. No. 13 at 283-310.) Hale raised these claims on direct appeal to the Ohio Supreme Court. *See Hale*, 892 N.E.2d at 897–903.

176

## A.  Procedural Posture

Respondent argues that many of these claims are procedurally defaulted because the Ohio Supreme Court found them waived as defense counsel did not object to the challenged conduct at trial. (Doc. No. 17 at 134.) As previously explained, Ohio's "firmly-established" contemporaneous objection rule is "an independent and adequate state ground" upon which to find federal habeas claims procedurally defaulted. *See, e.g., Keith*, 455 F.3d at 673. Those claims, therefore, are procedurally defaulted. Moreover, Hale does not offer any argument regarding the cause for, or prejudice resulting from, his procedural default of this claim. Nor does he contend that he is actually innocent such that the default should be excused.

## B.  Merits Analysis

The Supreme Court established the test for claims of prosecutorial misconduct in *Darden*, 477 U.S. 168: "The relevant question is whether the prosecutors' [conduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 181 (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983), and *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)). The Court emphasized that "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Id.* (quoting *Donnelly,* 416 U.S. at 642); *see also Byrd*, 209 F.3d at 529 ("We do not possess supervisory powers over state court trials."); *Cook v. Bordenkircher*, 602 F.2d 117, 119 n.5 (6th Cir. 1979) ("[I]t is the responsibility of the [state courts] to police their prosecutors; we have no such authority."). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct," therefore, "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). The *Darden* standard "is a very general one, leaving courts 'more leeway

177

. . . in reaching outcomes in case-by-case determinations' . . . ." *Parker v. Matthews*, 567 U.S. 37, 48–49, 132 S. Ct. 2148, 183 L. Ed. 2d 32 (2012) (rejecting the Sixth Circuit's multi-step test for prosecutorial misconduct) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004)).

The Ohio Supreme Court addressed Hale's claims of prosecutorial misconduct on direct appeal, as follows:

### Discovery

{¶ 157} Hale contends that the state failed to afford timely discovery of the felony records of certain prosecution witnesses. See Crim.R. 16(B)(1)(a). However, Hale fails to explain how he was prejudiced. In each instance, the information was disclosed before the defense cross-examined the witness.

{¶ 158} Hale also contends that the state failed to timely disclose evidence regarding Hale's financial transactions. However, as Hale concedes, the trial court imposed a sanction on the state for this lapse. The trial court limited the state's financial evidence to that involving Hale's financial condition at the time of the murder, while excluding evidence involving bounced checks and identity theft by Hale—evidence holding greater potential for prejudice. Discovery sanctions are within the trial court's discretion, *Parson,* 6 Ohio St.3d at 445, 6 OBR 485, 453 N.E.2d 689, and Hale does not show that the judge abused his discretion here.

{¶ 159} Hale's other discovery-related claims duplicate claims made in Hale's first and eighth propositions of law, which we have overruled.

### Voir Dire

{¶ 160} Hale accuses the prosecutors of "plant[ing] prejudicial information in the jurors' minds" during voir dire. During general voir dire, the prosecutor asked the panel about familiarity with firearms, and when one juror mentioned owning a derringer, the prosecutor asked how many bullets a derringer holds. He further asked the panel members whether any of them had ever moved or carried a person larger than themselves. Additionally, he asked the panel members to remember the most traumatic event in their lives.

{¶ 161} Each of these questions related to issues raised at trial. The trial judge has discretion as to the scope of voir dire, and Hale does not demonstrate that the judge abused his discretion here.

178

Hearsay

{¶ 162} Hale points to four instances in which the prosecutor presented hearsay. However, in three instances, the defense did not object, thereby waiving any issue. In a fourth (the dollar value of Green's jewelry), an objection was sustained, and the jury never heard the testimony. An appellant cannot predicate error on objections the trial court sustained. *Viox v. Weinberg,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, ¶ 36.

Leading Questions

{¶ 163} Hale lists 26 leading questions the prosecutor asked on direct examination. In 23 instances, the defense did not make a timely objection, so any issue pertaining to those questions is waived. In three instances, the defense did interpose timely objections. However, it is within the trial court's discretion to allow leading questions on direct examination. *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 190, 616 N.E.2d 909. Hale makes no attempt to explain how the trial court abused its discretion in overruling his objections. Nor does he explain why it was prosecutorial misconduct for the prosecutor to engage in conduct that the trial court had discretion to allow and did allow.

Victim Impact

{¶ 164} Hale claims that the prosecutor introduced victim-impact evidence and argument in the guilt phase. In one instance, the defense failed to object, waiving the issue. In two instances, objections were sustained. As already noted, an appellant cannot predicate error on objections that the trial court sustained. *Viox,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, ¶ 36. The rest of this claim duplicates section (C) of Hale's eighth proposition of law, which we have rejected.

"Irrelevant" and "Inflammatory" Evidence

{¶ 165} Hale claims that the prosecutor introduced irrelevant and inflammatory evidence.

{¶ 166} First, Lashayla Hale testified that Hale had once told her that he had a gun and felt like shooting his mother's ex-boyfriend. (The prosecutor did not deliberately elicit the part about shooting the ex-boyfriend.) The trial court initially overruled a defense objection. The next day, the defense moved for a mistrial. The trial court offered to consider giving a curative instruction instead. However, for tactical reasons, the defense declined to request an instruction. Thus, Hale "cannot now complain that none was given." *State v. Davie* (1997), 80 Ohio St.3d 311, 322, 686 N.E.2d 245.

179

{¶ 167} Second, the prosecutor asked Lashayla, over objection, whether Hale had a drinking problem. This question was irrelevant to the guilt phase, but the error was harmless in view of the overwhelming evidence of Hale's guilt. In two other instances in which Hale objected at trial to questions asked of Lashayla, his objections were sustained. See *Viox,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36.

{¶ 168} Third, the prosecutor asked Sergeant Baird about Hale's admission that he disposed of the gun, Green's clothing, and Green's shoulder bag. On objection, the prosecutor withdrew the question.

{¶ 169} The prosecutor's question violated the trial court's order imposing discovery sanctions. (*See* discussion of section (A) of Hale's eighth proposition of law.) However, the disposal of the shoulder bag was neither irrelevant nor inflammatory. In any event, at trial, Hale did not cite the irrelevant and inflammatory nature of the question as grounds for his objection, so this claim is waived.

{¶ 170} Finally, Hale claims the prosecutor made inflammatory comments about the evidence. The prosecutor referred to the items Hale had purchased to clean up the murder scene as the "murder scene clean-up kit." He also asked Sergeant Pestak whether a hat found in Hale's baggage had "three rough cut holes in it that would approximate if someone tried to wear it as a mask, two eye holes and a mouth hole." However, the defense did not object to these questions, so this issue is waived.

{¶ 171} The prosecutor also referred to Hale's confession as his "mea culpa" and "his two-hour long considered statement." Objections to these comments were sustained; hence, there was no error. *Viox,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36. The defense did not request curative instructions in either case, thus waiving any claim to such instructions. *Davie,* 80 Ohio St.3d at 322, 686 N.E.2d 245.

Speculative Testimony

{¶ 172} Hale claims that Detective Grida gave testimony that was speculative, unreliable, and outside his personal knowledge. *See* Evid.R. 602 (witness may not testify to matters outside his personal knowledge).

{¶ 173} Grida testified that police believed that Hale had help moving Green's body because, given the route taken and the body's size, there would have been more abrasions on the outer garbage bag if only one person had dragged it. Hale's objection was overruled.

{¶ 174} This testimony may have been admissible as lay opinion under Evid.R. 701, as it was rationally based on Grida's perceptions and helpful to a clear

180

understanding of a fact in issue. However, the state does not argue the point. In any event, given the overwhelming evidence of Hale's guilt, any error in admitting this testimony was harmless.

{¶ 175} Grida also testified about how blood may have gotten onto the wall of Room 231 and expressed an opinion that the lodge employees who found the body could not have moved it. The defense did not object to this testimony, so any issue is waived.

{¶ 176} Hale also claims that Sergeant Pestak testified about matters outside his personal knowledge. Pestak testified that he "assume[d]" that Green's family last saw him on June 20 or 21, 2004. Pestak also identified a page in Green's receipt book and testified, "[I]t's signed by, I'm guessing it's signed Douglas Green." These matters had little or no importance to the case, and any error was harmless in light of the overwhelming evidence of guilt.

## Improper Rebuttal

{¶ 177} Johnny Smith, testifying about his 1998 rape accusation against Green, stated on direct examination that he had not been consulted about the plea bargain that reduced the charge to misdemeanor assault. On cross-examination, Smith admitted that the prosecutor's office had contacted him and that he had approved the plea bargain.

{¶ 178} On rebuttal, the state called Michael Nolan, the assistant prosecutor who had handled the 1998 case. Nolan confirmed that he had discussed the proposed plea bargain with Smith and that Smith had consented to it. Hale contends that Nolan's testimony violated Evid.R. 616(C), which states: "If offered for the sole purpose of impeaching a witness's testimony, extrinsic evidence of contradiction is inadmissible" unless permitted by Evid.R. 608(A), 609, 613, 616(A), or 616(B), or by the hearsay exception regarding learned treatises.

{¶ 179} But Hale did not object to Nolan's testimony at trial. Hence, this issue is waived, absent plain error. Nolan's testimony was not prejudicial in the least; Johnny Smith had already admitted on cross-examination that he had agreed to the plea bargain.

## Victim's Family

{¶ 180} At one point during trial, one of the prosecutors talked with Green's relatives in the courtroom. Hale claims that this conduct somehow constituted an emotional appeal to the jury. But there is nothing improper in a prosecutor's speaking to the victim's family, and Hale's claim regarding the effect on the jury is speculative.

Guilt–Phase Closing Arguments

{¶ 181} Hale claims that several comments in the prosecutor's argument misrepresented evidence, shifted the burden of proof, or were inflammatory.

{¶ 182} The prosecutor said that Hale had "set up the meeting place" with Green on the day of the murder. This statement was not supported by evidence. However, a defense objection was sustained, so the trial court did not err. *Viox,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36. Moreover, the defense did not request a curative instruction, so any error in the trial court's failure to give one is waived. *Davie,* 80 Ohio St.3d at 322, 686 N.E.2d 245.

{¶ 183} Hale claims that the prosecutor misrepresented evidence by stating that Hale "had a gun in that room, Room 260 on June 21st, 2004." A defense objection was overruled. Hale argues that the evidence—i.e., Hale's statement—showed that Green owned the gun. But the prosecutor's comment referred to Hale's *possession* of the gun, which was undisputed.

{¶ 184} The prosecutor also said that at the time Hale set up his meeting with Green, he "knew he had to be out [of the lodge] by the 22nd." That inference is a reasonable one based on the evidence. Lodge records, authenticated and explained by the lodge's owner, showed that Hale checked into the lodge for seven days' tenancy on June 8, 2004, and renewed his tenancy for another seven days on June 15, to expire on June 22.

{¶ 185} The prosecutor referred to certain facts as "undisputed": that Green was a 47–year–old husband and father, that phone records showed that Hale had called Green, that the Underground Railroad was closed on Mondays, and that Hale stole and used Green's credit card. Objections to these statements were overruled. These references were not improper. They were directed not toward the defendant's silence, but toward the strength of the state's case. *State v. Ferguson* (1983), 5 Ohio St.3d 160, 5 OBR 380, 450 N.E.2d 265, paragraph one of the syllabus. See also *State v. Webb* (1994), 70 Ohio St.3d 325, 328–329, 638 N.E.2d 1023.

{¶ 186} The prosecutor said that Hale's "picking up the pen with his left hand [when signing the *Miranda* waiver] was a lie." A defense objection was sustained, however, so no error occurred. *Viox,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36.

{¶ 187} The prosecutor asked "what became of" the gun that Hale told his sister Lashayla he had. A defense objection was sustained. The prosecutor then asked, "Where is it?" The trial court overruled a defense objection. Hale argues that the prosecutor's question improperly shifted the burden of proof onto him. We disagree. "The prosecution is not prevented from commenting upon the failure of

182

the defense to offer evidence in support of its case." *State v. Williams* (1986), 23 Ohio St.3d 16, 20, 23 OBR 13, 490 N.E.2d 906.

{¶ 188} Hale claims that the prosecutor misrepresented "[r]oom logs showing when Hale came and went," but Hale does not explain how the prosecutor misrepresented the room logs.

{¶ 189} Finally, the prosecutor asked whether Hale's acts showed him to be a "person worthy of compassion" or "a person * * * [who] wasn't capable of showing concern for the person who was decomposing back in Room 231." Defense objections were sustained. No error occurred. *Viox,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36. Hale complains that the trial court gave no curative instruction, but Hale did not request one. Thus, his complaint about the lack of an instruction is waived. *Davie,* 80 Ohio St.3d at 322, 686 N.E.2d 245.

Disparaging Defense Counsel

{¶ 190} Outside the jury's presence, the prosecutor accused defense counsel of acting in bad faith, trying to "create error" and to "set up" an ineffective-assistance claim. Hale contends that these statements "improperly chilled the defense" and "stifle[d] defense counsel's arguments." Nothing in the record supports Hale's speculation. If anything, the record suggests that the vigor of defense counsel's advocacy was unabated throughout the trial. Nor does Hale cite any authority for the proposition that such remarks, made outside the jury's presence, amount to reversible error.

{¶ 191} While approaching the bench to argue a defense objection, the prosecutor expressed the opinion that the objecting counsel was "out of [his] mind." Such a remark, made in front of the jury, would have been improper; an attorney may not disparage opposing counsel for making an objection. See *State v. Keenan* (1993), 66 Ohio St.3d 402, 406, 613 N.E.2d 203. However, nothing in the record shows that the jury could or did hear the prosecutor's remark.

{¶ 192} During the penalty phase, the prosecutor asked Dr. Fabian, the defense psychologist, whether he had ever worked for the county public defender's office. A motion for mistrial was denied. Hale fails to demonstrate that the trial court abused its discretion in denying a mistrial. See generally *State v. Sage* (1987), 31 Ohio St.3d 173, 182, 31 OBR 375, 510 N.E.2d 343 (grant or denial of mistrial is within trial court's discretion).

Penalty–Phase Cross–Examination

{¶ 193} The prosecutor asked Dr. Fabian whether it was true that mitigating factors "can occur in individuals within the same family and they don't act out * * * in a criminal sense." This method was a proper way to highlight the fact that a bad

upbringing does not necessarily cause criminal behavior. See *State v. Hanna,* 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 98; *State v. Newton,* 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 95.

{¶ 194} In cross-examining Dr. Fabian, the prosecutor raised the possibility that Hale might escape from prison. A defense objection was sustained. The defense specifically asked that no curative instruction be given at that time. The trial court offered to give one later if asked to do so. However, the defense never made any such request. Hence, no reversible error exists. *Viox,* 169 Ohio 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36; *Davie,* 80 Ohio St.3d at 322, 686 N.E.2d 245.

{¶ 195} In two other instances, defense objections were also sustained at trial. The prosecutor asked Dr. Fabian whether he was "familiar with the Ohio prison riots that resulted in guard fatalities" and asked: "So the mere presence or fact of a mitigation evaluation or report does not in and of itself prove the existence of mitigation in that person's background?" The trial court did not allow Fabian to answer either question. Thus, no error was committed. *Viox,* 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, at ¶ 36.

Penalty–Phase Closing Arguments

{¶ 196} First, Hale complains that the prosecutor stated in closing argument that "the attention and the sympathy that rightly should flow to that victim sometimes becomes perversely focused on the defendant." This statement was improper, because sympathy may play no role in the jury's decision. However, the trial court sustained a defense objection, and it had previously instructed the jury: "You must not be influenced by any consideration of sympathy or prejudice." Thus, the prosecutor's comment was not prejudicial.

{¶ 197} Second, Hale complains that the prosecutor displayed Green's photo to the jury during argument. As the photo was in evidence, however, it was not improper to display it to the jury.

{¶ 198} Third, the prosecutor argued that Hale had "no remorse and has no concern." Hale claims this was improper because he did not present remorse as a mitigating factor. See *DePew,* 38 Ohio St.3d at 289–290, 528 N.E.2d 542. But Hale did raise remorse as an issue by expressing remorse in his unsworn statement.

{¶ 199} Fourth, the prosecutor argued that during the robbery, Hale "made a choice to cock the gun, shoot him twice. * * * Reload that gun, and shoot him twice more * * *." Hale claims this narrative was improper because the circumstances of the murder cannot be used as aggravating circumstances.

{¶ 200} However, the prosecutor did not state that the circumstances of the murder were "aggravating circumstances." See *Wogenstahl,* 75 Ohio St.3d at 355–356, 662

N.E.2d 311. The prosecutor's argument dealt with prior calculation and design, which were elements of the felony-murder specification and which were therefore relevant to the sentencing. The existence of prior calculation and design had further relevance to this case because it rebutted the defense claim that Green had provoked his own murder.

{¶ 201} Fifth, the prosecutor stated that the issue was whether the mitigating evidence lessened Hale's "moral culpability." This statement was erroneous. See *State v. Jackson,* 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 115–116. But cf. *Penry v. Lynaugh* (1989), 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (punishment "should be directly related to the personal culpability of the criminal defendant"), overruled on other grounds, *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. However, Hale did not object, and the comment was not plain error. See *State v. Brinkley,* 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 138.

{¶ 202} Hale's remaining claims of improper argument involve statements to which he did not object at trial. Hale's failure to object waived each of these claims.

*Hale*, 892 N.E.2d at 897–903.

Hale again argues that this decision is not an "adjudication on the merits" under AEDPA's § 2254(d) because the state court did not address Hale's constitutional claims. (Doc. No. 31 at 482.) As explained above, however, a state court need not cite any federal constitutional law for its decision to constitute an "adjudication on the merits" for purposes of § 2254(d). *See Early*, 537 U.S. at 8 (a state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent); *Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Hale alternatively claims the Ohio Supreme Court's decision was unreasonable under § 2254(d) but specifically challenges only two of his many preserved prosecutorial-misconduct

claims. First, he asserts the state court erroneously concluded that he was not prejudiced by the prosecution's failure to timely produce evidence that he had bounced checks in discovery. (Doc. No. 31 at 483.) "[T]here is no general constitutional right to discovery in a criminal case[,]" however. *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977). The Sixth Circuit has held, therefore, that a prosecutor's violation of a state discovery order is not cognizable on habeas review. *See Warlick v. Romanowski*, 367 F. App'x 634, 639 (6th Cir. 2010); *Colston v. Burke*, 37 F. App'x 122, 125 (6th Cir. 2002). Hale's second criticism of the Ohio court's decision is that it failed to address the issue of the cumulative effect of the misconduct (Doc. No. 31 at 483), which the Court will consider below.

As to the rest of his preserved claims, Hale does nothing more than reassert the arguments he made to the Ohio Supreme Court, with absolutely no reference to AEDPA's standards under § 2254(d)(1) or (d)(2). (*Compare* Doc. No. 31 at 458–82, *with* Doc. No. 7-3 at 273–98 (Ohio Supreme Court merit brief).) Federal habeas corpus review, however, "is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Harrington,* 562 U.S. at 102–03. It is, after all, the "habeas petitioner's burden . . . [to] show[] there was no reasonable basis for the state court to deny relief." *Id.* at 98. This Court has reviewed the state court's resolution of these claims and finds that it is not in any regard contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or based on an unreasonable determination of the facts in light of the evidence presented.[26] As the state court reasonably concluded, the claims were unsubstantial; for

---

[26] In addition to the claims preserved for habeas review, the Court also considers Hale's claim regarding the prosecutor's statement that the issue in sentencing was whether the mitigating evidence lessened Hale's "moral culpability," which the state court found erroneous but reviewed for plain error, applying federal law, and found none. *See Stewart*, 867 F.3d at 638.

many of the claims, the trial court sustained defense objections to the challenged conduct, the underlying allegations of constitutional violations were meritless, or the errors were harmless. The Court also has reviewed *de novo* those prosecutorial-misconduct claims Hale waived and therefore procedurally defaulted, and finds they also lack merit for many of the same reasons.

Finally, in evaluating whether prosecutorial misconduct denied a defendant a fair trial, a court may consider the "cumulative effect" of several instances of misconduct. *See Berger v. United States,* 295 U.S. 78, 89, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). This Court has considered the alleged misconduct as a whole and finds that no meaningful misconduct took place. Accordingly, Hale has failed to demonstrate that any misconduct on the part of the prosecution was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial," and he is not entitled to relief on his twenty-first ground for relief. *See Darden*, 477 U.S. at 181 (internal quotation marks and citation omitted).

## XII.   Twenty-Third Ground for Relief: *Prosecutorial Misconduct/Suppression of Evidence*

In his twenty-third ground for relief, Hale claims that the prosecution failed to disclose material exculpatory and impeachment evidence, violating his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). (Doc. No. 13 at 313–17.) He argues that prosecutors should have produced to him before trial three categories of evidence he recently has obtained: (1) parole and prison records showing Hale's positive institutional adjustment in prison, compliant behavior on parole, and that he informed his parole officer a week before the murder the address of the lodge and room number where he was staying; (2) a police report recounting an interview with Green's niece, in which she described a voicemail Green left for his daughter near the time of the murder that "almost sounded like a suicide call"; and (3) a police report detailing an interview with Ricardo Cuffari, a friend of Green's, in which an officer

187

told Cuffari that the police knew Green was bisexual and Cuffari replied that he did not know that. (*Id.* (citing Doc. No. 13-21 (Police Rpt./Green Voicemail); Doc. No. 13-22 (Hale Parole Records); Doc. No. 13-24 (Police Notes/Cuffari Interview); Doc. No. 13-25 (Hale Prison Records)).) Respondent contends this claim is based upon documents that are not in the Court's record and therefore not reviewable and is also procedurally defaulted and meritless. (Doc. No. 31 at 39–40; 145–50.)

As Respondent asserts, Hale must overcome two procedural hurdles before this Court can consider the merits of his *Brady* claim. First, Hale must demonstrate that the new evidence upon which he bases his claim satisfies the requirements of 28 U.S.C. § 2254(e)(2), which generally governs habeas courts' ability to hold evidentiary hearings, but also applies to the introduction of new evidence without an evidentiary hearing, such as when the petitioner seeks to introduce new evidence based on a motion to expand the record. *Holland v. Jackson*, 542 U.S. 649, 653, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004). Hale has filed a motion to expand the record requesting the admission of these documents, among others (Doc. No. 37), which Respondent opposes (Doc. No. 38).[27] Second, Respondent asserts that Hale's *Brady* claims are procedurally defaulted because Hale has never raised them in state court, and it would be futile for him to do so now. (Doc. No. 17 at 146–47.) Hale counters that he can establish cause through the State's suppression of the materials. (Doc. No. 31 at 500–501.)[28] As the requirements of § 2254(e)(2) and both Respondent's

---

[27] The Court will address Hale's motion to expand the record (Doc. No. 37) in its entirety and his motion for discovery (Doc. No. 34) in Section XVII of this opinion.

[28] Hale argues in the alternative that the default can be excused by the ineffective assistance of his trial or post-conviction counsel. (Doc. No. 31 at 490 n.81, 499 n.82.) As explained above, however, his related ineffective-assistance-of-trial-counsel claim is itself procedurally defaulted and/or meritless. Additionally, the *Martinez/Trevino* equitable exception allowing the ineffective assistance of post-conviction counsel to constitute cause for procedural default does not apply in this case, and even if does, it would not assist Hale with these claims because it applies only to claims of ineffective assistance of trial counsel. *See Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013).

188

procedural-default defense and Hale's cause-and-prejudice argument mirror the elements of a *Brady* claim itself, the Court will examine them together.

For Hale to establish a *Brady* violation, he must demonstrate that: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence was suppressed by the state, either willfully or inadvertently; and (3) prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). Evidence is considered favorable under *Brady* if it would have had "some value . . . [or] weight and its tendency would have been favorable" to the defendant. *Kyles v. Whitley*, 514 U.S. 419, 450–51,115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). To meet the suppression requirement, the petitioner must show that the evidence was in the prosecution's exclusive control. *Coe*, 161 F.3d at 344. There is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose." *Id.* (internal quotation marks and citations omitted). Prejudice, or materiality, in the *Brady* context is a far more difficult test to meet than the threshold questions of suppression and favorability. *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002). Evidence is "material" when there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70, 129 S. Ct. 1769, 173 L. Ed. 2d 701 (2009). Courts examine each item of alleged *Brady* evidence individually for suppression and favorability, then consider the cumulative impact of any *Brady* evidence for materiality. *Kyles,* 514 U.S. at 436–37 & n.10.

To satisfy § 2254(e)(2), Hale must show that he "failed to develop the factual basis of a claim in state court proceedings" because: (1) "the factual predicate of the claim could not have

189

been previously discovered through the exercise of due diligence"; *and* (2) "the facts underlying the claim establish, by clear and convincing evidence, that, but for the constitutional error, no reasonable jury would have found him guilty." 28 U.S.C. § 2254(e)(2)(A), (B). A prisoner is at fault in failing to develop the evidence if there is a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *M. Williams*, 529 U.S. at 432. The required diligence is "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435.

The standards for both the procedural default of a *Brady* claim and cause and prejudice to excuse that default require similar showings. Respondent argues, and Hale appears to concede, that these *Brady* claims are procedurally defaulted rather than unexhausted. (Doc. No. 17 at 146–47; Doc. No. 31 at 499–501.) The difference is that "[w]here state court remedies are no longer available to a petitioner . . . , procedural default and not exhaustion bars federal court review." *Williams*, 460 F.3d at 806; *see also Gray*, 518 U.S. at 161–62 ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . . it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law'") (internal citations omitted). If Hale may return to state court and his *Brady* claims are unexhausted, Hale's petition would be a "mixed petition," and, although a petitioner's failure to exhaust a claim does not deprive a district court of jurisdiction, the court may not grant a writ if the petition contains both exhausted and unexhausted claims. 28 U.S.C. § 2254(b), (c); *Rose*, 455 U.S. at 522; *Harris v. Lafler*, 553 F.3d 1028, 1031 (6th Cir. 2009).[29] These claims are procedurally

---

[29] Hale explains that "he could have brought this claim in state court because he did not discover the *Brady* material until just a few days before his habeas petition was due[,]" and therefore had to raise the claim in his habeas petition to preserve it under AEDPA's one-year statute of limitations. (Doc. No. 31 at 501.) And he notes that "[i]f this Court nonetheless finds that Hale failed to exhaust this claim, Hale will seek to stay this petition and hold it in abeyance so that he can return to state court to attempt to present this claims." (*Id.*) Respondent, for his part, stresses that he

defaulted, therefore, if Hale *cannot* satisfy Ohio's requirements for a delayed motion for new trial or a successive petition for post-conviction relief. Under Ohio Criminal Procedure Rule 33(B), a defendant may be entitled to a new trial based on newly discovered evidence after the deadline for filing such motions if he can show "by clear and convincing proof that [he] was unavoidably prevented from the discovery of the evidence upon which he must rely . . . ." Ohio R. Crim. P. 33(B). Ohio law permits second, successive, or untimely post-conviction petitions if the petitioner shows: (1) that he was "unavoidably prevented from discovery of the facts" of the claim; and (2) but for constitutional error at trial, no reasonable factfinder would have found petitioner guilty of the offense of which he was convicted or eligible for the death sentence. Ohio Rev. Code § 2953.23(A)(1).

If the *Brady* claims are procedurally defaulted, for Hale to establish cause and prejudice to excuse the default, he must satisfy the first two requirements—suppression and favorability—of the three-part *Brady* test. *See Strickler*, 527 U.S. at 282 (cause and prejudice to excuse procedural default of a *Brady* claim "parallel[s] two of the three components of the alleged *Brady* violation itself").

Thus, this Court may examine the merits of Hale's *Brady* claims only if the alleged *Brady* material is reviewable and the claim is not procedurally defaulted. And it is neither. Hale has not satisfied the preliminary requirements of each these procedural issues: (1) that he was diligent in attempting to develop the new evidence in state court but unavoidably prevented from discovering

---

"expressly *does not* waive [an] exhaustion" defense to these claims. (*See* Doc. No. 17 at 146 n.18 (emphasis in original).) Indeed, habeas courts my grant a petitioner's motion to stay a federal habeas case for exhaustion only if that court determines "there was good cause for the petitioner's failure to exhaust his claims first in state court" and "the unexhausted claims are not "plainly meritless." *Rhines v. Weber*, 544 U.S. 269, 277, 125 S. Ct. 1528, 161 L. Ed. 2d 440 (2005). Even in this scenario, however, as will be explained below, Hale could not satisfy the *Rhines* test and show that his claims are not "plainly meritless."

the material because the State suppressed it; and (2) the alleged *Brady* evidence would have been favorable to his defense.

Hale states that he filed multiple discovery motions upon the State before his 2005 trial, including demands for the disclosure of exculpatory and impeaching evidence. (*See, e.g.,* Doc. No. 7-1 at 86–98.) But, according to Hale, he did not discover the documents at issue until October 2, 2018, in response to a public records request his federal habeas counsel made two months earlier. (Doc. No. 31 at 490–92.) This does not constitute "diligence" under § 2254(e)(2). "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *M. Williams*, 529 U.S. at 437. Hale has not identified any effort on his part or on his counsel's part to develop the factual predicate of this *Brady* claim from the time of his 2005 trial to 2018. Nor has he made any showing that he was "unavoidably prevented" from obtaining this information or that the prosecution suppressed this material. Hale quickly obtained these documents from the State through a simple public records request; it is reasonable to assume that he could have discovered the records the same way many years earlier, possibly even before he filed his state post-conviction petition. *See State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 662 N.E.2d 334, 336 (Ohio 1996) (Ohio's Public Records Act "is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records.").

Moreover, none of this information was suppressed by the State. As Respondent points out, even without his prison and parole records, Hale presumably knew the "favorable" information within them that he now argues he would have presented at trial. He knew he behaved well in prison, complied with his parole obligations, and that he reported to his parole officer where he was living the week before the murder. This information was not in the State's exclusive control

and therefore could not have been suppressed by the prosecution for purposes of *Brady*. *Coe*, 161 F.3d at 344.

The information in the police notes regarding the Cuffari interview also was not suppressed by the State. Prosecutors informed defense counsel that Cuffari was going to testify and provided his contact information; defense counsel could have interviewed him before trial. (*See* Doc. 8-4 (Trial Tr.) at 311.) Furthermore, Hale argues that the value of these police notes to the defense was that they revealed the police "knew" that Green was bisexual. (Doc. No. 31 at 498 (citing Doc. No. 13-22 (Police Notes/Cuffari Interview)).) But Detective Baird told Hale that himself during Hale's first police interview, and he testified to it at trial; defense counsel could have investigated this issue before trial and cross-examined Baird about it. (*See* Doc. No. 8-3 (Trial Tr.) at 494–95.) And Cuffari's testimony was consistent with his police interview in stating that he did not know Green was bisexual. (*See* Doc. No. 8-4 (Trial Tr.) at 493.) The information in the notes, therefore, was not suppressed.

The same is true of the police report concerning Green's voicemail message for his daughter. The prosecution had no obligation to produce to the defense a police report containing double hearsay and speculative information about Green sounding suicidal, which had no apparent value to the defense's case or for impeachment purposes. Hale posits that without this information, he "had no idea that it was important to interview Green's family about his behavior in the days leading up to his death . . . ." (Doc. No. 31 at 497.) But given Hale's self-defense claim, it is unreasonable to suggest that only this information would have prompted the defense to interview persons who may have known about Green's state of mind at the time of the murder. This information was available from other sources and not suppressed by the prosecution. *Coe*, 161 F.3d at 344.

Hale, therefore, has failed to demonstrate the diligence in seeking to obtain this information in state court necessary to satisfy § 2254(e)(2), and the record cannot be expanded to include these documents. Nor has Hale shown that he was "unavoidably prevented" from discovering this until 2018 as required to seek additional post-conviction remedies at this point in Ohio. This claim is procedurally defaulted. Moreover, Hale has not satisfied *Brady*'s threshold requirement of suppression and therefore has not established cause and prejudice to excuse the default. Hale's twenty-third ground for relief is denied.

## XIII.   Twenty-Fourth Ground for Relief: *Cumulative Error*

Hale claims for his twenty-fourth ground for relief that cumulative error at his trial violated his constitutional rights. (Doc. No. 13 at 229-31.) Respondent argues this claim is procedurally defaulted, not cognizable on habeas, and/or meritless. (Doc. No. 17 at 150-53.) The Court need not reach the issue of procedural default or the merits of this claim because it is unequivocally non-cognizable on habeas review. The Sixth Circuit repeatedly has held that a claim of cumulative trial error is not cognizable on federal habeas review. *See, e.g., Williams*, 460 F.3d at 816 ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."). This ground for relief is denied.

## XIV.   Twenty-Fifth Ground for Relief: *Constitutionality of Ohio's Death Penalty Scheme*

Hale's twenty-fifth ground for relief challenges Ohio's death-penalty scheme as violating the Fifth, Sixth, Eighth, and Fourteenth Amendments as well as international law. (Doc. No. 13 at 320–45.) Specifically, Hale argues that Ohio's scheme: (1) imposes arbitrary and unequal sentences; (2) provides unreliable sentencing procedures; (3) burdens the defendant's right to a jury; (4) requires submission of reports and evaluations; (5) contains a constitutionally invalid statute when used to provide the aggravating circumstance for an aggravated-murder charge; (6)

194

contains two unconstitutionally vague provisions; (7) requires improper proportionality and appropriateness review; (8) provides inadequate corrective process; and (9) violates international law. (*Id.*)

Hale raised these claims to the Ohio Supreme Court on direct appeal, which summarily denied them, *see Hale*, 892 N.E.2d at 907, and in post-conviction proceedings, *see Hale*, 2016 WL 4978449, at *8-9. The claims, therefore, are preserved for habeas review. Respondent asserts they are meritless. (Doc. No. 17 at 153–54.)

The Supreme Court has "time and again reaffirmed that capital punishment is not *per se* unconstitutional." *Glossip v. Gross*, 576 U.S. 863, 881, 135 S. Ct. 2726, 192, L. Ed. 2d 761 (2015); *see also Gregg v. Georgia*, 428 U.S. 153, 177, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). Moreover, the Sixth Circuit repeatedly has upheld the constitutionality of Ohio's death-penalty scheme in particular, rejecting many of the claims Hale asserts here. *See Beuke*, 537 F.3d at 652–53 ("Beuke next challenges the constitutionality of Ohio's death penalty scheme. His arguments are entirely meritless and have been rejected by this court on numerous occasions. We therefore will afford them minimal attention."); *Cooey v. Strickland*, 604 F.3d 939, 944 (6th Cir. 2010); *Cooey,* 289 F.3d at 928; *Buell v. Mitchell*, 274 F.3d 337, 367–76 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001); *Byrd*, 209 F.3d at 539; *Jamison v. Collins*, 100 F. Supp. 2d 647, 759–67 (S.D. Ohio 2000).

Nevertheless, the Court will address each of Hale's claims individually.

### 1. Imposes arbitrary and unequal punishment

Hale first claims that Ohio's death-penalty scheme violates the Fourteenth Amendment's guarantee of equal protection and the Eighth Amendment's protection against cruel and unusual punishment, because it allows the death penalty to be imposed in an arbitrary and discriminatory

manner. (Doc. No. 13 at 320–21.) The Sixth Circuit repeatedly has rejected this argument. *See, e.g., Buell,* 274 F.3d at 367; *Byrd*, 209 F.3d at 539. It has explained:

> We note that the Ohio death penalty statute includes a number of capital sentencing procedures that the United States Supreme Court held in *Gregg v. Georgia*, 428 U.S. 153, 188–95, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), specifically to reduce the likelihood of arbitrary and capricious imposition of the death penalty. These procedures include: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review. In *Gregg*, the Court stated that the concerns expressed in *Furman* could be met by "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195, 96 S. Ct. 2909. By complying with this requirement, the Ohio death penalty statute significantly reduces the likelihood of arbitrary and capricious imposition of the death penalty and does not run afoul of the Constitution.

*Buell*, 274 F.3d at 367. This claim fails.

### 2.   Provides unreliable sentencing procedures

Hale next argues that Ohio's death-penalty statute violates the Equal Protection and Due Process Clauses by not requiring the state to prove the absence of any mitigating factors or that death is the only appropriate penalty. (Doc. No. 13 at 322–23.) He also asserts that it is unconstitutionally vague in defining the process of weighing aggravating and mitigating circumstances. (*Id.*) The Sixth Circuit has rejected this argument as well, reasoning:

> In *Proffitt v. Florida*, 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Supreme Court upheld a statutory scheme for weighing aggravating circumstances against mitigating factors that is similar to Ohio's, which lays out specific aggravating circumstances and mitigating factors that are to be considered at sentencing. Ohio Rev. Code § 2929.04. The Court also has approved of a statute that did not enunciate specific factors to consider or a specific method of balancing the competing considerations. *See Franklin v. Lynaugh*, 487 U.S. 164, 172–73, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988); *Zant v. Stephens*, 462 U.S. 862, 875, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The Court has held that "it is constitutionally required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of a death

196

sentence." *Sumner v. Shuman,* 483 U.S. 66, 72, 107 S. Ct. 2716, 97 L.Ed.2d 56 (1987) (quoting *Gregg*, 428 U.S. at 189–90 n. 38, 96 S. Ct. 2909). The sentence imposed on Buell complies with *Sumner* as well as the Supreme Court's holding in *Blystone*, 494 U.S. at 305, 110 S. Ct. 1078, that a death penalty is constitutional if it "is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances." In Buell's case, both the jury at the penalty phase of trial and the reviewing courts specifically considering the aggravating circumstances and mitigating factors presented and determined that capital punishment was appropriate. By weighing these specific considerations, it cannot be said that a mandatory death penalty was imposed on Buell.

*Buell*, 274 F.3d at 368. This claim, therefore, also is unfounded.

### 3.  Burdens defendants' right to a jury

Hale further contends that Ohio's statutory framework for the death penalty is unconstitutional because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial. (Doc. No. 13 at 324.) Hale, however, provides no clearly established Supreme Court precedent supporting the argument. He cites dicta from *Lockett*, 438 U.S. at 617, but "clearly established Federal law" for purposes of § 2254(d)(1) includes "only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White*, 572 U.S. at 419 (internal quotation marks and citations omitted). This claim lacks merit.

### 4.  Requires submission of reports and evaluations

Hale also argues that Ohio's death penalty statute Ohio Rev. Code § 2929.03(D)(1) is unconstitutional because it requires the submission of the presentence investigation report and mental evaluation to the jury or judge once requested by a capital defendant. (Doc. No. 13 at 324.) He claims this mandatory submission prevents defense counsel from giving effective assistance and prevents the defendant from effectively presenting his case in mitigation. (*Id*.) Again, as Hale

identifies no Supreme Court precedent clearly establishing that Ohio's statute regarding these reports and evaluations infringes on a capital defendant's constitutional rights, this claim fails.

### 5. Fails to genuinely narrow the class of eligible individuals

Hale further contends that Ohio's death-penalty scheme is unconstitutional because Ohio Rev. Code § 2929.04(A)(7) fails to "'genuinely narrow the class of persons eligible for the death penalty and . . . reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" (Doc. No. 13 at 324 (quoting *Zant v. Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983)).) Under that provision, he argues, if a defendant commits murder during the commission of a felony, the felony can elevate a murder to aggravated murder *and* serve as an aggravating circumstance, making the defendant eligible for the death penalty without proof of an additional new factor. (*Id.* at 325.) The Sixth Circuit has often rejected this argument as well. *See, e.g., Beuke*, 537 F.3d at 652–53; *Buell*, 274 F.3d at 369–70; *Smith v. Mitchell*, 348 F.3d 177, 214 (6th Cir. 2003).

### 6. "Nature and circumstances" language is unconstitutionally vague

Hale further argues that the phrase "nature and circumstances" is used both as a mitigating factor in Ohio Rev. Code § 2929.04(B) and as a consideration in support of aggravating circumstances in Ohio Rev. Code § 2929.03(D)(1), making Ohio's death-penalty weighing procedure unconstitutionally vague. (Doc. No. 13 at 326–28.) The Sixth Circuit renounced this argument in *Cooey v. Coyle*, stating:

> We find this argument meritless. The only conceivable way for a court properly to weigh all the aggravating and mitigating circumstances is to take a hard look in both instances at the "nature and circumstances of the offense." We cannot understand how the court's analysis could possibly become "unconstitutionally vague" by looking at the nature and circumstances of the offense in determining both aggravating and mitigating circumstances. We cannot even imagine a constitutional violation here.

198

*Cooey,* 289 F.3d at 927–28.  This claim lacks merit.

### 7.  Proportionality and appropriateness review

Hale next challenges the adequacy of Ohio's statutorily-required appellate review of death sentences to determine whether they were excessive or disproportionate compared to the penalty imposed in other cases. (Doc. No. 13 at 328–30.) The Supreme Court has held, however, that comparative review by an appellate court is not constitutionally required. *Pulley v. Harris*, 465 U.S. 37, 50–51, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984) ("There is . . . no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it."); *see also Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003) ("The Supreme Court has held that the Constitution does require proportionality review, but that it only requires proportionality between the punishment and the crime, not between the punishment in this case and that exacted in other cases.") (citing *Pulley*, 465 U.S. at 50). And the Sixth Circuit repeatedly has upheld Ohio's proportionality review system as constitutional. *See, e.g.*, *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 854 (6th Cir. 2017) (collecting cases); *Buell*, 274 F.3d at 369 (noting that in "limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed, Ohio has properly acted within the wide latitude it is allowed"). This claim fails.

### 8.  Provides inadequate corrective process

Next, Hale contends that Ohio's post-conviction relief scheme is unconstitutional. (Doc. No. 13 at 330–32.) This claim also is not cognizable on federal habeas review. *See, e.g., Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) ("[E]rrors in post-conviction proceedings are outside the scope of federal habeas corpus review."); *Leonard*, 846 F.3d at 854–55 (declining to revisit

199

issue). As the Sixth Circuit has explained, "'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'" *Id.* (quoting *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986)). Challenges to state post-conviction proceedings "address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration." *Kirby*, 794 F.2d at 247. A due process claim related to collateral post-conviction proceedings, therefore, even if resolved in a petitioner's favor, would not "result [in] . . . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention." *Id*. Such claims, therefore, cannot be brought in federal habeas proceedings. *Id*. at 246. This claim, too, fails.

### 9.  Violates international law

Finally, Hale contends Ohio's death-penalty scheme violates international law. (Doc. No. 13 at 332–35.) The Sixth Circuit examined this issue in great detail in *Buell* and rejected it. *See Buell*, 274 F.3d at 370–76; *see also Jamison*, 100 F. Supp. 2d at 766 ("the Court finds no indication that the international obligations of the United States compel elimination of capital punishment"). As to the contention that the death penalty violates international agreements, the circuit court held:

> We must conclude that Ohio's imposition of the death penalty does not violate any international agreements entered into by the United States. The agreements upon which Buell relies do not specifically outlaw the death penalty. To the extent that the agreements ban cruel and unusual punishment, the United States has included    express    reservations    preserving    the    right    to    impose the death penalty within the limits of the United States Constitution. Moreover, neither agreement is binding on courts of the United States.

*Buell*, 274 F.3d at 372.

And the court rejected the argument that the death penalty violates customary international law, stating that "[e]ven if [it] were to conclude that the abolition of the death penalty was a

customary norm of international law or rose to the higher level of being a peremptory norm or *jus cogens,* we do not believe that this would be a sufficient basis for our court to invalidate Ohio's death penalty statute." *Id*. at 373–74. This claim is meritless.

Accordingly, Hale's twenty-fifth ground for relief is denied.

## XV. Twenty-Sixth Ground for Relief: *Method of Execution*

Hale's twenty-sixth ground for relief asserts that Ohio's lethal injection method of execution violates the Eighth Amendment's ban on cruel and unusual punishments. (Doc. No. 24 at 4–7.) Respondent argues this claim is not cognizable on habeas review and is procedurally defaulted. (Doc. No. 33 at 76–81.)

Respondent contends Hale procedurally defaulted this claim by failing to present it to state courts. (*Id*. at 155–56.) Hale counters that it is not defaulted because Ohio does not provide a forum for method-of-execution challenges. (Doc. No. 31 at 543–44 (citing *Scott v. Houk,* 998 N.E.2d 835 (Ohio 2010)).) This Court need not address the procedural-default argument, however, because the Court finds the claim is not cognizable on habeas corpus review.

The Supreme Court has affirmed the constitutionality of execution by lethal injection three times in recent years: in *Baze v. Rees*, 553 U.S. 35,128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008); *Glossip v. Gross*, 576 U.S. 863, 135 S. Ct. 2726, 192 L. Ed. 2d 761 (2015); and *Bucklew v. Precythe*, 139 S. Ct. 1112, 203 L. Ed. 2d 521 (2019). In *Glossip*, an action filed under 42 U.S.C. § 1983, the Supreme Court adopted the test for facial method-of-execution challenges established by the controlling opinion in the fractured *Baze* decision: that prisoners must demonstrate that the

201

method presents a substantial risk of severe pain and there is a readily available alternative procedure. *Glossip*, 576 U.S. at 877-78 (citing *Baze*, 553 U.S. at 50–52).[30]

In so holding, the Supreme Court in *Glossip* indicated that Eighth Amendment method-of-execution claims are not cognizable in habeas corpus. Generally speaking, habeas corpus petitions challenge the validity of confinement or the particulars affecting its duration, while § 1983 actions challenge the circumstances of confinement. *See Nelson*, 541 U.S. at 643. In *Glossip*, the Court clarified that in an earlier decision, *Hill v. McDonough*, 547 U.S. 573, 126 S. Ct. 2096, 165 L. Ed. 2d 44 (2006), it "held that a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentenc*e*." *Glossip*, 576 U.S. at 879. In *Glossip,* the Supreme Court explained that its line of method-of-execution decisions "have been animated in part by the recognition that because it is settled that capital punishment is constitutional, '[i]t necessarily follows that there must be a [constitutional] means of carrying it out.'" *Id.* at 869 (quoting *Baze*, 553 U.S. at 47). In other words, a habeas claim challenging a method of execution is not likely to invalidate a death sentence and result in habeas relief because there presumably will always be a feasible alternative method available. The Sixth Circuit, in turn, held in *In re Campbell*, 874 F.3d 454 (6th Cir. 2015), that after *Glossip*, "[n]o longer can a method-of-execution claim impair a death sentence itself. And since a method-of-execution claim can no longer 'attack the validity of the prisoner's conviction or death sentence,' a habeas court cannot act upon it." *Id.* at 462 (citing *Glossip*, 576 U.S. at 879).

---

[30] Notably, the Court further observed in *Glossip* that, "[w]hile methods of execution have changed over the years, [the Supreme Court] has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Glossip*, 576 U.S. at 869 (internal quotation marks and citation omitted). Indeed, the Sixth Circuit repeatedly has upheld Ohio's lethal-injection protocols as constitutional. *See, e.g., In re Ohio Execution Protocol Litigation ("IOEPL")*, 881 F.3d 447, 454 (6th Cir. 2018) (October 2016 protocol), *cert. denied*, 139 S. Ct. 216 (2018); *IOEPL*, 860 F.3d 881, 884–85 (6th Cir. 2017) (October 2016 protocol); *Cooey v. Strickland*, 604 F.3d 939, 944 (6th Cir. 2010) (November 2009 protocol, "Plan B").

Hale argues, however, that in the Supreme Court's 2019 *Bucklew* decision, the Court reversed course, making it "clear" that "habeas remains an appropriate forum for method-of-execution litigation in certain circumstances." (Doc. No. 31 at 542.) In *Bucklew*, a § 1983 action challenging the constitutionality of Missouri's lethal-injection method of execution, the Court held that the *Baze-Glossip* test applies to both facial and as-applied Eighth Amendment challenges to a method of execution. *Bucklew*, 139 S. Ct. at 1126–29. Hale derives his contention that *Bucklew* establishes that habeas is after all a proper vehicle for method-of-execution claims from a single explanatory parenthetical in the case. (Doc. No. 31 at 542.) In articulating its view that a petitioner may look to another method that the state already has authorized or "a well-established protocol in another State" to identify a readily available alternative procedure, the Supreme Court in *Bucklew* noted a potential conflict might arise between a state's current death penalty law and the petitioner's proposed *Glossip* alternative. *Bucklew*, 139 S. Ct. at 1128. The Court cited *Hill*, 547 U.S. at 582–83, for the proposition that "existing state law might be relevant to determining the proper procedural vehicle for the inmate's claim." *Bucklew*, 139 S. Ct. at 1128. And it added a parenthetical statement to the citation, quoting *Hill*: "if the relief sought in a 42 U.S.C. § 1983 action would 'foreclose the State from implementing the [inmate's] sentence under present law,' then 'recharacterizing a complaint as an action for habeas corpus might be proper'." *Id.* (alteration in original). Hale cites *Bailey v. Wainwright*, 951 F.3d 343 (6th Cir. 2020), a non-capital sentencing case, as confirming his position that *Bucklew* abrogated *Campbell*.

But the Sixth Circuit explicitly rejected Hale's argument in *In re Smith*, 806 F. App'x 462, 464–65 (6th Cir. 2020) (per curiam). It found the petitioner had "place[d] too much weight upon the explanatory parenthetical in *Bucklew*" and declared, "*Campbell* is the law of this circuit and

203

remains binding law . . . ." The circuit court also was careful to distinguish its *Bailey* decision. *See id*. at 465 n.3.

In light of *In re Smith, Campbell* remains controlling precedent. Hale's method-of-execution claim, therefore, is not cognizable on habeas corpus review, and his twenty-sixth ground for relief is denied.

## XVI. Twenty-Seventh Ground for Relief: *Actual Innocence*

In his twenty-seventh ground for relief, Hale claims that he is actually innocent of the crimes for which he was convicted. (Doc. No. 13 at 350–56.) Respondent argues this claim is not cognizable on habeas and meritless. (Doc. No. 17 at 156–63.)

In *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993), the Supreme Court held that "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 404. The Court stated in *dicta*, however, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional" regardless of whether any constitutional violation occurred during trial. *Id*. at 417. But the Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*; *see also House v. Bell*, 547 U.S. 518, 520, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006).

Since *Herrera*, however, the Supreme Court has never applied a freestanding actual innocence claim. *McQuiggin v. Perkins*, 569 U.S. 383, 392, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013) (declining to resolve whether a freestanding actual innocence claim is cognizable on federal habeas review). And the Sixth Circuit has held that such a claim is not a valid ground for habeas

204

relief. *See, e.g., Smith v. Nagy*, 962 F.3d 162, 207 (6th Cir. 2020); *Cress v. Palmer*, 484 F.3d 844, 854–55 (6th Cir. 2007).

Even if a "freestanding" claim of actual innocence were to apply here, Hale could not meet its "extraordinarily high" standard. Hale supports this claim with new expert opinions. (Doc. No. 31 at 546–48.) But as discussed in relation to Hale's eleventh ground for relief, this evidence is neither new nor persuasive. It most certainly does not establish his factual innocence. This claim, therefore, is both non-cognizable and unfounded.

## XVII.     Motions for Discovery and to Expand the Record

Hale has filed a motion for discovery (Doc. No. 34) and motion to expand the record (Doc. No. 37). Respondent opposes both motions. (Doc. Nos. 38, 39.)

### A.  Motion for Discovery

Hale seeks to conduct discovery on ten of his twenty-seven grounds for relief. (Doc. No. 34.) They are: ground one (jury selection); grounds three, eleven, and eighteen (ineffective assistance of trial counsel); ground five (right to presence at trial); ground seven (invalid waiver of right to testify); ground eight (trial-court error in permitting testimony of unqualified experts); ground nineteen (adjudication of non-capital sentences); ground twenty-two (ineffective assistance of appellate counsel); and ground twenty-three (prosecutorial misconduct/non-disclosure of exculpatory evidence (*Brady*)). (*Id*. at 18–61.) He also seeks discovery of evidence that will assist him in establishing cause and prejudice to excuse the procedural default of eleven of his grounds for relief (grounds one, two (trial-court error/*voir dire*), three, five, seven, ten (miscellaneous trial-court errors), eleven, fourteen (trial-court error/victim-impact evidence), eighteen, twenty-two, and twenty-three) based on the ineffective assistance of trial, appellate, or post-conviction counsel. (*Id*. at 61–68.)

205

A federal habeas petitioner, "unlike the usual civil litigant, is not entitled to discovery as a matter of ordinary course." *Bracy*, 520 U.S. at 904. Discovery in habeas cases is governed by Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, which permits petitioners to initiate discovery available under the federal civil rules "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Rules Governing § 2254 Cases, Rule 6(a). "Good cause" for discovery under Rule 6 exists only "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . .'" *Bracy*, 520 U.S. at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300, 89 S. Ct. 1082, 22 L. Ed. 2d 281 (1969)).

The burden is on the petitioner to demonstrate the materiality of the information requested. *See Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004). Habeas Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations," but requires "specific allegations of fact." *Id.* (internal quotation marks and citations omitted). When a habeas petitioner "offers nothing more than vague musings on how [the desired discovery] might . . . unfold[,]" a district court may correctly determine that he or she has "fail[ed] to satisfy the 'good cause' standard required to obtain habeas corpus discovery." *Stojetz*, 892 F.3d at 207.

The Supreme Court's decision in *Pinholster*, 563 U.S. 170, has further circumscribed the availability of discovery in federal habeas proceedings. There, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.[31] Noting that § 2254(d)(1) review "focuses on what a

---

[31] Review under § 2254(d)(2) is limited to evidence presented in the state-court proceedings by its express terms. *See* 28 U.S.C. § 2254(d)(2).

206

state court knew and did," the Court reasoned that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id*. at 182. "'Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" *Id*. at 186 (quoting *M. Williams*, 529 U.S. at 427–29).

Under *Pinholster*, "district courts are precluded from conducting evidentiary hearings to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue." *Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013); *see also Bourne v. Curtin*, 666 F.3d 411, 415 (6th Cir. 2012) (finding petitioner was not entitled to an evidentiary hearing because the state courts had adjudicated his claim on the merits and, under *Pinholster*, petitioner was "stuck with 'the record that was before the state court'"). And the Sixth Circuit consistently has held that *Pinholster* bars consideration of new evidence developed in federal habeas proceedings that relates to claims adjudicated on the merits in state courts. *See, e.g., Loza v. Mitchell*, 766 F.3d 466, 494 (6th Cir. 2014) ("Loza's selective prosecution claim was adjudicated on the merits in state court, and, therefore, *Pinholster* requires us to consider only the evidence that was before the state court when reviewing Loza's claim."); *Moore v. Mitchell*, 708 F.3d 760, 780–84 (6th Cir. 2013) (holding federal habeas court may not consider additional evidence not presented to state courts even where parties jointly moved to expand the record to include that evidence before *Pinholster* was decided); *Sheppard v. Bagley*, 657 F.3d 338, 344 (6th Cir. 2011) (refusing to consider evidence adduced at federal evidentiary hearing in light of *Pinholster*).

The Supreme Court did not address the availability of discovery in federal habeas proceedings in *Pinholster*, however, and neither it nor the Sixth Circuit has directly addressed the

207

issue since *Pinholster* was decided. *See, e.g., Davis v. Bobby*, 2017 WL 2544083, at *3 (S.D. Ohio June 13, 2017). Recently, however, the Sixth Circuit appeared to recognize *Pinholster*'s limitation on discovery when finding a district court had properly denied a habeas petitioner's motion for discovery in part because the claim to which it applied "was adjudicated on the merits in state court, [and the court's] review [was] limited to the record that was before the state court." *Guysinger v. Buchanan*, No. 20-3285, 2020 WL 5405892, at *2 (6th Cir. July 16, 2020). And the clear trend among district courts in this circuit is to apply *Pinholster* to limit discovery in habeas proceedings and deny petitioners' requests for discovery of evidence that *Pinholster* would bar from their review. *See, e.g., Broom v. Bobby*, No. 1:10-cv-2058, 2018 WL 1621083, at *3–5 (N.D. Ohio Apr. 4, 2018) (Boyko, J.); *Lang v. Bobby*, No. 5:12-cv-2923, 2014 WL 5393574, at *8 (N.D. Ohio Oct. 23, 2014) (Zouhary, J.); *Davis*, 2017 WL 2544083, at *2–3 (collecting cases). As one district court has observed: "It would defy logic to preclude a petitioner from developing factual information in an evidentiary hearing [under *Pinholster*], but allow her to introduce the same factual information via discovery and expansion of the record." *Caudill v. Conover*, 871 F. Supp. 2d 639, 646 (E.D. Ky. 2012).

Federal habeas courts may consider new evidence, however, when deciding whether there is cause and prejudice or actual innocence to excuse a procedurally defaulted claim. *House*, 547 U.S. at 537–38. But habeas courts have denied discovery requests related to procedurally defaulted claims where the petitioner did not show that the discovery could produce evidence excusing the default. *See Williams v. Bagley*, 380 F.3d at 975–76 (holding district court properly denied a habeas petitioner's discovery requests relating to procedurally defaulted ineffective-assistance claims because the petitioner had not shown that the requested discovery could "resolve any factual disputes that could entitle him to relief"); *Owens v. Guida*, No. 00-cv-2765, 2002 WL 1398544, at

208

*2 (W.D. Tenn. Jan. 9, 2002) ("Petitioner has not shown that she is entitled to conduct discovery because the information sought would not have established cause and prejudice for the asserted procedural default of her ineffective assistance of counsel claim.").

In this case, Hale's requests are extremely broad, seeking, for example: depositions of every attorney (totaling eleven), investigator, mitigation specialist, and expert who has worked on his case, as well as each of the prosecutors, his parole officers, and certain prison officials; the prosecutors' files on the case and the files of every agency involved in the investigation of Green's murder; and voluminous records relating to his jury-composition claims, including county voter registration, drivers' license, and jury and jury venire lists between 2000 and 2010, and an ODRC list of all persons with felony convictions in Ohio during that time period. (*See, e.g.,* Doc. No. 34 at 21–26.)

Respondent argues Hale has not shown good cause for any of the discovery he seeks, because his requests are either precluded under *Pinholster* as the claims to which they relate were adjudicated on the merits in state court, would not yield relevant evidence where the claims are procedurally defaulted, or would be futile because the claims either are not cognizable on habeas corpus review or plainly meritless. (*See* Doc. No. 35 at 3–4.) Moreover, he contends, many of the requests are overbroad, extremely onerous, and unsupported by specific factual allegations. (*See, e.g., id.* at 9–14.) This Court agrees.

First, as explained below, discovery on many sub-claims of the following claims are precluded under *Pinholster* because Hale raised them in state court, where they were adjudicated on the merits, specifically, grounds three, eleven, eighteen, and nineteen. (*See id.* at 17, 19, 20.)

Second, discovery is not warranted on claims that are clearly procedurally defaulted or on the ineffective assistance of various counsel that he asserts as cause to excuse such defaults. As

209

explained below, Hale's claims of ineffective assistance of trial counsel are either procedurally defaulted themselves or meritless; any ineffective assistance of appellate counsel claims are procedurally defaulted and cannot constitute cause for the default of other claims; and ineffective assistance of post-conviction counsel does not constitute cause for the default of ineffective-assistance-of-counsel claims as applied in this case. Accordingly, there is not good cause for discovery on Hale's unequivocally procedurally defaulted claims (all or portions of grounds one, seven, fourteen, and twenty-two); or on the ineffective assistance of counsel asserted as cause for other defaulted claims. Moreover, the discovery Hale seeks relating to ineffective assistance is overly broad and onerous.

Third, Hale has not shown good cause for his request for discovery of his first ground (jury-selection process), as it is unlikely to succeed and also is extremely onerous.

Hale's motion for discovery is denied.

**B.  Motion to Expand the Record**

Hale also asks the Court to expand the record to include twenty-five exhibits. (Doc. No. 37.) They are: expert reports of a forensic psychiatrist, forensic pathologist, bloodstain pattern expert, and sexual abuse and trauma expert (Doc. Nos. 13-1, 13-2, 13-5, 13-6); affidavits of Hale's sisters regarding testimony they could have provided for mitigation purposes at the sentencing phase of trial (Doc. Nos. 13-3, 13-4); general information about gunshot residue (Doc. No. 13-7); various documents relating to Cuyahoga County's jury-selection process (Doc. Nos. 13-8 – 13-15); juror questionnaires from his trial (Doc. Nos. 13-16 – 13-19); Hale's declaration relating to his decision whether to testify at trial (Doc. No. 20); a police report about a voicemail Green left on his daughter's phone shortly before the murder that Green's niece said "almost sounded like a suicide call" (Doc. No. 13-21); Hale's parole records (Doc. No. 13-22); general information about

210

overdraft loan programs (Doc. No. 13-23); police notes regarding an interview with State witness Ricardo Cuffari (Doc. No. 13-24); and Hale's prison records (Doc. No.13-25). This evidence, Hale asserts, supports his habeas claims relating to: (1) unconstitutional jury-selection procedures; (2) trial-court errors in *voir dire*; (3) ineffective assistance of counsel; (4) his right to testify; (5) prosecutorial misconduct in suppressing material exculpatory or impeachment evidence; and (6) actual innocence. (*See* Doc. No. 39 at 10–25.) He further contends the evidence supports his assertions of cause and prejudice through the ineffective assistance of trial, appellate, and post-conviction counsel. (*See*, *e.g., id.* at 7.) Respondent does not oppose Hale's request regarding the jury questionnaires (Doc. Nos. 13-13, 13-16 – 13-19) because they were part of the state-court record, but otherwise opposes the motion. (Doc. No. 38 at 2.)

Rule 7 of the Rules Governing Section 2254 Cases confers on district courts the authority to expand the record with "additional materials relating to the petition." Rules Governing Section 2254 Cases, Rule 7(a). The decision whether to order an expansion of the record under Rule 7 generally falls within the sound discretion of the district court judge. *Ford v. Seabold*, 841 F.2d 677, 691 (6th Cir. 1988).

Motions to expand the record under Rule 7 must meet the standards of AEDPA's § 2254(e)(2), although that provision is expressly directed only at evidentiary hearings. *Holland,* 542 U.S. at 653 ("Those same restrictions [of § 2254(e)(2)] apply *a fortiori* when a prisoner seeks relief based on new evidence *without* an evidentiary hearing.") (emphasis in original). Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A)     the claim relies on –

211

> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

In *M. Williams*, 529 U.S. 420, the Supreme Court held that "[u]nder the opening clause of § 2254(e)(2), the failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432. The Court defined this diligence requirement, which is separate from the heightened standard of § 2254(e)(2)(A)(ii), as "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. Thus, a habeas petitioner may introduce new evidence in support of a claim "only if [the petitioner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed in § 2254(e)(2) were met." *Holland*, 542 U.S. at 652–53.

Respondent argues that Hale has not met the requirements of § 2254(e)(2), but has "intentionally by-passed the state courts and raised claims for the first time in federal court, thus defaulting his claims"—a practice AEPDA was enacted in part to prevent. (Doc. No. 38 at 4.) Hale contends that he was diligent in 2007 in his state post-conviction proceedings in requesting an

evidentiary hearing and seeking funding to retain experts in legal representation, substance abuse, cultural, grief/loss, and neurology—both of which were denied. (Doc. No. 39 at 7, 19 (citing Doc. No. 7-4 at 36–59; Doc. No. 7-5 at 23–39).) He offers no evidence that he or his counsel made any attempt to obtain the proffered evidence until eleven years later, when his federal habeas counsel collected it while preparing his petition. (*See, e.g.,* Doc. No. 37 at 8, Doc. No. 37-1.) But he contends this apparent lack of diligence was the fault of his post-conviction counsel. (Doc. No. 39 at 19.) He notes that "'a person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance.'" (*Id*. (quoting *M. Williams*, 529 U.S. at 432).)

Hale's motion is granted as to two groups of the submitted materials. First, Hale was not at fault for failing to develop sooner his fair-cross-section and equal-protection claims relating to Cuyahoga County's jury-selection process (Doc. Nos. 13-8 – 13-15). The factual predicate of these claims was not apparent or readily available to Hale or his counsel at trial or before his post-conviction proceedings. *See Ambrose*, 684 F.3d at 645–46 ("to suggest that an effective defense attorney must investigate the jury assembly process in every case conditioned upon his client's loss of the right is unnecessary and wasteful") (internal citation and quotation marks omitted). Second, Hale's request to introduce the juror questionnaires (Doc. Nos. 13-13, 13-16 – 13-19), to support his claim of trial-court error during *voir dire* and related ineffective-assistance claims, also is granted, as the questionnaires were part of the state-court record.

Hale has not satisfied § 2254(e)(2)'s threshold diligence standard as to the remaining proffered evidence, however, by showing that he made "a reasonable attempt, in light of the information available at the time, to investigate and pursue the claims in state court." *M. Williams*, 529 U.S. at 435. As Hale asserts, he requested and was denied an evidentiary hearing and funding

for experts in state post-conviction proceedings. *See Hale*, 2016 WL 4978449, at *1. But those requests did not relate to the same claims or concern the same evidence at issue here. And, notably, even without a hearing, the post-conviction state appellate court provided a thorough analysis of the merits of Hale's ineffective-assistance claims and considered the numerous supporting exhibits. *See id*. at *2–7. Aside from one claim,[32] Hale concedes he never raised the claims in state court that he now seeks to support with new evidence—namely, ineffective assistance of counsel for failure to investigate and retain experts, wrongful suppression of evidence, right to testify, and actual innocence. (*See* Doc. No. 31 at 312.) And he has not identified any efforts by counsel to develop these claims in state court or any efforts of his own to pursue possible omissions by his counsel relating to these matters during post-conviction proceedings. *See M. Williams*, 529 U.S. at 439.

Hale cannot blame his post-conviction counsel for this lack of diligence either. The Supreme Court made it clear in *M. Williams* that the diligence required under the opening clause of § 2254(e)(2) applies to both the petitioner *and* his counsel; if either are at fault for failing to develop the evidence in state court, the stricter conditions of § 2254(e)(2)(A) and (B) will apply. *See, e.g., M. Williams*, 529 U.S. at  425 (explaining diligence under § 2254(e)(2)'s opening clause requires a showing of "some greater fault, attributable to the prisoner *or the prisoner's counsel*") (emphasis added); 439–40 ("Counsel's failure to investigate these references in anything but a

---

[32] That claim is ineffective assistance of trial counsel for failing to present his testimony, which Hale raised on direct appeal in state court and the Ohio Supreme Court adjudicated on the merits. *See Hale,* 892 N.E.2d at 905–06. Hale now offers his own declaration (Doc. No. 13-20) in support of this claim as well as new claims asserting his right to testify and ineffective assistance of trial counsel in coercing him not to testify. (*See* grounds for relief seven and eleven.) Hale's declaration also cannot be considered in reviewing the ineffective-assistance claim he raised in state court under *Pinholster*, because, as explained above, the Sixth Circuit consistently has held that *Pinholster* bars consideration of new evidence developed in federal habeas proceedings that relates to claims adjudicated on the merits in state courts. *See, e.g., Loza*, 766 F.3d at 494; *Moore v. Mitchell*, 708 F.3d 760, 780–84 (6th Cir. 2013).

214

cursory manner triggers the opening clause of § 2254(e)(2).”). Counsel's omissions, therefore, do not *excuse* a lack of diligence under § 2254(e)(2), they *constitute* a lack of diligence under that provision.

Hale argues that the remaining, non-jury-related exhibits support his claims of ineffective assistance of counsel for failing to investigate and present evidence at trial. The record shows, however, that he and his counsel were on notice of the information he claims should have been developed and presented at trial, and it could have presented at his post-conviction proceeding. First, Hale submitted numerous expert reports at his post-conviction petition, which the appellate court considered. *See Hale*, 2016 WL 4978449, at *2–7. He could have pursued and acquired the additional expert opinions he now proffers (Doc. Nos. 13-1, 13-2, 13-5, 13-6). Hale also either knew the information his sisters now attest they could have presented for mitigation purposes at trial, or at least was aware they were able to provide relevant and favorable mitigation evidence (Doc. Nos. 13-3, 13-4). Hale and his counsel also were on notice that issues relating to gunshot residue and Hale's financial difficulties at the time of the murder were relevant to his defense, and general information on these topics was readily available (Doc. Nos. 13-7, 13-23). Given Hale's self-defense claim, Green's state of mind at the time of the offense also was an apparent avenue of inquiry for Hale and defense counsel, and they could have investigated this matter before trial or post-conviction proceedings (Doc. No. 13-21). Further, Cuffari was a disclosed State witness, whom defense counsel could have interviewed before trial and did cross-examine (Doc. No. 13-24). Hale also clearly was aware of, and presumably knew, the favorable information regarding his positive institutional adjustment and parole compliance contained in his prison and parole records (Doc. Nos. 13-22, 13-25). And, finally, Hale obviously knew the contents of his declaration about his desire to testify at trial and disagreement with counsel on that subject; by its

215

very nature, this evidence could have been presented to the state court had Hale been diligent (Doc. 13-20). "[I]f, as [Hale] contends, a reasonable investigation would have revealed the evidence discussed above, then it should have been developed in relation to his ineffective assistance claims during his first postconviction proceeding." *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

Moreover, Hale's arguments that this evidence also supports his claims regarding his right to testify, the prosecution's alleged suppression of evidence (as discussed in greater detail in relation to Hale's twenty-third ground for relief), actual innocence, and cause and prejudice for procedural default do not alter the Court's conclusion that Hale has failed to demonstrate that he was diligent in his efforts to develop the factual bases of these claims.

Hale's failure to satisfy the diligence requirement of § 2254(e)(2) triggers the strict requirements of § 2254(e)(2)(A) & (B), which Hale does not claim to have satisfied and which, as explained in relation to Hale's grounds for relief three, seven, eleven, eighteen, twenty-three, and twenty-seven, he cannot meet. Section 2254(e)(2), therefore, precludes admitting into the record all of the submitted exhibits except the jury questionnaires and exhibits related to his jury-selection claim. *See, e.g., West v. Bell*, 550 F.3d 542, 551 (6th Cir. 2008) (noting district court did not abuse its discretion to deny expansion of the record with evidence not presented to the state courts when inmate initially raised his claims).

Accordingly, Hale's motion to expand the record is granted with respect to proposed exhibits eight through nineteen (Doc. Nos. 13-8 through 13-19) and denied as to the remaining exhibits (Doc. Nos. 13-1 through 13-7; 13-20 through 13-25).[33]

---

[33] Even though he attaches the documents necessary for the Court to address his claims (which the Court has considered), Hale also requests that he be permitted to introduce into the record "the entirety of the juror questionnaires for completeness of the record and to have a full picture of the voir dire in this case." (Doc. No. 37 at 15.) The Court grants this request because, as stated previously, the juror questionnaires are part of the state-court record, and, as Hale argues, all of the questionnaires should be included in the record in the interest of having a complete state-court record

CERTIFICATE OF APPEALABILITY ANALYSIS

The Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Hale's claims for relief. The Sixth Circuit has held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).

Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C. § 2253, which provides in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate

---

in these federal habeas proceedings. Accordingly, Hale is ordered to submit the remaining juror questionnaires from his trial-court record within fourteen days of this Court's judgment on his petition.

he was denied a *constitutional*, rather than federal, right. *Slack v. McDaniel*, 529 U.S. 473, 483–84, 529 U.S. 1595, 146 L. Ed. 2d 542 (2000) (interpreting the significance of the revision between the pre- and post-AEDPA versions of that statute).

Furthermore, if a habeas claim is not procedurally defaulted, then the court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id*. at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

After taking the above standards into consideration, the Court finds as follows:

The Court will not issue a COA for grounds for relief: three, five, six, ten, eleven, twelve, thirteen, fifteen, eighteen (except for the ineffective-assistance claim related to the *Blakely* claim), twenty-one, twenty-three, and twenty-five. No jurist of reason would debate the Court's conclusions on these claims.

No COA will issue for grounds for relief: one, two, four, seven, eight, fourteen, eighteen, twenty, twenty-two, because they are unequivocally procedurally defaulted.

In addition, no COA will issue for grounds for relief: nine, twenty-four, twenty-six, and twenty-seven because they are not cognizable on federal habeas review.

The Court will issue a COA for Hale's nineteenth ground for relief based on *Blakely v. Washington*, 542 U.S. 296 (2004), and the related sub-claim of Hale's eighteenth ground for relief asserting trial counsel's ineffective assistance in failing to object on grounds established in *Blakely*. A reasonable jurist could debate the Court's conclusions regarding these claims.

218

## CONCLUSION

For the foregoing reasons, this Court denies Hale's Petition for Writ of Habeas Corpus (including the amended twenty-sixth ground for relief). (Doc. Nos. 13, 24-1). The Court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to the nineteenth ground for relief and related sub-claim of the eighteenth ground for relief, and the court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to those claims only. As to all remaining claims, the court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

**IT IS SO ORDERED**.

Dated: March 31, 2021

_____
**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**

219